**David Owens** (SBN 275030)
**Elizabeth Wang**, IL Bar: 6287634,
CO Bar 45976*
**Steven Art**, IL Bar: 6302319*
**Wallace Hilke**, IL Bar: 6329814*
hilke@loevy.com
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902

**Jan Stiglitz** (SBN 103815)
js@cwsl.edu
Law Office of Jan Stiglitz
14462 Garden Tr.
San Diego, CA 92127
Phone: (619) 807-5890

**Michael D. Seplow** (SBN 150183)
**Paul Hoffman** (SBN 71244)
mseplow@sshhzlaw.com
hoffpaul@aol.com
Schonbrun Seplow Harris
Hoffman & Zeldes LLP
9415 Culver Boulevard, #115
Culver City, CA 90232
Phone: (310) 396-0731

*Counsel for Plaintiff*

*Pro hac vice admission pending

## UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER TORRES,<br><br>Plaintiff,<br>v. | **COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff's Complaint

| | |
|---|---|
| LOS ANGELES SHERIFF'S DEPARTMENT; COUNTY OF LOS ANGELES; JIMMIE GATES #111207; DAVID CASTILLO #111663; DARREN DIVIAK; BAHMAN ATABAKI #408371; DEPUTY R. BARTON, # 410462; RYAN DEYOUNG #410355; ALFREDO R. CASTRO, #013440; LARRY LINCOLN; MICHAEL O'SHEA; STEVE TILLMANN; RALPH SALAZAR; DEPUTY GILBERT; DEPUTY GUERRERO; and UNIDENTIFIED EMPLOYEES of the COUNTY OF LOS ANGELES AND THE LOS ANGELES SHERIFF'S DEPARTMENT,<br><br>                                  Defendants. | **42 U.S.C. § 1983: Fourth and Fourteenth Amendments, Failure to Intervene, Conspiracy to Deprive Constitutional Rights, *Monell;* State-Law: Intentional Infliction of Emotional Distress, Civil Conspiracy, Malicious Prosecution, Respondeat Superior, Indemnification; Bane Act, CA Civil Code § 52.1.** |

2

Pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1367, Plaintiff ALEXANDER TORRES, by his undersigned attorneys, complains of Defendants, the LOS ANGELES SHERIFF'S DEPARTMENT (the "Department" or "LASD"); LOS ANGELES COUNTY; JIMMIE GATES #111207; DAVID CASTILLO #111663; DARREN DIVIAK; BAHMAN ATABAKI #408371; DEPUTY R. BARTON, # 410462; RYAN DEYOUNG #410355; ALFREDO R. CASTRO, #013440; LARRY LINCOLN; MICHAEL O'SHEA; STEVE TILLMANN; RALPH SALAZAR; DEPUTY GILBERT; DEPUTY GUERRERO; and UNIDENTIFIED EMPLOYEES of the LOS ANGELES SHERIFF'S DEPARTMENT, and states as follows:

## INTRODUCTION

1.      Because of the shocking misconduct of officers in the Los Angeles Sheriff's Department ("LASD"), Plaintiff Alexander Torres was wrongly convicted of a homicide that he did not commit.

2.      Torres was just 21 years old at the time of his conviction. He spent another twenty years in prison before he was exonerated.

3.      The homicide of which Torres was wrongly convicted occurred at night and no witnesses could identify the shooter.

4.      Instead of honestly investigating the crime, LASD officers decided to frame Torres and fabricated eyewitness identifications to convict him. They also

suppressed evidence of alternative suspects who were questioned about the crime.

5.     In doing so, those officers, named as Defendants in this case, acted pursuant to the County of Los Angeles and the Los Angeles Sheriff's Department's unconstitutional policies and practices, including their failures to discipline and supervise officer misconduct, their allowance of evidence suppression and fabrication, their encouragement of officers to secure convictions at the expense of residents' constitutional rights, and their tolerance of self-organized gangs of deputies engaged in illegal acts.

6.     Torres will never regain the foundational years of his life stolen from him on account of Defendants' misconduct. This lawsuit seeks redress for those injuries.

## JURISDICTION AND VENUE

7.     This action is brought pursuant to 42 U.S.C. § 1983 and California law to redress the Defendants' tortious conduct and their deprivation of Torres's rights secured by the United States Constitution.

8.     This court has jurisdiction of Torres's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein occurred here, and most parties live here or are affiliated

Plaintiff's Complaint

with this District.

## THE PARTIES

10.　　Plaintiff Alexander Torres is a 42-year-old man residing in Long Beach, California.

11.　　At all relevant times, Defendants Jimmie Gates, David Castillo, Darren Diviak, Bahman Atabaki, Deputy R. Barton, Ryan Deyoung, Alfredo R. Castro, Larry Lincoln, Michael O'Shea, Steve Tillmann, Ralph Salazar, Deputy Gilbert, Deputy Guerrero, and Unknown Employees of the Los Angeles Sheriff's Department (together, "Defendant Officers") were law enforcement officers employed by the Los Angeles Sheriff's Department. All are sued in their individual capacities.

12.　　Defendants Los Angeles Sheriff's Department and County of Los Angeles are California municipal entities. They are or were the employers of each individually named Defendant and the other Unidentified Officers. They are liable for all torts committed by the Defendant Officers pursuant to California law. They are also responsible for indemnifying judgments against the Defendant Officers. Finally, they are responsible for the policies, practices, and customs that caused Torres's wrongful conviction.

## THE MARTIN GUITRON SHOOTING

13.　　On or about December 31, 2000, around 7 p.m., Martin Guitron was

Plaintiff's Complaint

shot and killed on the 15100 block of El Camino Ave in Paramount, California.

14.     Martin Guitron was a member of the Compton Vario Segundo ("CVS") gang. His nickname was "Casper."

15.     The shooter approached Guitron in a car described by eyewitnesses as a dark Chevy 1990s Caprice with tinted windows and chrome rims.

16.     The shooter got out of the car and confronted Guitron, shooting him multiple times.

17.     Guitron died from his injuries.

18.     Casings from .45 caliber bullets were collected from the scene.

19.     Torres had absolutely nothing to do with the shooting of Martin Guitron.

**DETECTIVES DECIDE TO PURSUE TORRES**

**RATHER THAN CONDUCT AN HONEST INVESTIGATION**

20.     On the scene of the shooting, Defendant Officers, including Defendant Atabaki, a deputy with the Los Angeles Sheriff's Department, spoke with Enrique Valdovinos.

21.     Valdovinos claimed that he was walking with Guitron; that Guitron was nervous because gangsters from the CVTF gang ("Compton Vario Tortilla Flats") were trying to kill him; and that he (Valdovinos) had witnessed the shooting.

Plaintiff's Complaint

22.     Valdovinos could not give any physical description of the shooter and did not associate the shooter with any name.

23.     At the scene, Defendant Barton asked Valdovinos to come to a Sheriff's station to speak further. Barton interviewed him there.

24.     At the station, Valdovinos said to the Defendant Officers, including Defendant Barton, that he did not know who the shooter was, but again explained that he thought the shooter was probably in the CVTF gang.

25.     According to Defendant Officers, Valdovinos described the shooter as a male Hispanic, between 16 and 20 years old, with a clean-shaven face and head. Again, Valdovinos could not provide a name, and he could not provide any further description.

26.     Meanwhile, two LASD detectives, Defendants Gates and Castillo, were dispatched to the crime scene the night of the shooting and assumed investigative responsibility for the case.

27.     Defendants Gates and Castillo were the homicide detectives with primary responsibility for investigating the homicide.

28.     Defendant Officers, including Defendants Gates, Castillo, Atabaki, Barton, Deyoung, and other unidentified officers, spoke with witnesses on the day of the shooting and the day following. None of those witnesses provided leads in the investigation.

