**David Owens** (SBN 275030)
**Elizabeth Wang\***, IL Bar: 6287634,
CO Bar 45976
**Steven Art\***, IL Bar: 6302319
**Wallace Hilke\***, IL Bar: 6329814
hilke@loevy.com
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902
\*Admitted pro hac vice

**Jan Stiglitz** (SBN 103815)
js@cwsl.edu
Law Office of Jan Stiglitz
14462 Garden Tr.
San Diego, CA 92127
Phone: (619) 807-5890

**Michael D. Seplow** (SBN 150183)
**Paul Hoffman** (SBN 71244)
mseplow@sshhzlaw.com
hoffpaul@aol.com
Schonbrun Seplow Harris
Hoffman & Zeldes LLP
9415 Culver Boulevard, #115
Culver City, CA 90232
Phone: (310) 396-0731

*Counsel for Plaintiff*

LOEVY & LOEVY
Attorneys at Law

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER TORRES,<br><br>                    Plaintiff,<br><br>          v.<br><br>LOS ANGELES SHERIFF'S DEPARTMENT, et al.,<br><br>                    Defendants. | Case No. 2:22−cv−07450 MWF (MARx)<br><br>Hon. Michael W. Fitzgerald, District Judge<br><br>Magistrate Judge Margo A. Rocconi<br><br>**Plaintiff's Response to Defendants' Motion for Summary Judgment [Dkt. 111-1]**<br><br>Date:          July 15, 2024<br>Time:          10:00 am<br>Courtroom:   5A (Hon. Michael W. Fitzgerald) |

# **Table of Contents**

Table of Authorities .............................................................................................. iii

Introduction ..........................................................................................................2

Legal Standard ......................................................................................................2

Background ...........................................................................................................3

Argument ..............................................................................................................6

   I.    Count 1 (Due Process/Fair Trial) .............................................................6

       A. Fabrication of Evidence (Count I) ....................................................7

          i.    Defendants Forfeited Argument ....................................7

          ii.   A Jury Must Decide Plaintiff's Fabrication Theory ..................8

       B. A Jury Must Decide Plaintiff's Unduly Suggestive Eyewitness
          Identification Theory........................................................................10

          i.    Causation Is No Defense..............................................12

       C. A Jury Could Find Diviak, Castro, and Lincoln Suppressed Exculpatory
          Evidence ...........................................................................................14

       D. There Is No Qualified Immunity on Count I ...................................17

          i.    Fabrication of Evidence ...............................................18

          ii.   Suppression Identification ............................................19

          iii.  Suggestive Identification ..............................................19

   II.   A Jury Must Decide Torres's Fourth Amendment Illegal Seizure and
       Malicious Prosecution Claims.................................................................20

       A. There Is No Immunity or Collateral Estoppel....................................20

       B. Defendants Lacked Probable Cause to Prosecute Torres ..................21

       C. Defendants Are Not Entitled to Qualified Immunity on Count II ......22

   III.  Failure to Intervene ...............................................................................23

   IV.  Conspiracy ............................................................................................23

   V.   Defendants Are Not Entitled to Qualified Immunity on the Failure to
       Intervene or Conspiracy Claims.............................................................24

LOEVY & LOEVY
Attorneys at Law

*Table of Contents and Authorities*                                                    22-CV-07450

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LOEVY & LOEVY
Attorneys at Law

VI.     *Monell* Claim ..................................................................................25

    A. Legal Standard.................................................................................25

    B. No *Brady* Policies .........................................................................26

    C. Uncontrolled Deputy Gangs...........................................................28

    D. Uncontested Monell Theories ........................................................29

VII.    IIED ...................................................................................................31

VIII.   Civil Conspiracy ...............................................................................31

IX.     Bane Act ............................................................................................31

X.      Respondeat Superior and Indemnification ........................................32

CONCLUSION ................................................................................................32

*Table of Contents and Authorities*                                                    22-CV-07450

1

## **Table of Authorities**

2   *Alexander v. City of South Bend*, 433 F.3d 550 (7th Cir. 2006) .............................. 10

3   *Anderson v. Creighton*, 483 U.S. 635 (1987) ...................................................... 17

4   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ......................................... 2, 3

5   *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998) .......................................... 26

6   *Atkins v. Cnty. of Riverside*, 151 F. App'x 501 (9th Cir. 2005) ............................. 10

7   *Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004) .................................. 21

8   *Baldwin v. Placer Cnty.*, 418 F.3d 966 (9th Cir. 2005) .......................................... 25

9   *Banks v. Dretke*, 540 U.S. 668 (2004) .................................................................... 7

10  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397 (1997) ........... 28

11  *Beck v. City of Upland*, 527 F.3d 853 (9th Cir. 2008) ........................................... 20

12  *Bigford v. Taylor,* 834 F.2d 1213 (5th Cir. 1988). ................................................. 21

13  *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) ............................. 8, 9

14  *Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir. 2015) .......................................... 8

15  *Brousseau v. Haugen*, 543 U.S. 194 (2004) .......................................................... 18

16  *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972) ......................................................... 24

17  *Caldwell v. City and Cnty. of San Francisco*, 889 F.3d 1105 (9th Cir. 2018) ........ 20

18  *Cameron v. Craig*, 713 F.3d 1012 (9th Cir. 2013) ................................................ 25

19  *Canton v. Harris*, 489 U.S. 378 (1989) ................................................................ 26

20  *Carillo v. Cnty. of Los Angeles*, 798 F.3d 1210 (9th Cir. 2015) ....................... 14, 19

21  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................... 31

22  *Costanich v. Dep't of Social & Health Svcs.*, 627 F.3d 1101 (9th Cir. 2010). 8, 9, 10

23  *Crowe v. Cnty. of San Diego*, 608 F.3d 406 (9th Cir. 2010) .................................. 13

24  *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ............................................. 18

25  *Dirks v. Martinez,* 414 F. App'x 961 (9th Cir. 2011) ............................................. 25

26  *Eberle v. City of Anaheim*, 901 F.2d 814 (9th Cir. 1990) ........................................ 8

27  *Fulton v. Bartik*, 2024 WL 1242637 (N.D. Ill. Mar. 22, 2024) ............................. 21

28  *Giglio v. United States*, 405 U.S. 150 (1972) ............................................. 14, 15, 19

*Table of Contents and Authorities*                                    22-CV-07450

LOEVY & LOEVY
Attorneys at Law

*Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999) .............................25

*Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011) ....................................................15

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) ..................................26

*Hadley v. City of Anaheim,* 2020 WL 5604024 (C.D. Cal. Sept. 18, 2020)............31

*Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007) ...................................................10

*Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999)..............................................17, 26

*Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010) .....................................13

*Hope v. Pelzer,* 536 U.S. 730 (2002).......................................................................17

*Hyun Ju Park v. City and Cnty. of Honolulu*, 952 F.3d 1136 (9th Cir. 2020) ........28

*Jackson v. Barnes*, 749 F.3d 755 (9th Cir. 2014) ...................................................30

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) ..................................28

*Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986).........................................26

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).........................................13

*Kyles v. Whitley*, 514 U.S. 419 (1995).......................................................14, 15, 19

*Lemire v. Cal. Dep't of Corrs. & Rehab.*, 726 F.3d 1062 (9th Cir. 2013) .............16

*Lobato v. Las Vegas Metro. Police Dep't*, 2022 WL 4017055

    (D. Nev. Sept. 1, 2022).......................................................................................18

*Long v. Cnty. of Los Angeles,* 442 F.3d 1178 (9th Cir. 2006)................................25

*Manson v. Brathwaite*, 432 U.S. 98 (1977) ......................................................10, 19

*Manuel v. Joliet*, 580 U.S. 357 (2017).....................................................................20

*Maryland v. Pringle*, 540 U.S. 366 (2003) ..............................................................21

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir.2011) ...................................................18

*Meggs v. Boulevard Ventures, LLC*, 2016 WL 1259390 (D. Nev. Mar. 30, 2016) ..8

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018)...................................14, 15, 16, 19

*Mendocino Environmental Center v. Mendocino Cnty.*, 192 F.3d 1283

    (9th Cir. 1999) ....................................................................................................24

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) ..................................26

*Monell v. New York Department of Social Services* 436 U.S. 658 (1978).............12

LOEVY & LOEVY
Attorneys at Law

*Table of Contents and Authorities*                    22-CV-07450

1  *Monroe v. Pape*, 365 U.S. 167 (1961) ........................................................................ 25

2  *Napue v. Illinois*, 360 U.S. 264 (1959) ........................................................................ 7

3  *Neil v. Biggers*, 409 U.S. 188 (1972) ........................................................................ 10

4  *Nesmith v. Alford,* 318 F.2d 110 (5th Cir. 1963) ...................................................... 24

5  *O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir. 2021) .................................................... 10

6  *O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988) ............................................... 24, 25

7  *Olivier v. Baca*, 913 F.3d 852 (9th Cir. 2019) ........................................................... 31

8  *Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470 (9th Cir. 1992) ................................ 26

9  *Pasene v. Correa*, 656 F. Supp. 3d 1185 (D. Haw. 2023) ......................................... 10