Plaintiff's Complaint

29.     When Defendants Gates and Castillo realized that there was no clear suspect for the shooting and that the eyewitnesses could not help them develop any lead, they decided to invent a suspect themselves and make the evidence implicate that suspect.

30.     Defendants Gates and Castillo focused on Torres first because, in their view, Torres had a history of conflict with Guitron and was affiliated with the CVTF gang.

31.     Defendants Gates and Castillo decided that Torres was a good enough suspect and decided to manufacture evidence to convict him of Guitron's murder.

32.     All of the individually named Defendant Officers agreed to join and assist Defendants Gates and Castillo in their efforts to prosecute Torres for the Guitron homicide, despite the fact that they had no evidence of his guilt.

33.     The Defendant Officers agreed to falsely initiate Torres's prosecution for the Guitron shooting, even though they knew that Defendants Gates and Castillo were manufacturing false evidence to wrongfully convict him.

34.     In agreeing to falsely initiate Torres's prosecution, the Defendant Officers determined that they would not conduct a legitimate, honest investigation of the shooting but would, instead, focus their efforts on obtaining Torres's wrongful conviction.

35.     Various supervisors, including Defendants Larry Lincoln and Michael

Plaintiff's Complaint

O'Shea, joined the conspiracy and suppressed evidence of the Defendant Officers' misconduct. Specifically, instead of noting inconsistencies in the Defendant Officers' reports and insisting on an honest accounting of the investigation, they encouraged the Defendant Officers to do whatever was necessary to secure a conviction, including suppressing exculpatory evidence. Further, they participated in this suppression by approving reports that they knew or suspected to be incomplete or inaccurate.

36.     Defendant Officers never disclosed their agreement to frame Torres for a crime he did not commit.

**THE DEFENDANT OFFICERS MANUFACTURE A FALSE EYEWITNESS ID AND OTHER FALSE TESTIMONY FROM VALDOVINOS**

37.     To frame Torres for Guitron's murder, the Defendant Officers, including Defendants Gates and Castillo, manufactured a false statement for Valdovinos to give, pressured Valdovinos into giving that statement, and knew that Valdovinos's resulting false account was a fabrication.

38.     In addition, Defendant Officers, including Defendants Gates and Castillo, suppressed exculpatory and impeachment evidence, including evidence that could have been used to impeach Valdovinos, and evidence of the Defendant Officers' investigatory misconduct.

39.     Defendant Officers, including Defendants Gates, Castillo, Atabaki,

Plaintiff's Complaint

Barton, and Lincoln, agreed to create false evidence that at the crime scene Valdovinos had identified the shooter as a man named "Alex," even though Valdovinos never made that statement.

40.     Fabricated details of Valdovinos's false eyewitness account manufactured by Defendant Officers included that an "Alex" from the CVTF gang had been trying to kill Guitron during the week before the murder; that Valdovinos had observed the shooting in a manner that allowed him to provide more details about the shooter and the shooting, when in fact he had initially told Defendant Officers that he had seen nothing useful; and that Valdovinos in fact recognized Torres as the shooter.

41.     Because this manufactured evidence was false, it contradicted what Valdovinos initially told Sheriff's officers following the shooting. To obscure these contradictions, the Defendant Officers agreed to change their stories to create consistency among Valdovinos's accounts, and to lie to cover up the inconsistencies created by their misconduct.

42.     Defendant Officers, including Defendants Castillo, Gilbert, and Guerrero, conducted an improper lineup identification procedure with Valdovinos. Defendant Officers knew that Valdovinos had not seen Torres at the scene of the shooting, but they conducted the lineup so that Valdovinos could falsely identify Torres as the shooter.

**THE DEFENDANT OFFICERS ARREST AND INTERROGATE TORRES**

43.     To pin the murder on Torres, Defendant Officers, including Defendants Gates and Castillo, developed false evidence to obtain a search warrant on Torres's house.

44.     Specifically, Defendants Gates and Castillo took a statement from Valdovinos indicating that Torres had driven to Valdovinos's house, pointed a gun at "Lupe," one of Valdovinos's friends, and told that friend that he was looking for Valdovinos.

45.     Lupe denied these invented details, told LASD officers that the man who approached him did not ask about Valdovinos, and did not identify Torres as the person who had approached him. Nevertheless, Defendant Officers, including Defendants Gates and Castillo, continued in their attempts to frame Torres.

46.     Defendant Officers, including Defendants Gates and Castillo, obtained a search warrant for night service at Torres's home, and served that warrant in the early morning of January 18, 2001. They used false and fabricated details from their investigation to obtain the warrant.

47.     Defendant Officers, including Defendants Gates and Castillo, planned the search to disorient and confuse members of Torres's family. Sheriff's officers used a ram to break down the front door and stormed the house, rounding up the sleeping residents (who included a 15-month-old toddler).

Plaintiff's Complaint

48.     Defendant Officers, including Defendants Gates, Castillo, and Salazar, interrogated Torres's family members while they were detained in their home. Gates and Castillo fabricated statements from Torres's family members, adding details not provided by the family members about Torres's purported gang membership and details contradicting Torres's alibi on the night of the murder.

49.     In interrogating Torres's family members, Defendant Officers, including Defendants Gates, Castillo, and Salazar, were not trying to conduct an honest investigation, but only to prevent Torres from establishing his actual innocence of Guitron's murder.

50.     Defendant Officers, including Defendants Gates, Castillo, and Salazar, hid and suppressed evidence of their misconduct in interrogating Torres's family members.

51.     Defendants Gates and Castillo arrested Torres, who was taken to a Sheriff's station.

52.     At the station, Defendant Officers, including Defendants Gates and Castillo, interrogated Torres. They coerced him by asking him for his mother's immigration status—which had no connection whatsoever to Guitron's murder—and by communicating that Torres's mother could be deported if Torres did not cooperate with Gates and Castillo.

Plaintiff's Complaint

53.     Torres asked Defendants Gates and Castillo for a lawyer during his interrogation. Gates and Castillo did not allow him to contact a lawyer and did not stop questioning him after he asked for a lawyer.

## THE DEFENDANT OFFICERS MANUFACTURE A SECOND FALSE EYEWITNESS IDENTIFICATION

54.     To perfect their conspiracy, Defendant Officers, including Defendants Gates, Castillo, and Castro, sought to fabricate additional evidence from witness Carlos Arechiga.

55.     Arechiga had previously been interviewed immediately following the shooting. At that time, he did not provide a lead on the shooter.

56.     Nevertheless, Defendants Gates, Castillo, and Castro decided to manufacture an eyewitness identification by Arechiga. They visited him in Rosarito Beach, Mexico multiple times, but Arechiga was unable to, and did not, make any identifications.

57.     In February 2001, Defendants Gates, Castillo, and Castro approached Arechiga in Rosarito Beach, Mexico. They showed him six photos, one of which was Torres, and asked Arechiga if he could identify the shooter.

58.     Arechiga did not recognize the shooter from any of the photographs, and said as much to Defendants Gates, Castillo, and Castro.

59.     Defendant Officers, including Gates, Castillo, and Castro, suppressed

Plaintiff's Complaint

1   evidence of Arechiga's non-identification.

2       60.     Defendant Officers, including Gates, Castillo, and Castro, told

3   Arechiga that he had to choose someone and that he should just choose the person

4   who best refreshed his memory. Even after being instructed to make a false

5   identification, Arechiga told Defendants Gates, Castillo, and Castro that he could

6   not make an identification.

7       61.     Defendant Officers did not stop. After Defendants Gates, Castillo, and

8   Castro's continued coercion, Arechiga eventually caved and said that two of the

9   photos bore some resemblance to the shooter. But even then, Arechiga declined to

10  make an identification.

11      62.     Defendants Gates, Castillo, and Castro then instructed Arechiga to

12  circle Torres's photograph and to sign and date it. Arechiga followed their

13  instructions, circled Torres's photograph, and signed and dated the document.