10  *Poppell v. City of San Diego*, 149 F.3d 951 (9th Cir. 1998) .................................... 22

11  *Pyle v. Kansas*, 317 U.S. 213 (1942) ......................................................................... 18

12  *Reed v. Lieurance*, 863 F.3d 1196 (9th Cir. 2017) .................................................... 21

13  *Rodarte v. Gutierrez*, 2023 WL 109723 (9th Cir. Jan. 5, 2023) ................................. 7

14  *Rose v. San Joaquin Cnty.*, 2006 WL 1795103 (E.D. Cal. June 28, 2006) ............. 10

15  *Sanders v. City of Chicago Heights*, 2016 WL 2866097 (N.D. Ill. May 17, 2016) 19

16  *Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216 (9th Cir. 2018) ................ 3

17  *Smiddy v. Varney*, 665 F.2d 261 (9th Cir. 1981) ....................................................... 20

18  *Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973) ............................................................... 24

19  *Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) ........................................................ 8

20  *Staub v. Proctor Hospital* 562 U.S. 411 (2011) ........................................................ 12

21  *Tatum v. Moody,* 768 F.3d 806 (9th Cir. 2014) .......................................................... 13

22  *Tennison v. City & Cnty. Of San Francisco*, 570 F.3d 1078 (9th Cir. 2009) .......... 15

23  *Thomas v. County of Riverside*, 763 F.3d 1167 (9th Cir. 2014) ............................... 25

24  *Thompson v. Clark*, 596 U.S. 36 (2022) .................................................................... 20

25  *Tolan v. Cotton*, 572 U.S. 650 (2014) .......................................................................... 3

26  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) ..................................... 26

27  *United States v. Bagley*, 473 U.S. 667 (1985) ........................................................... 14

28  *United States v. Bethal*, 245 F. App'x 460 (6th Cir. 2007) ....................................... 22

LOEVY & LOEVY
Attorneys at Law

*United States v. Butler*, 567 F.2d 885 (9th Cir. 1978).............................................19

*United States v. Drake*, 543 F.3d 1080 (9th Cir. 2008)........................................11

*United States v. Gardner*, 475 F.2d 1273 (9th Cir. 1973)....................................24

*United States v. Klebig*, 2006 WL 2038366 (E.D. Wis. July 20, 2006).................22

*United States v. Koon*, 34 F.3d 1416 (9th Cir. 1994).........................................23

*United States v. Lanier*, 520 U.S. 259 (1997).................................................17

*United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007) ....................................21

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) .........................................................................................................17

*Ward v. EEOC*, 719 F.2d 311 (9th Cir. 1983)...................................................23

*Wearry v. Cain*, 577 U.S. 385 (2016) .............................................................15

*Whirl v. Kern*, 407 F.2d 781 (5th Cir. 1968) .....................................................24

*Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010)...............................................14

*Woods v. City of Reno*, 2020 WL 4194844 (D. Nev. July 21, 2020) ....................31

*Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017) .................................................17, 18, 25

## **Other Authorities**

Cal. Gov. Code § 825..................................................................................32

LOEVY & LOEVY
Attorneys at Law

*Table of Contents and Authorities*                                    22-CV-07450

### Introduction

In 2001, Plaintiff Alexander Torres was arrested, prosecuted, and convicted of a drive-by shooting that he did not commit. He proclaimed his innocence through more than twenty years of imprisonment. Torres's conviction was overturned and he received a judicial determination of innocence. In this civil rights action, Torres brings claims for suppression and fabrication of evidence against the County of Los Angeles, the Los Angeles Sheriff's Department (LASD) and its deputies who caused his wrongful conviction.

Torres's wrongful conviction was the product of a scheme by Defendants Jimmie Gates and David Castillo to "solve" a homicide by any means necessary. Gates and Castillo not only suppressed myriad pieces of exculpatory evidence, but also fabricated inculpatory witness statements from whole cloth. They roped in Daren Diviak, who agreed to hide evidence implicating Torres; Alfredo Castro, who lied about a critical eyewitness's statements; and Larry Lincoln, their supervisor, who covered up the scheme.

Defendants acknowledge that Plaintiff's Section 1983 claim for suppression of evidence (Count I) against Gates and Castillo must be tried. However, Defendants seek summary judgment on all other claims against the Defendants. But Defendants have forfeited argument on several of Plaintiff's claims. They also ask the Court to resolve numerous fact questions in their favor, which is forbidden at summary judgment. Factual disputes preclude judgment as a matter of law and require a trial to resolve. The motion should be denied.[1]

### Legal Standard

Rule 56 permits summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Where

---

[1] Plaintiff voluntarily dismisses Defendants Atabaki, Barton, Deyoung, O'Shea, Tillmann, and Salazar, as well as Count IX for all Defendants (state-law malicious prosecution).

*Plaintiff's Response to Defendants' Motion for Summary Judgment*     22-CV-07450

"'evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" a genuine issue of material fact exists. *Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248). The evidence must be construed "'in the light most favorable to the opposing party,'" and inferences must be drawn "in favor of the nonmovant." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (cleaned up).

### Background

On December 31, 2000, Martin Guitron was murdered in a drive-by shooting in Paramount, California. The killer was Jose Perez and the driver was Luis Gonzalez. Torres was not involved. Defendants Gates and Castillo were LASD homicide detectives who responded and interviewed witnesses. Their early leads were not promising. Enrique Valdovinos, a Compton Vario Segundo (CVS) gang member, told them that an "Alex" he knew from Compton Vario Tortilla Flats (CVTF) had been fighting with Guitron, but Valdovinos also told them that he saw the shooter and the shooter was not the "Alex" he knew from CVTF. Valdovinos described the shooter as around five feet six inches tall and wearing a long-sleeved plaid shirt. Valdovinos mentioned he didn't see the shooting, didn't see a gun in the shooter's hands, and didn't even hear the shots until he had biked 20 feet away, but Gates and Castillo never wrote those details down. Another eyewitness, Carlos Arechiga, was nearly 400 feet away at the time of the shooting and described the shooter very differently—as only five feet tall, slim and skinny, and wearing a white t-shirt. These details impeached Valdovinos, so Gates and Castillo never wrote them down, either. In fact, Gates and Castillo buried the recording of Valdovinos's interview by mislabeling it "Raul Cordova, No Side B." Pl.'s Resp. to Defs.' Uncontested Material Facts & Statement of Add'l Facts (PAMF) ¶¶ 65; 186-89; 192-93; 197-206; 240-49.

Gates and Castillo identified many other suspects, and learned further details impeaching Valdovinos, but never disclosed them; instead, they narrowed their focus on Torres. For one, Valdovinos initially described the murder vehicle as a Chevy

*Plaintiff's Response to Defendants' Motion for Summary Judgment*                    22-CV-07450

Caprice or a Chevy Impala, but later said it was "the same model" as a Mercury Marquis. Alternative suspect Oscar Valenzuela, whom Torres identified to police (and his lawyer argued at trial) as a suspect in the case, drove a Mercury Marquis—and in fact, Valdovinos **identified** the specific Marquis that Valenzuela drove as matching the model of the murder vehicle. PAMF ¶¶ 59; 205; 225-26; 290-301; 316-19.

Gates and Castillo engaged gang detective Daren Diviak to help them. At Torres's trial, the prosecutor told the jury that Diviak was not involved in the investigation. On January 3, Valdovinos told Castillo and Gates that a CVS gang member named "Tweetie" told him not to talk to detectives. Diviak identified Tweetie as Esteban Garnica, who was in prison at the time Valdovinos claimed they spoke. Gates and Castillo hid this information in an undisclosed investigative file (the "Poor Boy."). PAMF ¶¶ 207-224; 328-31.

Around January 9, someone confronted Valdovinos's friend Lupe with a gun in front of Valdovinos's house. Gates and Castillo interviewed Valdovinos. In the tape recording of that interview, Valdovinos told Gates and Castillo he assumed the man who confronted Lupe was Torres because of what Lupe told Valdovinos. Gates and Castillo decided to manipulate Valdovinos's statement. They never wrote down Valdovinos's statements that he didn't see who the person was, or that he never saw a gun because it was dark. They ignored that Valdovinos was confused about the name of Guitron's rival and called him "Alejandro" (which Torres didn't go by). Instead, Gates and Castillo repeatedly pressured Valdovinos and twisted his words to make it sound like Valdovinos had seen Torres. PAMF ¶¶ 227-234.