14      63.     Defendant Castro served as the interpreter for Defendants Gates and

15  Castillo's questioning of Arechiga and these identification procedures. Castro

16  agreed with Gates and Castillo to suppress evidence of Arechiga's true statements

17  and to instead manufacture a false identification of Torres.

18      64.     Defendant Officers, including Defendants Castro, Gates, and Castillo,

19  suppressed evidence of Arechiga's failure to make an identification.

20      65.     Defendant Officers, including Defendants Gates, Castillo, and Castro,

2em

also suppressed Arechiga's continued refusal to identify anyone and his statements that multiple photographs resembled the shooter.

66.     Defendant Officers, including Defendants Gates, Castillo, and Castro, suppressed or destroyed notes related to their attempts to manufacture an eyewitness identification from Arechiga, including his inability to make an identification and the Defendants' attempts to procure those identifications.

67.     The manufactured evidence of Arechiga's supposed identification of Torres was used against Torres at trial and contributed to his wrongful conviction.

## THE DEFENDANT OFFICERS SUPPRESS ADDITIONAL EXCULPATORY EVIDENCE

68.     To further cover up their misconduct, Defendant Officers suppressed notes relating to their investigation that exonerated Torres.

69.     For example, Defendant Diviak spoke with Torres and later claimed at Torres's criminal trial that Torres admitted to being a member of CVTF in their conversation. That fact was crucial to connect Torres to Valdovinos's account of the shooting and to support the Defendant Officers' theory that Torres had committed the crime.

70.     But Torres never made such an admission. Defendant Diviak's notes of his interview with Torres revealed that Torres had never made such a statement to Defendant Diviak. However, Defendant Diviak suppressed or destroyed those

Plaintiff's Complaint

1  notes to cover up his misconduct and so his false testimony at Torres's criminal

2  trial could not be impeached.

3      71.     Similarly, Defendant Officers, including Defendant Castillo,

4  suppressed a statement and other evidence from a conversation with Alma Perez,

5  who is Martin Guitron's sister.

6      72.     Perez told Defendant Officers, including Defendant Castillo, that she

7  had interacted with Torres's mother and that Torres's mother had given her an alibi

8  as to Torres's location during the shooting.

9      73.     Castillo later falsely testified that he took no notes regarding this

10  conversation.

11      74.     However, Defendant Officers, including Defendant Castillo,

12  suppressed or destroyed documents regarding Castillo's conversation with Alma

13  Perez.

14      75.     Defendant Officers' suppression or destruction of documents allowed

15  them to lie at trial without being impeached.

16      76.     Further, by suppressing or destroying these documents, Defendant

17  Officers were able to pick and choose the pieces of evidence that supported their

18  theory and withhold evidence that undermined their theory.

19      77.     The Defendant Officers suppressed other evidence that would have

20  exonerated Torres.

Plaintiff's Complaint

78.     For instance, Valdovinos said that he either biked or ran away from the shooting.

79.     But none of the other eyewitnesses to the shooting reported seeing Valdovinos fleeing the shooting.

80.     Even though various witnesses told the investigating officers that they did not see Guitron together with a second person, Defendant Officers suppressed that information to support their theory that Valdovinos was in close proximity to the shooting and was able to identify Guitron.

81.     On information and belief, Defendant Officers suppressed other evidence still not known to Torres.

## THE DEFENDANT OFFICERS SUPPRESS EVIDENCE OF ALTERNATE SUSPECTS

82.     No murder weapon, getaway car, DNA evidence, fingerprints, or other physical or forensic evidence was ever found connecting Torres to Guitron's murder.

83.     Defendant Officers identified and interviewed multiple potential suspects with connections to the murder.

84.     Defendant Officers suppressed and destroyed the evidence of these alternative suspects.

85.     For example, Defendant Officers interviewed a suspect who drove a

Plaintiff's Complaint

car matching the description of the car used by the shooter in Guitron's murder. But they never disclosed evidence of this interview to the prosecutors or to Torres.

86.     Defendant Officers, including Defendants Castillo, Gates, and Tillmann, also initially treated Valdovinos as a suspect. But they suppressed evidence showing that they treated him as a suspect, including evidence that they had interviewed him and challenged his account because of their belief that he was a suspect.

## TORRES IS PROSECUTED, CONVICTED, AND IMPRISONED BECAUSE OF THE DEFENDANT OFFICERS' MISCONDUCT

87.     Because of the Defendant Officers' misconduct, Torres was charged with murder and other crimes related to Guitron's murder.

88.     There was no probable cause to believe that Torres was involved in Guitron's murder in any way, either before or after the Defendant Officers' misconduct.

89.     Nonetheless, the Defendant Officers' misconduct caused Torres to be prosecuted. Following a jury trial, Torres was convicted of second-degree murder and of having personally and intentionally discharged a firearm causing great bodily injury and death. His conviction was the result of the Defendant Officers' misconduct described in this complaint. Torres was sentenced to 40 years to life in prison.

Plaintiff's Complaint

90.     Torres was thus faced with the prospect of spending the rest of his life in prison for a crime he did not commit.

91.     Without the Defendant Officers' misconduct, Torres would not have been prosecuted or convicted.

## TORRES'S WRONGFUL CONVICTION IS OVERTURNED

92.     In October 2021, Torres's conviction was vacated by the Superior Court of California, Los Angeles County.

93.     On October 19, 2021, Torres walked out of prison a free man, having spent more than twenty years in prison for a crime he did not commit.

94.     In April 2022, Torres was found factually innocent of Martin Guitron's murder by the Superior Court of California, Los Angeles County.

95.     The Los Angeles County District Attorney's Office—which moved the Superior Court to vacate Torres's conviction and to find him factually innocent—is now investigating the real killer in Guitron's murder.

96.     The Defendant Officers might have identified the real killer more than twenty years ago if they had honestly pursued the investigation instead of conspiring to frame Torres.

## THE POLICIES AND PRACTICES OF THE SHERIFF'S DEPARTMENT CAUSED TORRES'S CONVICTION

97.     During the times relevant to Torres's claims, the LASD condoned and

19

Plaintiff's Complaint

cultivated a culture of impunity which caused Torres's wrongful conviction.

98.    The LASD condoned and tolerated gangs of Sheriff's deputies that organized outside of the agency's hierarchy to reward members and exercise power over non-members. This tolerance communicated to the Defendant Officers that the LASD had intentionally abandoned its responsibility of supervising deputies.

99.    Sheriff's deputies were exposed to deputy gangs from the starts of their careers. Every new Sheriff's deputy's first assignment is serving as a guard in one of the County's jails.

100.    Sheriff's deputies at the jails are organized into gangs, including the "2000 Boys," the "3000 Boys," and the Posse. Deputies join the gangs by committing brutal violence against prisoners at the jail.

101.    These deputy gangs, like other deputy gangs throughout the LASD ("Department"), exercise independent control over the areas in which they work, above and apart from their nominal supervisors. Thus, deputies in their first jail assignments quickly learn that the Department has abdicated its own responsibility for supervising and disciplining deputies and has delegated such responsibility to deputy gangs.

102.    Deputy gangs initiated new members by requiring them to commit acts of brutality or excessive force. The gangs took the attitude that excessive force against residents was necessary to control crime. Their members believed that

Plaintiff's Complaint

constitutional rights were less important than being tough with perceived criminals. The LASD endorsed and tolerated these gangs and allowed them to operate. That tolerance signaled to officers, including Defendant Officers, that getting convictions and being aggressive and tough was more important than respecting residents' constitutional rights.

103.    Deputy gangs were also rampant at stations across Los Angeles County. New trainees at the Lynwood Station were given Viking pins on the first day of patrol training. At the end of their training periods, the Vikings deputy gang initiated select deputies through an initiation process that involved tattooing them with the gang's symbol.