On January 10, 2001, Gates and Castillo conducted an unorthodox photo identification where they started by showing Valdovinos photographs of Torres's home and car. Then Gates and Castillo showed Torres in a "six-pack" identification in which Torres was the only one of six photographs wearing a plaid shirt like Valdovinos had described. The description was so biased that in a fairness assessment experiment conducted by psychologist Nancy Franklin, 23 out of 30 participants

*Plaintiff's Response to Defendants' Motion for Summary Judgment*          22-CV-07450

1    chose Torres's photo based on Valdovinos's initial description, and there was a less

2    than 2 in a quadrillion chance of such a result occurring by chance. Castillo and Gates

3    hid evidence of the procedure by destroying their recordings or by violating the

4    LASD's rule that all interviews be recorded. PAMF ¶¶ 77-78; 363-373.

5        Diviak then met twice with Gates and Castillo on January 16, 2001: first to

6    make a plan to gather intelligence about Torres, and then to report back after visiting

7    Torres's house following the surveillance mission. Diviak would later testify at

8    Torres's trial as an apparently neutral "gang expert." PAMF ¶¶ 333-37.

9        On January 18, 2001, Torres was arrested and Gates and Castillo interrogated

10    him. Castillo threatened to "put" the murder on Torres if he did not confess or identify

11    the killer. Torres asked for a lawyer, but Gates and Castillo ignored him. Torres told

12    Gates and Castillo that Oscar Valenzuela was the killer. PAMF ¶¶ 82; 238-39.

13        Gates and Castillo then traveled to Mexico in February 2001 to manufacture a

14    further identification from Carlos Arechiga, enlisting homicide detective Alfredo

15    Castro. Castro did not interpret during the conversation with Arechiga and did not

16    assist in the photo identification procedure, but Gates and Castillo lied in their report

17    and said he did. Gates and Castillo interviewed Arechiga twice, but their report said

18    they only met with him once. Gates and Castillo showed Arechiga a photo array with

19    Torres's photo, but Arechiga told them that two of the people in the array looked like

20    the shooter. Gates and Castillo told Arechiga he had to pick one. Ultimately, Arechiga

21    only said that Torres's photo was "possibly the person" or "looked like" the shooter.

22    PAMF ¶¶ 250-61.

23        In March 2001, Valdovinos tried to frame **another** CVTF associate for

24    Guitron's murder. He told Gates and Castillo he had seen "Tricks" driving the murder

25    vehicle. Gates and Castillo conducted a photo identification in which Valdovinos

26    identified Juan Jose Radillo, AKA "Tricks," as the driver. Gates and Castillo did not

27    document the identification, but instead buried it in a "possible suspects" folder in

28    their "Poor Boy" investigative file which was never revealed to Torres. Radillo could

*Plaintiff's Response to Defendants' Motion for Summary Judgment*        22-CV-07450

LOEVY & LOEVY
Attorneys at Law

1    not have been the driver because he was in prison serving a 32-year sentence for

2    attempted murder at the time Guitron was murdered, which Gates and Castillo learned

3    five days after Valdovinos made that false identification. PAMF ¶¶ 302-15; 318-19.

4         Torres was criminally tried in June. On June 10, 2001, right before Arechiga

5    testified at Torres's trial, Gates and Castillo spoke with Arechiga and falsely

6    attributed further incriminating statements to him. The big lie was that Arechiga was

7    sure that Torres was the shooter, but as Arechiga testified at trial, that was false. There

8    were other lies too, like that Arechiga was just across the street when the murder

9    occurred (not nearly 400 feet away at his home, as he testified and his wife later

10   confirmed) and that Arechiga and his family had been intimidated by CVTF members

11   (also false). Gates and Castillo learned that Arechiga used a false name and was

12   unreliable but did not document that in a report. PAMF ¶¶ 262-72.

13        Gates and Castillo's supervisor Lieutenant Larry Lincoln endorsed their

14   scheme. He reviewed their reports, which obviously contained missing recordings and

15   other omissions, but never did anything to intervene or interrupt their illegitimate

16   investigation. PAMF ¶¶ 325-27.

17        Because of Defendant's misconduct, Torres was convicted of Guitron's murder

18   and sentenced to 40 years to life in prison. PAMF ¶ 191.

19                                **Argument**

20        Defendants have waived argument on Count I (suppression of evidence theory)

21   as to Defendants Castillo and Gates. Dkt. 111-1 at 19.

22        Defendants have forfeited argument as to Count I (fabrication of evidence

23   theory) as to Gates, Castillo, and Castro; Count I (unduly suggestive eyewitness

24   identification procedures) as to Gates, Castillo, and Castro; Count V (*Monell* claim) as

25   to three of Plaintiff's five trial theories; and Count VIII (Bane Act).

26   I.   Count I (Due Process/Fair Trial)

27        Plaintiff's first claim is for violating his due process right to a fair trial pursuant

28   to 42 U.S.C. § 1983. That claim includes three theories: fabrication of evidence,

*LOEVY & LOEVY*
*Attorneys at Law*

*Plaintiff's Response to Defendants' Motion for Summary Judgment*          22-CV-07450

unduly suggestive eyewitness identification procedures, and suppression of evidence. All theories must be tried.

### A.    Fabrication of Evidence (Count I)

Regarding Count I (42 U.S.C. § 1983 due process/fair trial violation), Defendants seek summary judgment on Plaintiff's fabrication of evidence theory. But Defendants haven't met their burden to move for summary judgment, and record requires a trial.

A police officer violates due process by manufacturing false evidence used to deprive a defendant of his liberty. *Banks v. Dretke*, 540 U.S. 668, 694 (2004), *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Rodarte v. Gutierrez*, 2023 WL 109723, at *1 (9th Cir. Jan. 5, 2023).

### i.    Defendants Forfeited Argument

Plaintiff's complaint alleged that Defendants falsified police reports; these allegations have always been part of the case. *See* Dkt. 1 (Compl.) ¶¶ 176-77. Those fabrications include:

- Representing that Valdovinos saw Guitron being shot on 12/31/00, while omitting that Valdovinos was already twenty feet away from Guitron when he first heard shots, never saw a gun, and did not even realize Guitron had been shot until an officer later told him (PAMF ¶¶ 197-204);

- Representing that Valdovinos saw Torres confront his friend Lupe and Valdovinos was "certain" about it, while omitting that it was dark, that Valdovinos never saw a gun, and that Valdovinos had to ask Lupe who the person was (PAMF ¶¶ 227-34);

- Lying that Castro interpreted in Spanish the 2/15/01 conversation with Arechiga to bolster the fabrication (PAMF ¶¶ 252-56);

- Omitting that detectives met with Delgado and Arechiga multiple times in February to obtain an identification (PAMF ¶ 251);

LOEVY & LOEVY
Attorneys at Law

*Plaintiff's Response to Defendants' Motion for Summary Judgment*    22-CV-07450

- Falsely stating that Arechiga said he was just across the street from Guitron's murder, when he was in fact 400 feet away (PAMF ¶¶ 267; 270); and

- Falsely stating that Arechiga said Torres was the shooter (PAMF ¶¶ 268; 272).

Defendants have forfeited argument by ignoring these fabrications and may not raise new arguments for the first time in reply. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990); *Meggs v. Boulevard Ventures, LLC*, 2016 WL 1259390, at *4 (D. Nev. Mar. 30, 2016).

### ii.    A Jury Must Decide Plaintiff's Fabrication Theory

If the Court declines to find forfeiture, Plaintiff's fabrication theory should nevertheless proceed to trial. At trial, Torres can prove fabrication directly, by showing that Defendants knew that the evidence was false, *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017), or circumstantially, by showing that Defendants continued investigating Torres "even though [they] knew or should have known that [he] was innocent," or "used investigative techniques that were so coercive and abusive that [they] knew or should have known that those techniques would yield false information." *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015) (discussing the two *Devereaux* prongs). These are not independent theories of liability; they are merely different ways to prove intent. *Id.* Material disputes of fact preclude summary judgment in both methods of proof.

"[D]eliberate fabrication can be shown by direct evidence, for example, when 'an interviewer … deliberately mischaracterizes witness statements in her investigative report.'" *Spencer*, 857 F.3d at 793 (cleaned up). On the "direct" route, the investigator's knowledge or reason to know of the plaintiff's innocence need not be proved, because the Constitution "prohibits the deliberate fabrication of evidence whether or not the officer knows that the person is innocent." *Id.* at 800. This includes false statements in police reports and declarations, such as reports that "contain[] evidence or statements" that were "never made." *Costanich v. Dep't of Social & Health Svcs.*, 627 F.3d 1101, 1112 (9th Cir. 2010); *see Blankenhorn v. City of*

*Plaintiff's Response to Defendants' Motion for Summary Judgment*                    22-CV-07450

*Orange*, 485 F.3d 463, 482 (9th Cir. 2007). Officers can also fabricate by omission by presenting only one side of a witness's statement. *Costanich*, 627 F.3d at 1112; *Lobato v. Las Vegas Metro. Police Dep't*, 2022 WL 4017055, at *7-8 (D. Nev. Sept. 1, 2022), *aff'd in part, rev'd in part and remanded*, 2023 WL 6620306 (9th Cir. Oct. 11, 2023); *cf. Blankenhorn*, 485 F.3d at 484 (finding omissions from police report actionable in malicious prosecution context). Here there is ample such evidence.

A jury could conclude that Defendants fabricated Carlos Arechiga's supposed identification of Plaintiff. Arechiga testified that he did not identify Plaintiff, yet Defendants' reports say the opposite. A jury could conclude that Defendants fabricated reports saying Arechiga was "just across the street" because Arechiga's wife confirmed that Arechiga was 400 feet away when the murder occurred. A jury could conclude that Gates and Castillo wrote false reports about Valdovinos's knowledge and observations of (1) Guitron's murder and (2) the armed confrontation of his friend Lupe several days later because the recordings of the interviews with Valdovinos are materially different than the reports (and the reports are misleading absent the omitted information). And a jury could conclude that Castro (the supposed interpreter) was complicit in the fabrication because he and Gates told the same lies at trial. PAMF ¶ 255.