104.    Deputy members of the Vikings gang engaged in egregious misconduct, including retaliating against supervisors whom they perceived as enemies.

105.    The Sheriff and his delegees knew that it was important to exercise control over deputies to ensure that they respected residents' constitutional rights and obeyed the law. They received internal and external notice of the prevalence of deputy gangs, and knew that deputy gang members shared a philosophy of using excessive force and violating residents' rights to try to "get tough" and secure convictions. However, the LASD made an intentional choice to allow those gangs to operate by not acknowledging their existence, allowing membership in such

Plaintiff's Complaint

1    gangs, and choosing not to monitor or track deputy gang membership.

2        106.    Long before he became Sheriff, Lee Baca knew that many deputy

3    gangs operated across the Department.

4        107.    After Lee Baca became Sheriff in 1998, he decided to allow deputy

5    gangs to continue to operate within the LASD. Baca knew, through his own

6    experiences and through media reports and coverage, that Sheriff's deputies had

7    organized gangs and had taken control over certain stations within LASD. The

8    Defendant Officers knew that Baca had not taken action against deputy gangs and

9    understood that the Department would not discipline them for the same illegal

10    activities engaged in by those gangs, including fabricating evidence, suppressing

11    evidence, and using unconstitutional threats.

12        108.    Deputy gangs were active at stations involved in Torres's wrongful

13    conviction, including the Lennox, Compton, and Lakewood stations. The

14    Defendant Officers knew that the Department condoned deputy gangs at those

15    stations. The LASD's policy was that closing cases and "getting tough" with

16    residents was more important than exercising control over deputies or preventing

17    constitutional violations, as communicated by its decision to allow these deputy

18    gangs to operate.

19        109.    Sheriff Sherman Block, who was Sheriff from 1982 to 1998,

20    condoned the LASD's deputy gangs. He once told a reporter, "Flashing a sign?

22

That's meaningless. In fact, I'm sure the gang members out there get a kick out of deputies flashing a sign, having their own gang." Employees of the Department, including the Defendant Officers, understood that Block condoned deputy gangs.

110.    In January 1991, Paul Tanaka was promoted to lieutenant, despite being an active member of the Vikings gang. Tanaka would later assume an executive position in the Department and contributed to the Department's failure to monitor, discipline, and prevent deputy gangs. The Defendant Officers understood that deputy gang members received promotions and that the LASD's policy was that deputy gang membership was not a disqualification for promotion within the LASD.

111.    Baca delegated considerable authority to Tanaka despite Tanaka's deputy gang affiliation and his decision to ignore deputy misconduct.

112.    Following the revelation of widespread deputy gang activity, racist deputy actions, and other deputy misconduct, Special Counsel James G. Kolts wrote and published a report in 1992 on misconduct issues across the Department. The report revealed—and put the Department on notice—that deputy gangs were widespread and responsible for violations of residents' rights. In 1998, when Baca became Sheriff, he knew that the LASD had decided to allow deputy gangs to operate. Baca continued that policy and allowed deputy gangs to continue operating, despite knowing that those gangs frequently violated residents' rights.

Plaintiff's Complaint

113.   The Vikings remained an active deputy gang even after the Kolts Report called for the Sheriff to investigate, monitor, and discipline such gangs. In May 1995, deputies passed out Viking pins to be worn at a deputy's funeral.

114.   Despite widespread flaunting of supervisory authority and organized acts of resistance and intimidation by deputy gang members against supervisors, the Department allowed deputy gangs to continue to operate. The LASD chose not to ban membership in deputy gangs and chose to ignore evidence of deputies' membership in those gangs.

115.   The LASD chose a policy of plausible deniability—allowing commanders and other supervisors to ignore the deputy gangs operating under their supervision—instead of requiring its commanders to know the specific problems in place at the stations under their supervision, whether deputy gangs were active at each station and the influence exerted by those gangs, and what kinds of misconduct were committed by gangs at those stations.

116.   By 1999, the Department's policy of allowing deputies to self-organize in deputy gangs had taken full effect and was known to the Defendant Officers. Deputy gang members had risen to leadership positions within the Department and condoned the gangs.

117.   The Regulators were another active deputy gang. The Regulators shook down deputies to raise money for deputies who received suspensions via the

24

1  LASD's disciplinary processes. The effect was to counteract whatever disciplinary

2  impact might have come from suspensions for misconduct.

3       118.    The Regulators were committed to an intensive code of silence no

4  different from that observed among criminal gangs; under oath, one Regulator

5  refused to discuss how the gang made decisions because such information was not

6  publicly known.

7       119.    Indeed, Regulator deputies refused to talk with the Department's

8  investigators regarding the gang's activities. The gang took over a Sheriff's station

9  and refused to respect the orders of superior officers. The Department tolerated and

10  condoned the activities of the Regulators and other gangs.

11       120.    Despite lacking any evidence that the Department's deputy gang

12  problem had been resolved, Los Angeles County and the LASD failed to monitor

13  or investigate the persistence of deputy gangs within the Department.

14       121.    The LASD and the County of Los Angeles had a policy and practice

15  of fabricating and suppressing evidence from criminal suspects, and of tolerating

16  and allowing such actions by its deputies. The Defendant Officers fabricated and

17  suppressed evidence in the Guitron murder investigation pursuant to that policy

18  and practice.

19       122.    In October 1989, Sheriff's deputies Elizabeth Smith and Anthony

20  Campbell beat Demetrio Carrillo after he spoke briefly with a woman who was

Plaintiff's Complaint

being cited by a deputy sheriff. The deputies then arrested Carrillo without

justification and prepared false reports against him to justify his arrest.

123.    In February 1990, multiple Sheriff's deputies were charged with

federal crimes in connection with the theft of more than a million dollars during

drug raids. Numerous deputies were eventually convicted on corruption charges.

124.    Testimony at those deputies' trials revealed that deputies at the

Lennox Station beat suspects, stole money, and framed suspects by pilfering

cocaine from the Department's evidence storage and planting it in homes and

vehicles.

125.    Deputies involved in the 1990 corruption scandal also lied in search

warrant affidavits and filed false police reports. Nearly two dozen criminal cases

were dismissed, plea-bargained, or reviewed because of the scandal.

126.    In February 1990, deputies dragged Jose Ortega from his friend's

porch and struck him in the back with a metal flashlight without necessity or

justification. They left him without arresting him, but later returned to take him to

the hospital. At the hospital, the deputies arrested him and filed false and

misleading police reports which included false statements and material omissions.

127.    In March 1990, deputies submitted knowingly false affidavits to

obtain search warrants on several residences in the City of Lynwood. They entered

these residents' homes, terrorized and humiliated them at gunpoint, and ransacked

Plaintiff's Complaint

their houses. Using the threat of violence, they detained and interrogated the residents in an effort to coerce confessions from them.

128.    In April 1990, deputies fabricated inculpatory evidence and suppressed exculpatory evidence regarding Thomas Rosas. To cover up their gratuitous violence, they falsely alleged that Rosas drank an alcoholic beverage on a public street, was verbally abusive towards officers, struck or tried to strike officers, or attempted to resist arrest. They also omitted from their reports that deputies tasered Rosas twice for no reason and used unreasonable and unnecessary force against Rosas.

129.    In May 1990, deputies falsely stated verbally, then falsely wrote, that resident Tracy Batts was armed with a handgun. They created this false narrative to justify their gratuitous shooting and killing of an unarmed man.

130.    In May 1990, deputy Paul Archambault falsely claimed that Elzie Coleman had brandished a handgun. After shooting and killing Coleman, Archambault fabricated evidence and wrote a false police report to justify the killing. Deputies removed witnesses from the scene of the shooting, falsely arrested eyewitnesses to cover up the true facts of the shooting, and presented false evidence and testimony at trial.