Separately, there is ample circumstantial proof of fabrication: Gates and Castillo knew or should have known that Torres was innocent, and they used coercive and abusive tactics in the investigation. The eyewitnesses were at best equivocal. Valdovinos tried to tell Gates and Castillo that he was unsure of his identification and that he was only identifying Torres because of his suspicions, not his observations. Arechiga said that two of the six people in the six-pack identification "looked like" the shooter. The shooter was not very familiar with the victim and asked him multiple times if he was "Casper", which makes it less likely that the shooter was familiar with the victim (as Torres was with Guitron). Gates and Castillo also knew that Valdovinos had lied about being confronted by "Tweetie" and lied again by identifying "Tricks"

LOEVY & LOEVY
Attorneys at Law

1 as the driver. Gates and Castillo also refused to acknowledge Valdovinos and

2 Arechiga's denials that they saw the shooter and threatened to "put" the murder on

3 Torres while refusing him a lawyer. PAMF ¶¶ 196-224; 227-34; 238-39; 302-15. The

4 jury must decide. *See Atkins v. Cnty. of Riverside*, 151 F. App'x 501, 506 (9th Cir.

5 2005) (holding false statement of witness account in police report satisfied

6 *Devereaux*'s second prong); *Rose v. San Joaquin Cnty.*, 2006 WL 1795103, at *7

7 (E.D. Cal. June 28, 2006) (finding *Devereaux*'s second prong satisfied where

8 investigators pressured witness to change identification and indicated who the "real"

9 culprit was).

10    Defendants' citation to *O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir. 2021) is

11 unavailing. That case holds that a "mere omission" or "technical" inaccuracy in a

12 police report will not, standing alone, support a claim for fabrication of evidence. *Id.*

13 at 1045-46. But the above fabrications were consequential and unduly bolstered the

14 prosecution's case. The Court cannot make the opposite inference in favor of the

15 defendants. *See Costanich*, 627 F.3d at 1113; *Lobato*, 2023 WL 6620306, at *1

16 (rejecting application of *O'Doan* where "totality of the [police investigators']

17 mischaracterizations, discrepancies, and omissions" precluded summary judgment).

18    **B.    A Jury Must Decide Plaintiff's Unduly Suggestive Eyewitness**

19         **Identification Theory**

20    Disputed facts also preclude summary judgment on the suggestive identification

21 theory. There is no dispute the identification evidence was used at trial. The operative

22 questions here are (1) whether there were suggestive procedures, and (2) whether the

23 identification was unreliable. *Neil v. Biggers*, 409 U.S. 188, 199 (1972); *Manson v.

24 Brathwaite*, 432 U.S. 98, 113 (1977); *Alexander v. City of South Bend*, 433 F.3d 550,

25 555-56 (7th Cir. 2006); *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007); *see

26 also Pasene v. Correa*, 656 F. Supp. 3d 1185, 1207 (D. Haw. 2023) (applying *Biggers*

27 standard to Section 1983 unduly suggestive identification claim).

28

*Plaintiff's Response to Defendants' Motion for Summary Judgment*                    22-CV-07450

LOEVY & LOEVY
Attorneys at Law

1    Suggestiveness occurs, among other ways, when a person is in "some way

2    emphasized" or the police indicate that "one of the persons pictured committed the

3    crime." *Simmons v. U.S.*, 390 U.S. 377, 383 (1968). The detectives' suggestive

4    methods here included: conducting suggestive showup (single photo) identification

5    procedures with Torres's residence and Torres's car; presenting a photo array of

6    Torres to Valdovinos where only Torres wore clothing matching Valdovinos's

7    description of the suspect; not separating Arechiga and Delgado during the photo

8    identification procedures; and telling Arechiga that he "had to pick one." As a result,

9    Dr. Franklin, an experienced research psychologist with expertise in memory and

10   eyewitness identification, concluded that any identifications of Torres made by

11   Valdovinos and Arechiga were highly unreliable and were likely the result of

12   exposure to highly suggestive influences introduced by police. The identifications

13   were further unreliable because Torres was completely innocent of the crime. PAMF

14   ¶¶ 186-95; 363-76.

15       The jury must also decide "whether under the 'totality of the circumstances' the

16   identification was reliable even though the confrontation procedure was suggestive."

17   *Biggers*, 409 U.S. at 199 (1972). The "factors to be considered … include the

18   opportunity of the witness to view the criminal at the time of the crime, the witness'

19   degree of attention, the accuracy of the witness' prior description of the criminal, the

20   level of certainty demonstrated by the witness at the confrontation, and the length of

21   time between the crime and the confrontation." *United States v. Drake*, 543 F.3d

22   1080, 1088 (9th Cir. 2008) (quoting *Biggers*, 409 U.S. at 199-200).

23       Here again, Defendants have forfeited the point by (1) not identifying the

24   applicable legal standard and (2) not making any arguments about the overall

25   reliability of the identification. In any case, there is clearly a jury issue. Torres was

26   innocent of the murder; Valdovinos said multiple times that he wasn't sure the shooter

27   was Alex (for example, that he thought "Alex," who he suspected of the murder,

28   "might [have] sen[t] someone else" to commit it; Valdovinos was 20 feet away and

LOEVY & LOEVY
Attorneys at Law

- 11 -
*Plaintiff's Response to Defendants' Motion for Summary Judgment*                22-CV-07450

pedaling faster when he heard the first shot; Valdovinos had only seen Torres a couple times before; and Arechiga never identified Torres at all, either in conversations with detectives or at trial. PAMF ¶¶ 60-61; 186-87; 227-34.

Defendants respond that their investigation was a "typical gang murder investigation" based on "reliable facts" in which the inconsistencies were all "examined and impeached during trial". Dkt. 111-1 at 20-21. A reasonable jury could easily find otherwise. They could credit Valdovinos's statement that the "Alex he knew" from CVTF (i.e., Torres) was not the murderer and note that Valdovinos relied on his friend Lupe's assumptions about who confronted him, not his own observations. They could also credit Dr. Scott's testimony that the Detectives' actions were irregular and fell short of generally accepted standards. PAMF ¶¶ 66; 227-34; 388-99. The jury could take note of all the suppressed exculpatory evidence, which shows the inconsistencies in the investigation were **not** examined or impeached at trial. The jury could note the coercive and abusive investigative tactics including pressuring eyewitnesses to make false identifications and denying Torres access to a lawyer. Defendants' other arguments boil down to resolving disputed facts in their favor, which is not permitted at this stage. This issue is for the jury.

### i.    Causation Is No Defense

Defendants seek refuge in the fact that prosecutors used their fabricated evidence to prosecute Torres, Dkt. 111-1 at 21-22, but that argument fails for legal and factual reasons.

Under Section 1983, a police officer is liable when that officer "causes [the individual] to be subjected" to constitutional violations. 42 U.S.C. § 1983. Indeed, *Monell v. New York Department of Social Services* acknowledged, "Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort." 436 U.S. 658, 692 (1978). *Staub v. Proctor Hospital* explains that proximate cause "requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that [are] too remote,

*Plaintiff's Response to Defendants' Motion for Summary Judgment*                    22-CV-07450

LOEVY & LOEVY
Attorneys at Law

1  purely contingent, or indirect.'" 562 U.S. 411, 419 (2011) (citing *Hemi Group, LLC v.*

2  *City of New York*, 559 U.S. 1, 9 (2010). Applying these principles, the Supreme Court

3  in *Malley v. Briggs* rejected the "no causation" argument that Defendants make here,

4  holding that an officer who submits a false affidavit can be liable for violating the

5  Constitution even though it is a judge who reviews the affidavit and issues the arrest

6  warrant. 475 U.S. 335, 345 n.7 (1986).

7      This defense further fails because "a § 1983 defendant is liable for setting in

8  motion a series of acts by others which the actor knows or reasonably should know

9  would cause others to inflict the constitutional injury," including when "they

10  affirmatively misrepresent[] the truth ... in reports on which the prosecutors and

11  defense counsel relied." *Tatum v. Moody,* 768 F.3d 806, 817 (9th Cir. 2014) (cleaned

12  up); *see also Crowe v. Cnty. of San Diego*, 608 F.3d 406, 430-31 (9th Cir. 2010)

13  (holding that a contrary rule would effectively bar *any* § 1983 action because a

14  prosecutor always introduces false evidence).

15      Factually, the Defendants fabricated evidence, hid evidence from prosecutors,

16  manufactured identifications, wrote false reports used by prosecutors, and testified

17  consistent with their false evidence. The record construed in Torres's favor shows

18  ample direct influence by Defendants over the decision to prosecute and causation of

19  Torres's injuries. It makes no difference that state prosecutors may *also* have been a

20  proximate cause of Torres's injuries because it is common for injuries to have

21  multiple proximate causes. *Staub*, 562 U.S. at 419-20. "[A] prosecutor's decision to

22  charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges

23  but to proceed to trial—none of these decisions will shield a police officer who

24  deliberately supplied misleading information that influenced the decision," as

25  Defendants did here. *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988).

26

27

28

LOEVY & LOEVY
Attorneys at Law

*Plaintiff's Response to Defendants' Motion for Summary Judgment*                    22-CV-07450

1

2

  **C.**  **A Jury Could Find Diviak, Castro, and Lincoln Suppressed Exculpatory Evidence.**

3

4

  Diviak, Lincoln, and Castro seek summary judgment on Plaintiff's suppression of evidence theory.