131.    In 1991, the Department's deputies suppressed evidence regarding their killings of residents: for example, describing an object held by a man they

Plaintiff's Complaint

1   shot and killed as a "rifle-like" object when it in fact was a wooden club and

2   describing another man they killed as pointing a revolver at them when he in fact

3   dropped his weapon before a deputy shot and killed him.

4        132.    Between 1991 and 2011, the Department suppressed evidence of

5   Francisco Carrillo's wrongful conviction. Deputy Craig Ditsch used an unduly

6   suggestive identification procedure, telling a key eyewitness that Mr. Carrillo

7   committed the crime and then suppressing evidence of his improper procedure.

8   Ditsch further suppressed that information and falsely represented in his report that

9   the witness had independently identified Mr. Carrillo. Ditsch conspired with other

10  deputies to use a photo "six pack" created in another case (which also involved

11  false eyewitness evidence) to influence the eyewitness to falsely identify Mr.

12  Carrillo. Even after Mr. Carrillo was wrongfully convicted of murder, Ditsch and

13  other Sheriff's deputies conspired to hide evidence of their wrongdoing.

14       133.    Between 1985 and 2012, the Department suppressed evidence of

15  Frank O'Connell's wrongful conviction. Sheriff's detectives failed to disclose

16  evidence pointing to another suspect and improperly influenced witnesses.

17  Specifically, detectives used unduly suggestive identification procedures to

18  pressure a key witness to identify O'Connell; detectives intimidated that same

19  witness into making a false identification; and detectives failed to turn over notes

20  indicating that another person who matched a description of the suspect had tried

28

to kill the victim years prior. The detectives continued in a conspiracy to hide evidence of this wrongful conviction during this time.

134.    Around 1995, deputies fabricated and suppressed evidence related to an unlawful police shooting. The deputies claimed that the suspect pivoted and pointed a gun at them. However, the suspect was shot in the back, demonstrating that he had not turned to fire at the deputies. And the suspect's supposed gun was found 37 feet away from where the suspect fell, but deputies shot the suspect in his spinal cord and inflicted an injury that would have prevented him from running 37 feet after being shot. The deputies' account of the shooting was obviously false. Still, the deputies suppressed the true facts of the shooting. The Department's internal investigation was so inadequate and flawed that it did not even mention that the suspect was shot from behind.

135.    In March 1999, David Auner suppressed evidence showing that witnesses to a shooting had been improperly admonished. Auner failed to give the appropriate admonishment to three eyewitnesses, then falsified a report claiming that he had appropriately admonished them.

136.    At the time of Torres's arrest, Sheriff Lee Baca had been running the Sheriff's Department for two years.

137.    During his tenure, Baca systematically covered up misconduct within the Department and shielded its employees from public accountability.

Plaintiff's Complaint

138.    In response to an FBI investigation of abuses committed by Sheriff's deputies, Baca hid a prisoner-informant within the County's jail system from FBI investigators. Baca also allowed two Sheriff's sergeants to threaten the lead FBI agent investigating deputy abuse.

139.    LASD deputies, including the Defendant Officers, knew that the Department did not oppose the suppression of exculpatory evidence or the fabrication of evidence. The Defendant Officers in this case acted in accordance with those policies and practices to convict Torres of a murder that he did not commit.

140.    The LASD and the County of Los Angeles had a policy and practice of training officers to commit misconduct and to seek convictions at all costs, including the violation of residents' rights.

141.    The Department knew that field training officers assigned to train and mentor new patrol deputies often committed misconduct and encouraged deputies to commit misconduct. It allowed deputies to be trained in improper and unconstitutional policing, consistent with its policy that being tough with residents and securing convictions was more important than respecting their constitutional rights.

142.    The Department also allowed deputy gangs to influence and control the assignment of field training officers.

Plaintiff's Complaint

30

143.     In April 1994, an independent monitor recommended that the LASD provide for centralized selection of field training officers and set specific criteria for removal of current field training officers, and automatic disqualification of field training officer applicants, for dishonesty or excessive force. The LASD instead chose to allow deputies who had committed excessive force or who had been found dishonest to serve as field training officers and continued to emphasize convictions and aggressiveness over constitutional rights.

144.     In 1996, a field training officer pled no contest to criminal charges after being accused by his trainee of planting false evidence and destroying evidence with the purpose of harassing Black and Latino residents. The trainee whistleblower faced violence and threats from deputy gang members and left the Department for her safety and the safety of her family. However, the Department never monitored and rooted out the deputy gang members responsible for this retaliation.

145.     Deputies were routinely trained to use excessive force, to discriminate against minorities, and to hold to a code of silence by the corrupt and gang-affiliated training officers employed by the Department.

146.     The Defendant Officers received this misguided training and their actions leading to Torres's wrongful conviction were pursuant to the training they received.

Plaintiff's Complaint

147.    The Defendant Officers recognized that the LASD would not discipline them for misconduct, or would administer only minimal discipline even for serious misconduct. Further, LASD's policy was to cover up misconduct and to shield both its employees and itself as a municipal entity from scrutiny and oversight.

148.    For example, the Department routinely covered up misconduct committed by its deputies by failing to accurately categorize it. It frequently designated excessive force by its deputies as "discourtesy" or "improper tactics," even for allegations of extreme force like being struck twice in the stomach or being struck repeatedly with flashlights and batons.

149.    Sheriff's supervisors also protected deputies from discipline and monitoring by "counseling" residents who came to the station to make complaints and trying to convince residents not to file complaints. Supervisors routinely failed to document such complaints. The LASD encouraged such actions because it did not want to be subject to scrutiny and oversight.

150.    Although the Department employed investigators to investigate deputy misconduct, those investigators routinely participated in cover-ups of misconduct. For example, when deputies responded to investigations with legal justifications instead of factual accounts, investigators made no effort to determine what actually happened.

Plaintiff's Complaint

1    151.    Department employees routinely submitted incomplete use of force

2    packages to cover up deputy misconduct. For example, they routinely failed to

3    videotape or photograph injuries alleged in use of force incidents, failed to

4    interview the complainant and witnesses to police uses of force, and omitted

5    important suspect and witness statements (such as allegations of racial slurs and

6    verbal abuse by deputies).

7    152.    Even when deputies committed serious misconduct that endangered

8    the life and constitutional rights of suspects, the Department responded with

9    minimal and ineffective punishment. For example, around 1995, the Department

10   gave a suspension of just four days to a deputy who pepper-sprayed an

11   unconscious, intoxicated man four times, causing such severe chemical injuries

12   that he had to go to the hospital. It gave a two-day suspension to a deputy who beat

13   and abused a disabled fourteen-year-old boy without any justification. And it

14   suspended for just two days a deputy who tried to tase a woman who had doused

15   herself in gasoline; aware that he could have caused her to burst into flames, the

16   deputy explained that he had tried to aim for a "dry spot."

17   153.    In 1993, a sheriff's deputy severely beat a Black man who had tried to

18   sell him a car radio, referring to him as a "n-----" and saying that he "hated n------."

19   Despite the excessive force and outrageous racism of the deputy's actions, the

20   Department gave him only a light punishment, communicating to deputies—

Plaintiff's Complaint

including the Defendant Officers—that it would not punish officers who used excessive force with residents while ignoring their rights.

154.     In 1995, an LASD sergeant assembled a seven-man team armed with flashlights, mace, and a taser to extract a prisoner from his cell for the sole purpose of administering a blood pressure test, ostensibly for the prisoner's health and benefit. The deputies beat the prisoner badly enough to break his jaw, requiring surgery. The sergeant's captain refused to discipline him and exonerated the sergeant, agreeing that the force used was "completely controlled, and minimal." The LASD endorsed this failure to discipline and allowed it to occur.