5

6

7

8

9

10

  *Brady* requires that exculpatory and impeachment evidence material to the criminal case be disclosed to the prosecution and defense. *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). To succeed, Torres must prove that the Defendants suppressed evidence favorable to him, that was material to the criminal case, and that they did so intentionally or with deliberate indifference to or reckless disregard for Torres's rights. *Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018).

11

12

13

14

  At the outset, Castro suppressed that he had participated in fabricating a statement from Arechiga. Section I(A)(ii), *supra*. Such impeachment evidence is material as a matter of law within the meaning of *United States v. Bagley*, 473 U.S. 667, 676 (1985), and *Giglio*, 405 U.S. 150, 154-55 (1972).

15

16

17

18

19

20

21

22

23

24

25

  Torres was deprived of other critical evidence. As discussed above, he never learned that Valdovinos had changed his description of the murder vehicle from a Chevy Caprice to a Mercury Grand Marquis—the same kind of car driven by Oscar Valdovinos, the alternative suspect Torres introduced at trial. Torres never learned that Valdovinos falsified the identity of the CVS gang members pressuring him to tell detectives Torres committed the shooting ("Tweetie") or that he lied to try to frame a CVTF member ("Tricks") who was in prison at the time of the murder, thereby revealing Valdovinos's gang motivation and impeaching Valdovinos's identifications. And Torres never learned that Valdovinos had not seen the shooting and had not seen a gun on either December 31, 2000 or when his friend Lupe was confronted, allowing Valdovinos to lie at trial that he saw Torres with a gun both times.

26

27

28

  The above is "classic *Brady* material." *Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010); *see Carillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1219-25 (9th Cir. 2015) (holding law in 1978 clearly established that police officers were bound to

LOEVY & LOEVY
Attorneys at Law

disclose material exculpatory evidence, including of an alternative suspect). The impeachment evidence is material under *Giglio*, 405 U.S. at 154. Further, it would have allowed Torres to make an "attack on the integrity of the investigation" and was thus obviously favorable to him. *Kyles*, 514 U.S. at 449.

Defendants do not challenge that the suppressed evidence was material (and have forfeited the point); even if they had, the materiality of the evidence is obvious. "Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Giglio*, 405 U.S. at 154). A litigant "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* All the suppressed evidence is considered in aggregate, not piece by piece. *Id.* at 394. And evidence that would impeach a key eyewitness is material. *Giglio*, 405 U.S. at 153-54. Here, this was an eyewitness case with no forensic or physical evidence against Torres. The suppressed evidence directly undermined the two purported eyewitness identifications that made up the entirety of the prosecution's case. Defendants have not developed any argument that the suppressed evidence was not weighty enough to affect the verdict; they have forfeited any such argument and may not make one for the first time on reply. All of this is more than enough for a reasonable jury to find that the suppression harmed Torres. *See, e.g.*, *Gonzalez v. Wong*, 667 F.3d 965, 984 (9th Cir. 2011) ("Where the withheld evidence opens up new avenues for impeachment, it can be argued that it is still material."); *Wearry*, 136 S. Ct. at 1006 (evidence impeaching one witness sufficient to be material).

The final element is intent: whether the officer "'acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors. *Mellen*, 900 F.3d at 1096. Here, "Plaintiffs are not required to establish that the [police officers] acted in bad faith in withholding the evidence." *Tennison v. City & Cnty. Of San Francisco*, 570 F.3d 1078, 1090 (9th Cir. 2009). This is not a high bar at summary judgment, as whether an officer "acted

LOEVY & LOEVY
Attorneys at Law

with deliberate indifference or reckless disregard 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Mellen*, 900 F.3d at 1101 (quoting *Lemire v. Cal. Dep't of Corrs. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013)).

Diviak was intimately involved in the investigation. He acquired and shared key pieces of suppressed evidence with Gates and Castillo, including the fact that "Tweetie" was in prison at the time Valdovinos claimed to speak with him. Diviak secretly met with Gates and Castillo twice on January 16, 2001—first to plan a discreet interview with Torres, and then to report back on his surveillance and results. Diviak then lied about his involvement, leading the prosecutor to represent to the Court and the jury that Diviak was not involved in the Guitron murder investigation. PAMF ¶¶ 328-39. This was a coordinated effort to hide Diviak's involvement and the results of his investigation (including that Valdovinos lied about being confronted by "Tweetie"), and Diviak's decision to join the scheme means a jury could find deliberate indifference or reckless disregard by him.

Castro is similar. Gates and Castillo felt confident writing false reports that Castro had interpreted during the February 15, 2001 interview with Arechiga—even though he hadn't—and Castro and Gates comfortably repeated the lie at trial. Castro was complicit in Gates and Castillo's decision to illicitly fail to record, hide the recording, or destroy the recording of the February 15, 2001 interview with Arechiga. Gates and Castillo would not have pursued this scheme without Castro's agreement, or so a reasonable jury could conclude. *See* Section IV (Conspiracy) below.

Finally, Lincoln testified that he conducted an administrative review of homicide detectives' files for completeness. PAMF ¶¶ 325-27. Consistent with his practice, he would have noticed the many glaring omissions in the file, including that there were no recordings of two critical eyewitness interviews (the 1/3/01 Valdovinos interview and the 2/15/01 Arechiga/Delgado interview) and that a third apparently missing eyewitness interview (the 1/1/01 interview with Arechiga) was present but

LOEVY & LOEVY
Attorneys at Law

1    was mislabeled as "No Side B." A jury could reasonably conclude that Lincoln

2    blessed these suppressions to pursue Torres's conviction.

3         In sum, the withholding of evidence was beyond reckless—it was willful and

4    intentional. All the best evidence impeaching Valdovinos and Arechiga, including

5    inconsistencies in their descriptions of the suspect and their locations when the murder

6    was committed, was suppressed. Again, mental state is not an appropriate basis for

7    summary judgment where, as here, the facts are hotly disputed. S*ee Vucinich v. Paine,*

8    *Webber, Jackson & Curtis, Inc*., 739 F.2d 1434, 1436 (9th Cir. 1984); *cf. Harris v.*

9    *Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including

10   questions of intent, should be left to the jury.")

11   ## D. There Is No Qualified Immunity on Count I

12        Defendants assert qualified immunity. For Castro, Diviak, and Lincoln, they

13   challenge whether Plaintiff can show a constitutional violation (which is addressed

14   above) and whether there was "clearly established law" giving them fair notice that

15   their actions violated Torres's rights. For Gates and Castillo, Defendants challenge

16   only whether there was clearly established law that their "investigative activities

17   constituted deliberate fabrication of evidence." Dkt. 111-1 at 30-31.

18        Regarding whether a right was "clearly established," the core issue is notice;

19   *i.e.,* the "'salient question … is whether the state of the law' at the time of an incident

20   provided 'fair warning' to the defendants 'that their alleged [conduct] was

21   unconstitutional.'" *Id*. at 656 (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)).

22   Analysis of whether a right was "clearly established" must occur in the context of a

23   particular case, not in the abstract or at too high a level of generality. *Anderson v.*

24   *Creighton*, 483 U.S. 635, 640 (1987). On the flipside, the Supreme Court has

25   consistently rejected the notion that qualified immunity is confined to determining

26   whether there is a case exactly on point; "officials can still be on notice that their

27   conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S.

28   at 741 (citing *United States v. Lanier*, 520 U.S. 259 (1997)); *see Ziglar v. Abbasi*, 137

LOEVY & LOEVY
Attorneys at Law

*Plaintiff's Response to Defendants' Motion for Summary Judgment*          22-CV-07450

S.Ct. 1843, 1866-67 (2017) ("It is not necessary, of course, that the very action in question has previously been held unlawful. That is, an officer might lose qualified immunity even if there is no reported case directly on point." (cleaned up)). Accordingly, qualified immunity is unavailable in the "obvious case," *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004) (*per curiam*), and where the application of pre-existing law is "apparent" even where there is no case 'directly on point.'" *Ziglar*, 137 S. Ct. at 1866. Otherwise, qualified immunity would become near-absolute immunity. *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir.2011) (*en banc*) ("If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations" of the constitution).

### i.  Fabrication of Evidence

There is "a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government"; the "proposition is virtually self-evident." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001); *see Pyle v. Kansas*, 317 U.S. 213, 216 (1942). The Ninth Circuit recently held that the prohibition on deliberately mischaracterizing suspect or witness statements in investigative reports was clearly established in 2001. *Lobato*, 2023 WL 6620306, at *1. A jury could conclude that Gates and Castillo wrote false, incomplete, and misleading police reports and pressured witnesses to make false statements incriminating Torres.