155.     The Department also chose not to meaningfully discipline deputies for obvious lies. For example, around 1997, a deputy beat a tackled suspect with a flashlight on the back several times and kicked him twice during a daytime arrest. He was asked why he chose to carry his flashlight in broad daylight, and responded, "You never know if you will have to go under a house or somewhere where it is dark, or if it is still light." The Department rejected his explanation, meaning that it determined that he lied in the course of a misconduct investigation. But despite the combination of excessive force and intentional dishonesty, the Department suspended the deputy for only two days.

156.     The Department similarly imposed only light discipline on supervisors even for egregious misconduct, suggesting to supervisors and patrol deputies alike

Plaintiff's Complaint

that misconduct would not be seriously punished. Around 1997, a lieutenant grabbed a witness by the collar, lifted him off the ground, spoke angrily to him, and threw the resident down, having lost control of himself. The lieutenant did not document his use of force and lied about his actions, denying using any force at all. He was defiant against his investigators and questioned why he was being investigated at all. He even instructed a subordinate not to mention his use of force in an official report. Despite his misconduct and dishonesty, the Department gave only a written reprimand to the lieutenant.

157.    Around 1997, personnel in the Department's Region II were allowed to flout the rules requiring that every citizen's complaint be formally reported and documented. The Department's disciplinary processes were so lax that this deviation continued and Department personnel understood that the Department endorsed such deviations.

158.    The Department ceded control of "fast" stations—stations with higher volumes of arrests and service calls—to aggressive deputies who organized into gangs to insulate themselves from discipline. Public reports regarding the Department noted that at such stations, deputies responded aggressively and with brutality to resistance or perceived disrespect from residents without serious interference by supervisors. The Department endorsed and allowed such conduct because it valued aggressive and "tough" behavior by its deputies above the

Plaintiff's Complaint

1   constitutional rights of residents.

2        159.    The Department ignored evidence of misconduct by its officers.

3   Evidence of officer wrongdoing and dishonesty frequently surfaced during civil

4   litigation against the Department. The Department failed to review and respond to

5   such evidence.

6        160.    By June 2000, the Department discontinued its use of centralized risk

7   management meetings and decreased its supervision of command-level staff and

8   station-level misconduct. Consistent with its decision to endorse and allow deputy

9   gangs and widespread police misconduct, the Department decreased its supervision

10  of misconduct, communicating to deputies including the Defendant Officers that

11  they need not fear discipline for misconduct.

12       161.    In 1999 and 2000, the Department tolerated and allowed the

13  disproportionate use of lethal and non-lethal force at Century Station and

14  throughout Region II generally. The Department chose not to investigate those

15  trends in line with its hands-off approach to addressing known issues of

16  misconduct and constitutional violations across the Department.

17       162.    Even by October 2001, the Department had not reversed its position

18  of lax oversight. It continued to eschew risk management, accountability, control

19  of the use of force, and the use of early warning and trend data. The Department

20  consciously chose to ignore the many constitutional violations committed by its

Plaintiff's Complaint

1   personnel.

2       163.    Torres's wrongful conviction was caused because the Defendant

3   Officers understood that they had free reign to violate his rights, pursuant to

4   LASD's policy of shielding its deputies from meaningful supervision and

5   discipline.

6       164.    The Department also chose to allow its officers to conduct unreliable

7   and unduly suggestive eyewitness identification procedures because it valued

8   securing convictions more than respecting residents' rights. As a result, residents

9   were frequently prosecuted as a result of fundamentally flawed and corrupt

10  eyewitness identification procedures. The Defendant Officers conducted unduly

11  suggestive identification procedures in accordance with these policies and

12  practices.

13      165.    The Department chose to allow deputies to improperly influence

14  eyewitnesses, including feeding information to those witnesses to skew their

15  identifications so that the witnesses would identify the deputies' preferred suspects.

16      166.    The Department's policy and practice was that deputies were not

17  required to document the information provided to eyewitnesses during

18  identification procedures.

19      167.    The Department chose not to train its deputies to provide exculpatory

20  eyewitness identification information to the prosecutor(s) in the case in which the

37

eyewitness was making an identification.

168.    The Department chose not to supervise deputies to require them to provide exculpatory eyewitness identification information to the prosecutor(s) in the case in which the eyewitness was making an identification.

169.    As described above, deputies frequently coerced witnesses into making false identifications, manipulated witnesses' selection of suspects during identification procedures, and failed to reveal evidence impeaching eyewitness identifications.

170.    The Defendant Officers' unduly suggestive identification procedures in the Guitron murder investigation were conducted pursuant to the LASD's practices and policies. The Defendant Officers knew that they need not fear discipline for improperly pressuring witnesses to make identifications or for fabricating such identifications.

### TORRES'S DAMAGES

171.    Torres spent more than twenty years incarcerated for crimes that he did not commit.

172.    Because of his wrongful conviction, Torres experienced tremendous pain and suffering. He was unable to share holidays, births, and other life events with loved ones. He lost the opportunity to start a career and a family, and now faces the tremendous challenge of picking up where he left off more than twenty

Plaintiff's Complaint

years ago.

173.     Torres suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above, all caused by the Defendant Officers' misconduct and the policies and practices of Defendants LASD and County of Los Angeles.

## COUNT I – 42 U.S.C. § 1983

### Fourteenth Amendment: Due Process, Fair Trial

174.     Each paragraph of this Complaint is incorporated as if restated fully herein.

175.     In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory and impeachment evidence from Torres, his attorneys, and prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Torres.

176.     In the manner described more fully above, the Defendant Officers fabricated false statements, including Valdovinos's purported identification of Torres and inculpatory statements of witnesses, fabricated reports and other evidence falsely implicating Torres in the murders, suborned perjury, obtained Torres's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against

Plaintiff's Complaint

Torres during his criminal case.

177.    In addition, these Defendant Officers produced a series of false and fraudulent reports and related documents, which they inserted into their file and presented to state prosecutors and judges. These documents, which were used to show Torres's purported connection to the murders, contained statements and described events that were fabricated and Defendant Officers knew to be false. Defendant Officers signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was false. Defendant Officers suppressed and withheld evidence of their wrongdoing.

178.    In the manner more fully described above, the Defendant Officers also procured supposed eyewitness identifications of Torres by using unduly suggestive identification techniques during photo arrays and in a live lineup. Defendant Officers used the resulting false identifications to taint Torres's criminal trial. The identification procedures were unnecessarily suggestive and resulted in unreliable identifications. The procedures were so conducive to irreparable mistaken identification that the identification's use violated due process of law.

179.    The Defendant Officers also suppressed evidence that demonstrated their knowledge of Torres's innocence, including evidence indicating that other suspects committed the shooting and evidence that eyewitnesses were unable to identify Torres as the shooter.

Plaintiff's Complaint

180.    The Defendant Officers purposefully failed to collect, and in some cases, destroyed, exculpatory evidence indicating that other suspects committed the shooting and evidence that eyewitnesses were unable to identify Torres as the shooter.

181.    In addition, based upon information and belief, Defendant Officers concealed, destroyed, and fabricated additional evidence that is not yet known to Torres.

182.    The misconduct of all the Defendant Officers directly resulted in the unjust and wrongful criminal prosecution and conviction of Torres and the deprivation of Torres's liberty, thereby denying him his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Torres would not and could not have been pursued, and there is a reasonable probability that he would not have been convicted.

183.    The misconduct of all of the Defendant Officers also directly resulted in the Torres's unjust criminal conviction, thereby denying him his constitutional right to due process, a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

184.    As a result of Defendant Officers' misconduct described in this Count, Torres suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering,

41

Plaintiff's Complaint

great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

185.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Torres's constitutional rights.

186.     The misconduct by all of the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Los Angeles Sheriff's Department and the County of Los Angeles, which Torres was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above and below.