Castro is implicated, too. Gates and Castillo would not have written the lies in their report about Castro interpreting during the conversation if Castro had not agreed to back them up at trial. And that's exactly what he did: Castro and Gates told the same false story about Castro supposedly translating during the 2/15/01 interview with Arechiga. See Section IV (Conspiracy) below. Castro actively participated in fabricating Arechiga's statements and is liable for that fabrication; and Defendants provide no reasoned basis to distinguish his role from Gates or Castillo.

*Plaintiff's Response to Defendants' Motion for Summary Judgment*                    22-CV-07450

ii.    Suppression Theory

Castro, Diviak, and Lincoln cannot claim qualified immunity for their role in suppressing exculpatory evidence. The law was well established in 2001 that doing so was forbidden. Diviak could not have reasonably believed that it was constitutionally permitted to hide evidence of an eyewitness's gang-motivated lies; Castro could not have reasonably believed that hiding an eyewitness's identification of another man in a photo lineup was permitted; and Lincoln could not have reasonably believed that it was appropriate to let homicide detectives hide and destroy recordings of eyewitness interviews.

As to *Brady*, "whether it was clearly established, in 1997, that police officers had a duty to disclose material impeachment evidence to prosecutors" is "not an open question." *Mellen*, 900 F.3d at 1103. The law as far back as 1978 clearly established that police officers were bound to disclose material exculpatory information. *Carillo*, 798 F.3d at 1219-25 (citing *United States v. Butler*, 567 F.2d 885 (9th Cir. 1978)). The same is true for exculpatory and impeachment evidence. *E.g., Giglio*, 405 U.S. at 154 (decided in 1972); *Kyles*, 514 U.S. at 449 (decided in 1995).

iii.    Suggestive Identification

The right against unduly suggestive identifications was clearly established in 2001 (although Defendants forfeited the point by not raising it). In 1968, the Supreme Court announced that identification procedures that highlight who the suspect is are unduly suggestive. *Simmons*, 390 U.S. 377. And it has been the law since at least 1977 that subjecting a criminal defendant to unduly suggestive identification procedures that taint the criminal proceedings violates due process. *Manson*, 432 U.S. 98; *see also Sanders v. City of Chicago Heights*, 2016 WL 2866097, at *10 (N.D. Ill. May 17, 2016) (holding it was clearly established in 1993 that impermissibly suggestive identification procedures violate due process rights). Qualified immunity has no application to any of Plaintiff's theories under Count I.

*Plaintiff's Response to Defendants' Motion for Summary Judgment*                22-CV-07450

1

2

## II.     A Jury Must Decide Torres's Fourth Amendment Illegal Seizure and Malicious Prosecution Claims

3     The Supreme Court held in *Manuel v. Joliet*, 580 U.S. 357, 363-64 (2017), and

4   *Thompson v. Clark*, 596 U.S. 36, 42 (2022), that it has long recognized a Fourth

5   Amendment claim for illegal seizure pursuant to legal process where the detention is

6   without probable cause. When Torres was arrested on January 18, 2001, Defendants

7   had already hidden and fabricated several critical pieces of evidence against him.

8   PAMF ¶¶ 197-206; 210-24; 227-49; 279-89;. By the time of his preliminary hearing,

9   Defendants had hidden and fabricated even more evidence. PAMF ¶¶ 250-61; 292-

10  301. In the light of those omissions and fabrications, there was no probable cause to

11  detain Torres, or so a jury could decide. Defendants' arguments to the contrary fail

12  (Dkt. 111-1 at 24-25). Defendants raise immunity and estoppel defenses, and

13  challenge whether a material dispute of fact exists about probable cause but do not

14  challenge whether material disputes of fact exist as to other elements of the claim

15  (such as malice) and have forfeited argument on those points.

16   ### A.     There is No Immunity or "Collateral Estoppel"

17     Defendants argue they are immune because a criminal complaint was filed

18  against Torres and probable cause was found at his preliminary hearing. Dkt. 111-1 at

19  23-24. Not so.

20     To start, the presumption of prosecutorial independence associated with filing a

21  criminal charge is rebutted by "the presentation by the officers to the district attorney

22  of information known by them to be false." *Smiddy v. Varney*, 665 F.2d 261, 266-67

23  (9th Cir. 1981), *overruled in part on other grounds by Beck v. City of Upland*, 527

24  F.3d 853 (9th Cir. 2008). Thus, "[d]eliberately fabricated evidence in a prosecutor's

25  file can rebut any presumption of prosecutorial independence." *Caldwell v. City and

26  Cnty. of San Francisco*, 889 F.3d 1105, 1116 (9th Cir. 2018). Likewise, just as with

27  warrant applications, knowingly withholding relevant information also rebuts the

28  presumption of independence. *See Manuel*, 137 S. Ct. at 920 n.8.. Here, Defendants'

LOEVY & LOEVY
Attorneys at Law

fabrication of inculpatory evidence and suppression of exculpatory evidence tainted the proceedings and rebutted the presumption of independence.

For the same reasons, collateral estoppel does not apply. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004) ("[C]ollateral estoppel does not apply when the decision to hold a defendant to answer was made on the basis of fabricated evidence presented at the preliminary hearing or as the result of other wrongful conduct by state or local officials.").

### B.    Defendants Lacked Probable Cause to Prosecute Torres

There is a material dispute of fact about probable cause, too. The "substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that belief must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (cleaned up). It exists where "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated, and police "may not disregard facts tending to dissipate probable cause." *Bigford v. Taylor,* 834 F.2d 1213, 1218 (5th Cir. 1988). If a reasonable jury could find an absence of probable cause, summary judgement should not be granted. *See Reed v. Lieurance*, 863 F.3d 1196, 1205 (9th Cir. 2017).

Prior to arresting Torres, Gates and Castillo had just two pieces of evidence supporting Torres's arrest: first, circumstantial motive evidence based on what Valdovinos had told him, and second, Valdovinos's manufactured identification of Torres. PAMF ¶¶ 227-34. The "motive" evidence, standing alone, does not justify an arrest, and the other identification evidence was fabricated and therefore does not support probable cause, either. *See Fulton v. Bartik*, 2024 WL 1242637, at *16 (N.D. Ill. Mar. 22, 2024) ("Regardless, however, of the strength of this possible motive, the Police Officer Defendants cannot establish probable cause, or even arguable probable

cause, with evidence only of motive."); *United States v. Klebig*, 2006 WL 2038366, at *7 (E.D. Wis. July 20, 2006) ("mere motive is insufficient."), *rev'd on other grounds*, 228 F. App'x 613 (7th Cir. 2007); *see also United States v. Bethal*, 245 F. App'x 460, 469 (6th Cir. 2007) (finding that status as gang member and suspect in drive-by shooting was insufficient for probable cause).

Gates and Castillo also ignored facts tending to dissipate probable cause. They ignored that Valdovinos told them that he merely suspected Alex of committing the murder and had not seen Alex on either December 31 or January 7. They ignored that Valdovinos told them he was more than twenty feet away and pedaling harder at the moment he first heard shots on December 31. They ignored that Valdovinos associated the shooter with "Alejandro" even though that is not Torres's name and no evidence associates that name with him. And Gates never mentioned these facts in his probable cause affidavit. PAMF ¶¶ 361-62. Their fabricated identification—feeding Valdovinos information to make a false identification instead of listening to Valdovinos's repeated non-identifications—cannot cure the defects in probable cause. The jury must decide.

C.    Defendants Are Not Entitled to Qualified Immunity on Count II

Defendants raise a vague and cursory challenge to Count II on qualified immunity grounds. Dkt. 111-1 at 26-27. That argument fails because the Fourth Amendment right not to be maliciously prosecuted has been clearly established since at least 1981. *Poppell v. City of San Diego*, 149 F.3d 951, 961 (9th Cir. 1998). Nor were Diviak, Castro, or Lincoln only minimally involved—a reasonable jury could find that they were full participants in the scheme to hide evidence from prosecutors. PAMF ¶¶ 210-24; 253-55; 328-39; 325-27. Defendants have identified no basis to apply qualified immunity.

### III.   Failure to Intervene

The constitutional obligation to intervene to prevent the rights of a civilian being violated applies in the context of *any* constitutional violation committed by another officer which the officer had the opportunity to prevent. *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd in part on other grounds*, 518 U.S. 81 (1996).

As discussed already, the Defendants knew a constitutional violation was underway giving rise to a duty to intercede and stop it. Diviak and Castro were complicit in the scheme to suppress evidence, or so a jury could decide. Castillo and Gates worked hand-in-hand and would have known of one another's misconduct; for example, each would have known that the police reports in the murder book contained material omissions and lies. And Lincoln saw the facially insufficient murder book and other materials and did nothing to stop it. Everyone could have done something to stop it: Gates and Castillo could have reported one another's misconduct; Castro and Diviak could have revealed the truth to the prosecutor when they testified at trial; Lincoln could have required Gates and Castill to disclose the hidden evidence and account for their misconduct.

Defendants argue that because the evidence against Torres was strong, there was no apparent duty to intervene. That argument is belied by the facts and is a total red herring. It has nothing to do with whether Defendants knew that material evidence was being suppressed or evidence was being fabricated. Nor is this claim duplicative; the failure to intervene to stop one another's misconduct is distinct from committing the misconduct (or joining a conspiracy to do so). The jury must decide.