**COUNT II – 42 U.S.C. § 1983**

**Fourth and Fourteenth Amendments: Malicious Prosecution**

187.     Each paragraph of this Complaint is incorporated as if restated fully herein.

188.     In the manner described more fully above, the Defendant Officers, acting as investigators, individually, jointly, and in conspiracy with each other, accused Torres of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Torres without any probable cause for doing so and in spite of the fact that they knew Torres was innocent.

189.     The Defendant Officers accused Torres of criminal activity knowing

Plaintiff's Complaint

those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

190.    The Defendant Officers made statements regarding Torres's purported culpability knowing that those statements were false. They were aware that, as described more fully above, no true or reliable evidence implicated Torres in the shooting.

191.    The Defendant Officers unreasonably seized Torres without probable cause and deprived him of his liberty, in violation of his rights secured by the Fourth and Fourteenth Amendments.

192.    The Defendant Officers deprived Torres of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty.

193.    The Defendant Officers subjected Torres to arbitrary governmental action that shocks the conscience in that Torres was deliberately and intentionally framed for a crime of which he was totally innocent, through Defendant Officers' misconduct. Defendant Officers' actions contravened fundamental canons of decency and fairness and violated Torres's rights under the Fourteenth Amendment.

194.    The Defendant Officers caused Torres to be improperly subjected to

Plaintiff's Complaint

1   judicial proceedings for which there was no probable cause.

2      195.    These judicial proceedings were instituted and continued by

3   Defendant Officers maliciously, resulting in injury.

4      196.    The misconduct described in this Count was undertaken intentionally,

5   with malice, willfulness, and reckless indifference to the rights of others.

6      197.    The prosecution terminated in Torres's favor when, after his

7   conviction was vacated, the State dismissed the charges against him.

8      198.    As a result of Defendant Officers' misconduct described in this Count,

9   Torres suffered loss of liberty and sustained and continues to sustain injuries,

10  including physical injury and sickness, and resultant emotional pain and suffering,

11  great mental anguish, humiliation, degradation, and other grievous and continuing

12  injuries and damages as set forth above.

13     199.    The misconduct by all of the Defendant Officers described in this

14  Count was undertaken pursuant to the policy and practice of the Los Angeles

15  Sheriff's Department and the County of Los Angeles, which Torres was the victim

16  of, and his injuries were caused by the policies and practices of those Defendants,

17  as described more fully above and below.

## COUNT III – 42 U.S.C. § 1983

### Failure to Intervene

20     200.    Each paragraph of this Complaint is incorporated as if restated fully

Plaintiff's Complaint

herein.

201.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Torres's constitutional rights, even though they had the opportunity to do so.

202.    These Defendant Officers had a reasonable opportunity to prevent this harm, but failed to do so.

203.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Torres's clearly established constitutional rights.

204.    As a result of the Defendant Officers' failure to intervene to prevent the violation of Torres's constitutional rights, Torres suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

205.    The misconduct by all of the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Los Angeles Sheriff's Department and the County of Los Angeles, which Torres was the victim of, and his injuries were caused by the policies and practices of those Defendants,

as described more fully above and below.

## COUNT IV – 42 U.S.C. § 1983

### Conspiracy to Deprive Constitutional Rights

206.    Each paragraph of this Complaint is incorporated as if restated fully herein.

207.    After the murder of Martin Guitron, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Torres of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

208.    Additionally, before and after Torres's conviction, the Defendant Officers further conspired to deprive Torres of exculpatory information to which he was lawfully entitled.

209.    In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

210.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above and was an otherwise willful participant in joint activity.

211.    The misconduct described in this Count was objectively unreasonable

and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Torres's rights.

212.    As a result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Torres's rights were violated, and he suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

213.    The misconduct by all the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Los Angeles Sheriff's Department and the County of Los Angeles, which Torres was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above and below.

## COUNT V – 42 U.S.C. § 1983

### *Monell* Claim

214.    Each paragraph of this Complaint is incorporated as if restated fully herein.

215.    Torres's injuries described in this complaint and the violations of his constitutional rights discussed above were caused by the policies and customs of the Defendants County of Los Angeles and the LASD, as well as by the actions of

Plaintiff's Complaint

1   their policy-making officials.

2   216.    At all times relevant to the events described in this complaint and for

3   a period of time before and after, the County of Los Angeles and the LASD failed

4   to promulgate proper or adequate rules, regulations, policies, and procedures

5   governing: the conduct of interrogations and questioning of criminal suspects and

6   witnesses; the collection, documentation, preservation, testing, and disclosure of

7   evidence, including physical evidence, material exculpatory evidence and

8   impeachment evidence, and information bearing upon the credibility of both lay

9   and law-enforcement witnesses; writing of police reports and taking of

10  investigative notes; obtaining statements and testimony from witnesses and

11  suspects; and the maintenance of investigative files and disclosure of those files in

12  criminal proceedings.

13  217.    In addition or alternatively, the County of Los Angeles and the LASD

14  failed to promulgate proper and adequate rules, regulations, policies, procedural

15  safeguards, and procedures for the training and supervision of officers of the

16  LASD, with respect to the conduct of interrogations and techniques to be used

17  when questioning criminal suspects and witnesses; the production and disclosure

18  of evidence, including physical evidence, material exculpatory evidence and

19  impeachment evidence, and information bearing upon the credibility of both lay

20  and law-enforcement witnesses; the writing of police reports and taking of

Plaintiff's Complaint

investigative notes; obtaining statements and testimony from witnesses; and the maintenance of investigative files and disclosure of the files in criminal proceedings.

218.     Officers and agents of the County of Los Angeles and the LASD committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures.

219.     Defendants County of Los Angeles and the LASD were aware of the need for adequate policies, training, and supervision, were deliberately indifferent to the need, and made a deliberate choice not to adopt adequate policies, training, or supervision, all of which was an official policy.

220.     Had policymakers of the County of Los Angeles and the LASD promulgated appropriate policies, the violation of Torres's constitutional rights would have been prevented.

221.     In addition, at all times relevant to the events described in this complaint and for a period of time before, the Defendants County of Los Angeles and the LASD had notice of practices and customs of officers and agents of the LASD that included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative or other materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses,

49

Plaintiff's Complaint

including by feeding facts, issuing undisclosed threats, and manipulating

witnesses; (3) officers failed to maintain and/or preserve material evidence and/or

destroyed evidence, including physical evidence; and/or (4) officers pursued

wrongful convictions through profoundly flawed investigations.

222.    These practices and customs, individually and/or together, were

allowed to flourish because the leaders, supervisors, and policymakers of the

County of Los Angeles and the LASD directly encouraged and were thereby the

moving force behind the very type of misconduct at issue by failing to adequately

train, supervise, and control their officers, agents, and employees; by failing to

adequately punish and discipline prior instances of similar misconduct; and by

maintaining a code of silence pursuant to which officers were encouraged not to rat

one another out, thus directly encouraging future abuses like those affecting

Torres.

223.    The above practices and customs were so well settled as to constitute

de facto policies of the County of Los Angeles and the LASD. The practices and

customs were able to exist and thrive, individually and/or together, because

policymakers with authority over the same exhibited deliberate indifference to the

problem, thereby effectively ratifying it, even though it was foreseeable that such

practices and customs would result in wrongful convictions such as Torres's.

224.    Within the County of Los Angeles and the LASD, a culture of

50

impunity, a code of silence, and a failure to discipline and supervise allowed widespread misconduct to go unchecked, as described more fully above.

225.    The fact that the misconduct described in this complaint during the Guitron homicide investigation was carried out openly and conspiratorially amongst numerous officers, including experienced homicide detectives, reflects the widespread, pervasive nature of the misconduct in the LASD at times relevant to the events described in this complaint.