### IV.   Conspiracy

A § 1983 conspiracy involves showing "an agreement or 'meeting of the minds' to violate [the plaintiff's] constitutional rights." *Ward v. EEOC*, 719 F.2d 311, 314 (9th Cir. 1983). Such an agreement "may be inferred from conduct and need not be proved by evidence of an express agreement"; a plaintiff need only point to some

Loevy & Loevy
Attorneys at Law

"facts probative of a conspiracy." *Id.* Thus, the existence of an "unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Mendocino Environmental Center v. Mendocino Cnty.*, 192 F.3d 1283, 1301-02 (9th Cir. 1999) (cleaned up). The defendants' intention or state of mind is a fact issue generally not resolvable by summary judgment. *Id.*

Here, Diviak hid evidence of his investigative work; Castro lied at trial consistent with the lies in Gates and Castillo's report; and Lincoln ignored obvious omissions and missing recordings from the murder investigation. This is concrete evidence of a group effort to hide and fabricate evidence to secure Torres's conviction. *Cf. United States v. Gardner*, 475 F.2d 1273, 1277 (9th Cir. 1973) ("Circumstantial evidence is not less probative than direct evidence, and, in some instances, is even more reliable."); *United States v. Nelson*, 419 F.2d 1237, 1240 (9th Cir. 1969) ("[U]nder some conditions circumstantial evidence may be equally or more reliable than direct evidence.") The jury must decide.

V.    Defendants Are Not Entitled to Qualified Immunity on the Failure to Intervene or Conspiracy Claims

Regarding failure to intervene, Defendants claim—without citation to *any authority whatsoever*—that there is not case law "establishing on particular facts that each Defendant had a duty or reasonable opportunity to intervene during their respective involvement in the case." Dkt. 111-1 at 34. That is wrong; courts have long recognized a duty to intercede. *See, e.g., O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (collecting cases back to 1972); *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972); *Whirl v. Kern*, 407 F.2d 781, 788-91 (5th Cir. 1968); s*ee also Nesmith v. Alford,* 318 F.2d 110, 119 (5th Cir. 1963) (all three officers liable for false arrest even though only one officer made the arrest); *Smith v. Ross*, 482 F.2d 33, 36 (6th Cir.

1  1973) (failure to act to protect the constitutional rights of another is actionable under

2  § 1983).

3      Similarly, it should be obvious that police officers must intercede without a

4  case on point. *Ziglar*, 137 S. Ct. at 1866. Established law provides that §1983 liability

5  should be read against the background of tort liability, *see, e.g., Monroe v. Pape*, 365

6  U.S. 167, 187 (1961), which includes refusal to act where someone has a duty to do

7  so; *see also O'Neill*, 839 F.2d at 10.

8      Defendants also argue, without citing any law or authority, that Plaintiff's right

9  not to be conspired against in this manner was not clearly established and that

10  Defendants' were not on notice that their actions constituted conspiracy. However,

11  local law enforcement officers have long known they can be held liable for engaging

12  in a conspiracy with one another to violate an individual's constitutional rights under

13  § 1983. *See Dirks v. Martinez,* 414 F. App'x 961, 963 (9th Cir. 2011); *Cameron v.*

14  *Craig*, 713 F.3d 1012, 1023 (9th Cir. 2013); *Baldwin v. Placer Cnty.*, 418 F.3d 966,

15  970-71 (9th Cir. 2005); *Gilbrook v. City of Westminster*, 177 F.3d 839, 857 (9th Cir.

16  1999).

17  VI.   *Monell* Claim

18      Torres pleaded, and has maintained through this litigation, several *Monell*

19  theories under which the LASD and County of Los Angeles may be held accountable

20  for causing his wrongful conviction. Defendants moved for summary judgment on

21  only a subset of those theories.

22  A.   Legal Standard

23      Local governments are liable for Section 1983 claims under *Monell* where their

24  employees are "acting pursuant to an expressly adopted official policy," or pursuant to

25  a "longstanding practice or custom." *Thomas v. County of Riverside*, 763 F.3d 1167,

26  1170 (9th Cir. 2014). A "policy" is "a deliberate choice to follow a course of action …

27  made from among various alternatives by the official or officials responsible for

28  establishing final policy with respect to the subject matter in question." *Long v. Cnty.*

LOEVY & LOEVY
Attorneys at Law

1   *of Los Angeles,* 442 F.3d 1178, 1185 (9th Cir. 2006) (cleaned up). Policies, practices,

2   and customs can involve affirmative action or refusing to act; *i.e.*, inaction. A policy

3   "of inaction or omission may be based on failure to implement procedural safeguards

4   to prevent constitutional violations." *Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1143

5   (9th Cir. 2012).

6        *"*Whether a local government entity has displayed a policy of deliberate

7   indifference is generally a question for the jury." *Oviatt ex rel. Waugh v. Pearce*, 954

8   F.2d 1470, 1478 (9th Cir. 1992). To establish causation, "Plaintiff need only

9   demonstrate that 'the identified deficiency … [is] closely related to the ultimate

10  injury.'" *Id.* (quoting *Canton v. Harris*, 489 U.S. 378, 391(1989)).

11       B.    No *Brady* Policies

12       A jury must decide Plaintiff's claim that LASD's failure to enact *Brady* policies

13  caused his wrongful conviction.

14       Courts recognize municipal liability under § 1983 for the deliberate choice not

15  to have a policy when one is required. *Canton*, 489 U.S. at 390; *see also Armstrong v.*

16  *Squadrito*, 152 F.3d 564, 577-78 (7th Cir. 1998); *Jones v. City of Chicago*, 787 F.2d

17  200, 204 (7th Cir. 1986) ("In situations that call for procedures, rules or regulations,

18  the failure to make policy itself may be actionable."). *Brady* obligations obviously

19  meet this standard. *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) (both

20  failure to train concerning *Brady* obligations and failure to train concerning adequate

21  identifications); *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) (failure to

22  train re *Brady*).

23       In seeking summary judgment on this theory, Defendants improperly ask the

24  Court to resolve factual disputes in their favor. It was obvious in 2001 that the

25  Department needed to define exculpatory evidence and mandate its disclosure. But the

26  LASD failed to create or enforce standards about what evidence and materials

27  homicide detectives would make available to prosecutors for review; did not have **any**

28  policy, training manual, or other written source defining what investigative steps

LOEVY & LOEVY
Attorneys at Law

*Plaintiff's Response to Defendants' Motion for Summary Judgment*                    22-CV-07450

should be documented in reports (and thereby disclosed to prosecutors); and lacked **any** written policy or training materials defined exculpatory evidence for detectives. PAMF ¶¶ 377-99.

Defendants argue that it is "undisputed" that across the LASD, homicide detectives routinely disclosed the "entire file" for their investigations. That is the direct opposite of what the LASD's 30(b)(6) representative said:

> Q: Detective Gates testified, "I have never given a poor boy to anybody, other than myself or my partner, maybe -- maybe Lincoln or Lieutenant maybe, but I doubt that. The poor boy is our bible. I'm not giving that to anybody." Is that consistent with the practices at the time [December 2000 to June 2001], that all things equal, there is no reason an investigator needs to give their poor boy to anybody else?
>
> A.      Not knowing the context of when he said not giving it to anybody else, **but during that time, that would be the mindset of the poor boy**. Obviously, you are under -- unless you were under some kind of legal obligation or court order to provide that to a trier of fact, or district attorney, or -- or -- or – or defense, **I think it was just being more that that's kind of the holy grail of -- of -- of your case.**"

PAMF ¶ 378. In this case, the Poor Boy was the investigative file where Defendants kept notes, case materials, and even physical evidence. A reasonable jury could credit the County's own testimony that at the time Torres was wrongfully convicted, it was the mindset of homicide detectives that "The poor boy is our bible. I'm not giving that to anybody" and that detectives treated the poor boy as the "holy grail" of the case.

The LASD has identified exactly **zero** procedural rules or practices designed to implement the *Brady* rule. At the time of this investigation, 2001, *Brady* had been on the books for nearly four decades and *Giglio* (requiring production of impeachment

LOEVY & LOEVY
Attorneys at Law

1  material) had been on the books for thirty years. But, LASD had absolutely no

2  procedural mechanisms for ensuring material was preserved or produce, a far

3  departure from any well-accepted policy. This is sufficient for a reasonable jury to

4  find LASD's policies were deficient.

5     A reasonable jury can easily find deliberate difference here. Deliberate

6  indifference exists where a policy is "so facially deficient that any reasonable

7  policymaker would recognize the need to act." *Hyun Ju Park v. City and Cnty. of*

8  *Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020); *see also Bd. of Cnty. Comm'rs of*

9  *Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997). As a result, inadequate *Brady*

10 rules are obviously actionable and raise questions for the jury. *See, e.g.*, *Jackson v.*

11 *City of Cleveland*, 925 F.3d 793, 823-25 (6th Cir. 2019).