226.    In addition, the misconduct described in this count was undertaken pursuant to the Defendants County of Los Angeles and the LASD's policies and practices in that the constitutional violations committed against Torres were committed with the knowledge, approval, or endorsement of persons with final policymaking authority for the County of Los Angeles and the LASD, or were actually committed by persons with such final policymaking authority.

227.    The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and caused Torres to suffer the grievous and permanent injuries and damages set forth above.

228.    Torres's injuries were caused by officers, agents, and employees of the County of Los Angeles and the LASD, including but not limited to the Defendant Officers, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

229.     As a result of the Defendants County of Los Angeles and LASD's policies, practices, and customs, Torres suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

## COUNT VI – State Law Claim

### Intentional Infliction of Emotional Distress

230.     Each paragraph of this Complaint is incorporated as if restated fully herein.

231.     Torres has complied with the California Tort Claims Act and has provided Defendants County of Los Angeles and LASD with a timely notice of the claim. This suit was initiated less than six months after providing such notice.

232.     Defendant Officers' conduct, as described more fully above, was outrageous and was done with intention and reckless disregard of the likelihood of causing emotional distress to Torres.

233.     As a result of the Defendant Officers' misconduct described in this Count, Torres suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

Plaintiff's Complaint

234.    Defendant Officers acted in a despicable manner subjecting Torres to cruel and unjust hardship in conscious disregard of his rights; committed intentional misrepresentation and deceit; concealed material facts known to them to deprive Torres of his legal rights; intended to cause injury to Torres; and willfully and consciously disregarded Torres's rights and safety.

## COUNT VII – State Law Claim

## Civil Conspiracy

235.    Each paragraph of this Complaint is incorporated as if restated fully herein.

236.    Torres has complied with the California Tort Claims Act and has provided Defendants County of Los Angeles and LASD with a timely notice of the claim. This suit was initiated less than six months after providing such notice.

237.    The Defendant Officers conspired together to frame Torres for Martin Guitron's murder, to suppress evidence pointing towards alternative suspects, and to suppress evidence of their own misconduct.

238.    Each Defendant Officer took at least one act in furtherance of the joint conspiracy.

239.    Each Defendant Officer, due to his participation in the joint conspiracy, is equally liable for the damages suffered by Torres.

240.    Defendant Officers acted in a despicable manner subjecting Torres to

Plaintiff's Complaint

cruel and unjust hardship in conscious disregard of his rights; committed

intentional misrepresentation and deceit; concealed material facts known to them

to deprive Torres of his legal rights; intended to cause injury to Torres; and

willfully and consciously disregarded Torres's rights and safety.

241.    As a result of the Defendant Officers' misconduct described in this

Count, Torres suffered loss of liberty and sustained and continues to sustain

injuries, including physical injury and sickness, and resultant emotional pain and

suffering, great mental anguish, humiliation, degradation, and other grievous and

continuing injuries and damages as set forth above.

## COUNT VIII – CA Civil Code § 52.1

### Bane Act

242.    Torres incorporates each paragraph of this Complaint as if fully

restated herein.

243.    Torres has complied with the California Tort Claims Act and has

provided Defendants County of Los Angeles and LASD with a timely notice of the

claim. This suit was initiated less than six months after providing such notice.

244.    As described more fully above, Defendant Officers violated Torres's

rights under the United States Constitution, United States law, the California

Constitution, and California law by fabricating evidence against him, using unduly

suggestive identification procedures, suppressing evidence of his innocence,

Plaintiff's Complaint

conspiring to frame him for a murder he did not commit, and in other ways described in Torres's allegations.

245.    Defendant Officers used threats, intimidation, and coercion against Torres and others in interfering with Torres's rights.

246.    Defendant Officers acted in a despicable manner subjecting Torres to cruel and unjust hardship in conscious disregard of his rights; committed intentional misrepresentation and deceit; concealed material facts known to them to deprive Torres of his legal rights; intended to cause injury to Torres; and willfully and consciously disregarded Torres's rights and safety.

247.    As a result of the Defendant Officers' misconduct described in this Count, Torres suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX – State Law Claim

## Malicious Prosecution[1]

248.    Torres incorporates each paragraph of this Complaint as if fully restated herein.

---

[1]   Plaintiff acknowledges that Defendants may assert immunity under California Government Code Section 821.6 on this claim. He pleads this claim to preserve it in case of a change of law.

Plaintiff's Complaint

249.     Torres has complied with the California Tort Claims Act and has provided Defendants County of Los Angeles and LASD with a timely notice of the claim. This suit was initiated less than six months after providing such notice.

250.     In the manner described above, Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Torres of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Torres without any probable cause for doing so and in spite of the fact that they knew Torres was innocent.

251.     In so doing, these Defendant Officers caused Torres to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

252.     Defendant Officers pursued Torres's prosecution until it terminated in his favor when a court reversed Torres's conviction and all the charges against him were dismissed.

253.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Torres's innocence.

254.     As a result of Defendant Officers' misconduct described in this Count, Torres suffered loss of liberty, great mental anguish, humiliation, degradation,

Plaintiff's Complaint

physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

255.     Defendant Officers acted in a despicable manner subjecting Torres to cruel and unjust hardship in conscious disregard of his rights; committed intentional misrepresentation and deceit; concealed material facts known to them to deprive Torres of his legal rights; intended to cause injury to Torres; and willfully and consciously disregarded Torres's rights and safety.

## COUNT X – State Law Claim

## Respondeat Superior

256.     Each paragraph of this Complaint is incorporated as if restated fully herein.

257.     Torres has complied with the California Tort Claims Act and has provided Defendants County of Los Angeles and LASD with a timely notice of the claim. This suit was initiated less than six months after providing such notice.

258.     In committing the above-mentioned torts, the Defendant Officers acted in the scope of their employment.

259.     The Los Angeles Sheriff's Department and Los Angeles County bear *respondeat superior* liability for the Defendant Officers' actions.

Plaintiff's Complaint

# COUNT XI

## Indemnification

260.    Each paragraph of this Complaint is incorporated as if restated fully herein.

261.    Torres has complied with the California Tort Claims Act and has provided Defendants County of Los Angeles and LASD with a timely notice of the claim. This suit was initiated less than six months after providing such notice.

262.    Pursuant to Cal. Gov. Code § 825, the Los Angeles Sheriff's Department and the County of Los Angeles are required to pay any judgment for acts committed by the Defendant Officers in the scope of their employment.

263.    The Defendant Officers' actions, as described above, were in the scope of their employment.

WHEREFORE, Plaintiff, ALEXANDER TORRES, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the Defendant Officers, as well as any other relief this Court deems appropriate including but not limited to injunctive or other non-monetary equitable relief.

Plaintiff's Complaint

# JURY DEMAND

Plaintiff, ALEXANDER TORRES, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**ALEXANDER TORRES**

By: /s/ David Owens
*One of Plaintiff's attorneys*

David Owens (SBN 275030)
Elizabeth Wang, IL Bar: 6287634, CO Bar: 45976*
Steven Art, IL Bar: 6302319*
Wallace Hilke, IL Bar: 6329814*
hilke@loevy.com
elizabethw@loevy.com
steve@loevy.com
david@loevy.com
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902

Jan Stiglitz (SBN 103815)
js@cwsl.edu
Law Office of Jan Stiglitz
14462 Garden Tr.
San Diego, CA 92127
Phone: (619) 807-5890

Michael D. Seplow (SBN 150183)
Paul Hoffman (SBN 71244)
mseplow@sshhzlaw.com
hoffpaul@aol.com
Schonbrun Seplow Harris

Plaintiff's Complaint

Hoffman & Zeldes LLP
9415 Culver Boulevard, #115
Culver City, CA 90232
Phone: (310) 396-0731

Counsel for Plaintiff

*Pro hac vice admission pending

Plaintiff's Complaint