12     C.  Uncontrolled Deputy Gangs

13     Torres's second triable *Monell* theory is that the LASD knew about, but failed

14 to stop, corrupt deputy gangs of sheriff's deputies. These gangs inspired strong

15 loyalty: Diviak lied multiple times under oath about his knowledge of and

16 involvement in the Lynwood Vikings, and refused under oath to name any other

17 members (although he admitted there were people he believed to belong to the group).

18 Even the detective who reinvestigated the Guitron homicide after evidence of Torres's

19 innocence emerged refused to name deputy gang members known to him. PAMF ¶

20 433.

21     These deputy gangs were not innocuous social clubs. As Roger Clark has

22 detailed, Diviak's Vikings tattoo reflects systemic racial prejudice and hatred.

23 Deputies joined these groups to hide each other's misconduct (a code of silence),

24 which was exacerbated by poor command and supervision. Larry Lincoln, who

25 belonged to the Cavemen gang, likewise acted consistently with the deputy gang code

26 of conduct by failing to supervise or discipline deputies who suppressed and

27 fabricated myriad pieces of evidence to convict Torres. In sum, by 2001, deputy gangs

28 were so pervasive and systemic that they corrupted professional standards and the

LOEVY & LOEVY
Attorneys at Law

oath required within the LASD. The LASD knew of the problem from memoranda written by command staff like Roger Clark, from external lawsuits, and from reports advising the Department of the problem. Still, the LASD did nothing. PAMF ¶¶ 420-67.

Defendants argue that Plaintiff cannot tie deputy subgroups to Plaintiff's wrongful conviction. Not so. Diviak and Lincoln corrupted the investigation consistent with the secretive and unlawful tactics of deputy gangs: specifically, violating the civil rights of criminal defendants and maintaining a code of silence. This tolerance of deputy gangs affected not only Lincoln and Diviak individually, who belonged to them, but also Gates and Castillo, who were supervised by Lincoln, and all the deputies involved in the investigation, who knew that the LASD tolerated the secrecy and "convictions at all costs" mindset of deputy gangs. The jury must decide.

### D.    Uncontested *Monell* Theories

Plaintiff brings three other *Monell* theories that Defendants have not contested. Although they have forfeited argument, Torres presents the following evidence requiring a trial on each theory:

First, Defendants as a matter of policy and practice failed to supervise homicide investigations. The Sheriff's Department's 30(b)(6) representative (a former homicide detective at LASD) candidly admitted that homicide detectives were not guided by their supervisors but instead operated without supervision, that nobody enforced recommend and acceptable investigation standards with those detectives, and that the LASD instead relied on detectives to "kind of police[] themselves." PAMF ¶¶ 400-03. Thus, the failure of supervision was not an isolated incident but instead the widespread policy and practice of the Department. The result was an entity-wide lack of supervision that was inconsistent with standards for supervision. As Dr. Scott opined, it is no surprise that when homicide investigators go unsupervised, wrongful convictions result. PAMF ¶¶ 400-19. Such a complete "failure to supervise the actions

*Plaintiff's Response to Defendants' Motion for Summary Judgment*                    22-CV-07450

1  of … deputies" constitutes "a policy of inaction." *Jackson v. Barnes*, 749 F.3d 755,
2  763 (9th Cir. 2014).

3       Second, the use of undisclosed "poor boy" files to hide evidence from the
4  criminal legal system was so widespread as to constitute a Department-wide practice.
5  As discussed above, the LASD acknowledged through its 30(b)(6) representative that
6  such files were routinely withheld by its detectives as a matter of practice, and the
7  mindset was to keep them hidden and undisclosed. The result is apparent in Gates's
8  testimony that he would **<u>never</u>** give his poor boy (investigative file) to a prosecutor or
9  defense attorney, and that he specifically did not want defendants to have information
10 about potential suspects. That is exactly how evidence was suppressed from Torres,
11 and the consequences of that practice were obvious and predictable. PAMF ¶¶ 273-78;
12 320-24; 340-60; 377-87.

13      Finally, the failure to create or enforce any standards for photographic
14 identification procedures also predictably caused wrongful convictions. No written
15 document guided the administration of photo identifications. The LASD lacked
16 policies or written guidance about prejudicial procedures that frequently occurred
17 (including in Torres's case), including showing repeated identification procedures to
18 eyewitnesses. As a result, Gates and Castillo violated generally accepted standards for
19 eyewitness identification including showing photos of the same person multiple times
20 or failing to take measures to prevent repeat identification procedures; conducting
21 showup (single photo) identification procedures of Torres's residence and Torres's
22 car; failing to cover up the plaid shirt worn by Torres in the six-pack after Valdovinos
23 had identified the perpetrator as wearing a plaid shirt; not separating Arechiga and
24 Delgado during the identification procedures; and instructing Arechiga that he "had to
25 pick one." PAMF ¶¶ 363-76. These improper tactics were predictably the result of,
26 and were caused by, the LASD's failure to create or enforce policies.

27      In sum, because Defendants forfeited this argument and did not even identify
28 "those portions of the pleadings, discovery and affidavits which demonstrate the

LOEVY & LOEVY
Attorneys at Law

*Plaintiff's Response to Defendants' Motion for Summary Judgment*                    22-CV-07450

1   absence of a genuine issue of material fact," the jury must decide on these three

2   uncontested theories. *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (citing

3   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

4   ## VII.   IIED

5       Prosecuting an innocent person for a crime they did not commit is outrageous

6   behavior that causes severe or extreme emotional distress and thus states an

7   intentional infliction of emotional distress claim. Courts routinely deny motions for

8   summary judgment in wrongful prosecution cases, like this one, where a reasonable

9   jury can conclude that the officers fabricated evidence causing wrongful

10  imprisonment. *E.g., Hadley v. City of Anaheim,* 2020 WL 5604024, at *15 (C.D. Cal.

11  Sept. 18, 2020); *Woods v. City of Reno*, 2020 WL 4194844, at *1-2, 16 (D. Nev. July

12  21, 2020).

13      Gates, Castillo, and Castro fabricated evidence against Torres and watched him

14  suffer through his criminal proceedings. Torres ultimately made a desperate plea to

15  the Court at a sentencing hearing, stating, "Can I ask a question? Do I have to go do

16  time for something I didn't do?" PAMF ¶ 190. In response, Defendants ask the Court

17  to construe facts in their favor and ignore the rest of the record. A reasonable jury

18  could clearly find that ginning up false evidence to cause an innocent person to go to

19  prison for 20 years for something he didn't do intentionally inflicts emotional distress.

20  ## VIII.   Civil Conspiracy

21      The state-law civil conspiracy claim should proceed to trial for the same

22  reasons as the federal conspiracy claim. Plaintiff incorporates that argument by

23  reference here.

24  ## IX.   Bane Act

25      Defendants' argument on Plaintiff's Bane Act claim is so cursory as to be

26  forfeited. And as discussed above, a reasonable jury could find Defendants

27  intentionally interfered with Plaintiff's constitutional right to a fair trial and that they

28  intimidated and coerced Torres and Arechiga. The jury must decide.

LOEVY & LOEVY
Attorneys at Law

*Plaintiff's Response to Defendants' Motion for Summary Judgment*                    22-CV-07450

## X.    Respondeat Superior and Indemnification

Defendants' argument on this point is so cursory as to be forfeited. They write, "Plaintiff has not alleged proper legal ground as to the public entity liability and has no evidence." But considering that California state law provides for indemnification of civil claims against law enforcement officers, Plaintiff's claims are valid and should proceed (and the Court should not entertain new arguments from Defendants in reply). *See* Cal. Gov. Code § 825.

## Conclusion

WHEREFORE, Plaintiff requests that the Court deny Defendants' motion for summary judgment.

Respectfully submitted,

**ALEXANDER TORRES**

By:  /s/ Wallace Hilke

*One of Plaintiff's attorneys*

David Owens (SBN 275030)
Elizabeth Wang, IL Bar: 6287634, CO Bar: 45976
Steven Art, IL Bar: 6302319
Wallace Hilke, IL Bar: 6329814
hilke@loevy.com
elizabethw@loevy.com
steve@loevy.com
david@loevy.com
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902

Jan Stiglitz (SBN 103815)
js@cwsl.edu
Law Office of Jan Stiglitz

*Plaintiff's Response to Defendants' Motion for Summary Judgment*          22-CV-07450

14462 Garden Tr.
San Diego, CA 92127
Phone: (619) 807-5890

Michael D. Seplow (SBN 150183)
Paul Hoffman (SBN 71244)
mseplow@sshhzlaw.com
hoffpaul@aol.com
Schonbrun Seplow Harris
Hoffman & Zeldes LLP
9415 Culver Boulevard, #115
Culver City, CA 90232
Phone: (310) 396-0731

Counsel for Plaintiff

## CERTIFICATE OF COMPLIANCE

I, Wallace Hilke, an attorney, certify that this brief contains 9954 words and complies with the word limit designated by court order dated May 17, 2024 (Dkt. 110).

## CERTIFICATE OF SERVICE

I, Wallace Hilke, an attorney, certify that on June 17, 2024, I caused the foregoing document to be served by electronic mail on all counsel of record.

/s/ Wallace Hilke

*Plaintiff's Response to Defendants' Motion for Summary Judgment*                      22-CV-07450