**David Owens** (SBN 275030)
**Elizabeth Wang\***, IL Bar: 6287634, CO Bar 45976
**Steven Art\***, IL Bar: 6302319
**Wallace Hilke\***, IL Bar: 6329814
hilke@loevy.com
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902
*Admitted pro hac vice

**Jan Stiglitz** (SBN 103815)
js@cwsl.edu
Law Office of Jan Stiglitz
14462 Garden Tr.
San Diego, CA 92127
Phone: (619) 807-5890

**Michael D. Seplow** (SBN 150183)
**Paul Hoffman** (SBN 71244)
mseplow@sshhzlaw.com
hoffpaul@aol.com
Schonbrun Seplow Harris
Hoffman & Zeldes LLP
9415 Culver Boulevard, #115
Culver City, CA 90232
Phone: (310) 396-0731

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER TORRES,<br><br>        Plaintiff,<br><br>      v.<br><br>LOS ANGELES SHERIFF'S DEPARTMENT, et al.,<br><br>        Defendants. | Case No. 2:22−cv−07450 MWF (MARx)<br><br>Hon. Michael W. Fitzgerald, District Judge<br><br>Magistrate Judge Margo A. Rocconi |
| | **Plaintiff's Additional Material Facts Establishing Genuine Disputes and Responses to Defendants' Statements of Uncontroverted Facts**<br>Date:        July 15, 2024<br>Time:       10:00 am<br>Courtroom:  5A (Hon. Michael W. Fitzgerald) |

**TO THIS HONORABLE COURT AND TO ALL COUNSEL OF RECORD:**

Pursuant to Federal Rule of Civil Procedure 56 and Central District California Rule 56-1, **PLEASE TAKE NOTICE** Plaintiff Alexander Torres respectfully submits the following Additional Material Facts Establishing Geniune Disputes and Response to Defendants' Statement of Uncontroverted Facts and Conclusions of Law in objection to Defendants' motion for summary judgment or summary adjudication.

Dated:  June 17, 2024

Respectfully submitted,

**ALEXANDER TORRES**

By:  /s/ Wallace Hilke_____

*One of Plaintiff's attorneys*

David Owens (SBN 275030)
Elizabeth Wang, IL Bar: 6287634, CO Bar: 45976
Steven Art, IL Bar: 6302319
Wallace Hilke, IL Bar: 6329814
hilke@loevy.com
elizabethw@loevy.com
steve@loevy.com
david@loevy.com
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902

Jan Stiglitz (SBN 103815)
js@cwsl.edu
Law Office of Jan Stiglitz
14462 Garden Tr.
San Diego, CA 92127

---

Phone: (619) 807-5890

Michael D. Seplow (SBN 150183)
Paul Hoffman (SBN 71244)
mseplow@sshhzlaw.com
hoffpaul@aol.com
Schonbrun Seplow Harris
Hoffman & Zeldes LLP
9415 Culver Boulevard, #115
Culver City, CA 90232
Phone: (310) 396-0731

Counsel for Plaintiff

## I.    PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENUINE DISPUTES

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| **ALEXANDER TORRES IS INNOCENT OF MARTIN GUITRON'S MURDER** | | |
| 186. | Alexander Torres is innocent of Martin Guitron's murder and had no involvement in his killing; the true perpetrators were Jose Perez (AKA "Popeye," the shooter) and Luis Gonzalez (AKA "Cyclops," the driver). | Ex. 1 (Judicial Finding of Innocence); Ex. 52 (Perez Dep.) at 10:20-12:25; 17:2-6 (taking the Fifth Amendment in response to questions about whether Jose Perez killed Martin Guitron; Ex. 2 (Gonzalez Decl.) (asserting he would take the Fifth Amendment in response to questions about his involvement in Martin Guitron's murder). |
| 187. | Because Torres was innocent of Guitron's murder, the eyewitnesses at his trial never saw him commit the murder. | Ex. 1 (Judicial Finding of Innocence); Ex. 52 (Perez Dep.) at 10:20-12:25; 17:2-6 (taking the Fifth Amendment in response to questions about whether Jose Perez killed Martin Guitron; Ex. 2 (Gonzalez Decl.) (asserting he would take the Fifth Amendment in response to questions about his involvement in Martin Guitron's murder). |
| 188. | No physical evidence at the crime scene ever connected Alex to the shooting. | Ex. 3 (Gates Dep.) at 217:7-15. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 189. | Although the LASD searched Torres's home on January 18, 2001, Detectives never found any clothing in Alex Torres's possession resembling the descriptions given by the witnesses. | Ex. 3 (Gates Dep.) at 222:20-221:11; Dkt. 116-2, Defs.' Ex 6 (Murder Book) at 20-21.[1] |
| 190. | On July 24, 2001, after he was wrongly convicted for Guitron's homicide, Torres asked the Court: "Can I ask a question? Do I have to go do time for something I didn't do?" | Dkt. 116-23, Defs.' Ex. 151 (Trial Tr.) at 951:21-23. |
| 191. | On August 23, 2001, Torres was sentenced to 40 years to life. | Dkt. 116-23, Defs.' Ex. 151 (Trial Tr.) at 956:8-16. |
| 192. | In 2006, Torres's family obtained a confession from Luis Gonzalez ("Cyclops"), the driver in Guitron's murder, who also identified "Popeye" (who was determined to be Jose Perez) as Guitron's killer. But Cyclops refused to repeat his confession and Torres spent fifteen more years in prison before he could be released. | Ex. 6 (Pedro Torres) Dep. at 45:21-46:20; 77:12-79:1; 94:13-95:14. |
| 193. | In 2021, when Guitron's murder was reinvestigated, evidence was found that further implicated Gonzalez and Perez in the murder: for example, Gonzalez drove a blue 1992 Chevy Caprice at the time of the murder, and Perez was arrested and convicted for an armed robbery with a .45 handgun (the same caliber used to shoot and | Ex. 7 (Landreth January 2024 Dep.) at 38:15-40:4. |

[1] Citation to the Murder Book refer to the numbered pages in the Murder Book itself, not the PDF page number.

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | kill Guitron) months after Guitron's murder. | |
| 194. | On October 19, 2021, after the Los Angeles District Attorney's Office corroborated Plaintiff's claims of innocence, Torres's conviction was overturned. | Ex. 8 (decision overturning conviction); Ex. 9 (10/19/21 Conviction Dismissal Tx.). |
| 195. | On April 13, 2022, Torres was granted a judicial finding of innocence. | Ex. 1 (judicial finding of innocence). |
| **Enrique Valdovinos Knew of Torres and Had Seen Him Before but Had Minimal Prior Interactions with Torres** | | |
| 196. | Prior to Jose Perez's murder, Valdovinos had only seen Torres "a couple of times" and the most recent time was about a month before the shooting, at the park. | Ex. 10 (Preliminary Hearing Tr.) at 11:19-23; Dkt. 116-18, Defs.' Ex. 151 (Trial Tr.) at 339:22-340:8. |
| **On December 31, Valdovinos Truthfully Told Detectives that the "Alex he Knows" Was Not Guitron's Shooter, But Gates and Castillo Hid Exculpatory Statements in Their Official Reports** | | |
| 197. | Defendants David Castillo and Jimmie Gates interviewed Enrique Valdovinos the night of Martin Guitron's murder at LASD Paramount substation in Los Angeles. | Ex. 11 (Castillo Dep.) at 41:18-42:5. |
| 198. | When Castillo and Gates interviewed Valdovinos the night of the murder (December 31, 2000), Valdovinos identified an "Alex" who had "tried to kill him three days ago." Valdovinos clarified that "the Alex he was talking about is not the Alex that he knows, who is from the gang, Tortilla Flats, Compton Vario Tortilla Flats." | Ex. 11 (Castillo Dep.) at 42:13-43:5. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 199. | In the December 31, 2000 interview, Valdovinos said that he did not see the shooter pull out a gun and start shooting the victim and did not see any gun during the shooting. | Ex. 3 (Gates Dep.) at 322:25-323:20. |
| 200. | Valdovinos told Gates and Castillo that he was twenty feet away from Guitron and the shooter when he first heard shots; he was on his bike and he was already "pedaling . . . harder"; however, Gates and Castillo's report does not reflect that Valdovinos was so far away. The fact that Enrique Valdovinos was already twenty feet away when he first heard shots is not documented in Gates and Castillo's January 4th report. | Dkt. 116-24, Defs.' Ex. 153 at 12:23-13:8; Dkt. 116-2, Defs.' Ex. 6, at COLA-006300; Ex. 3 (Gates Dep.) at 328:4-12. |
| 201. | The fact that Enrique Valdovinos said he didn't see a gun in the shooter's hand is not documented in Gates and Castillo's January 4th report. | Ex. 3 (Gates Dep.) at 328:13-329:1. |
| 202. | Enrique Valdovinos told Gates that he didn't even realize that Casper had gotten shot until an officer told him later, but Gates and Castillo never documented that statement in their murder book. | Ex. 3 (Gates Dep.) at 329:17-330:11. |
| 203. | Enrique Valdovinos told Gates that neither the passenger nor the driver in the murder vehicle were Alex, and that he knew the Alex who had confronted Casper (Guitron) at the liquor store, but Gates never documented that statement anywhere in the murder book. | Ex. 3 (Gates Dep.) at 330:15-332:1 |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 204. | Valdovinos told Gates and Castillo that he never saw his friend Guitron after Guitron was shot. | Dkt. 116-24, Defs.' Ex. 153 at 15:24-161. |
| 205. | Valdovinos told Gates and Castillo that the murder vehicle was a '90 to '92 Caprice. | Ex. 3 (Gates Dep.) at 252:25-253:3. |
| 206. | Valdovinos told Deputy Atabaki, the first deputy he spoke with, that the shooter was around five feet and between five and seven inches tall and weighed 150 to 160 pounds. | Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 1. |
| | **Valdovinos Was Pressured to Identify Torres** | |
| 207. | Valdovinos was a member of Compton Vario Segundo (CVS). | Dkt. 116-18, Defs.' Ex. 151 (Trial Tr.) at 332:3-7; Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ("DUMF") ¶ 163. |
| 208. | According to Gates and Castillo, on January 3, 2001, Valdovinos told them that a gang member named "Tweetie" from CVS had told him <u>not</u> to talk to detectives or tell police who committed the murder. | Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 36; Ex. 11 (Castillo Dep.) at 44:7-12. |
| 209. | In fact, "Tweetie" from CVS had told Valdovinos to tell police that Torres committed the murder. | Dkt. 116-18, Defs.' Ex. 151 (Trial Tr.) at 335:18-28. |
| | **On January 3, 2001, Gates and Castillo Obtain Information About "Tweetie," Diviak Lies to Cover It Up** | |
| 210. | On January 3, 2001, Gates and Castillo interviewed Valdovinos again at Paramount Sheriff's Station. | Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 36. |
| 211. | As of January 3, 2001, the main eyewitness [Enrique Valdoivnos] had described "Tweetie" from Compton | Ex. 11 (Castillo Dep.) at 274:17-20. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | Vario Segundo as taking an interest in the investigation. | |
| 212. | On January 3, 2024, Enrique Valdovinos did not identify Alex Torres as the shooter. | Ex. 3 (Gates Dep.) at 210:12-15. |
| 213. | Valdovinos was friends with other members of Compton Vario Segundo. Those friends tried to talk to Valdovinos after the shooting, and they tried to tell Valdovinos that Alex was the one who killed Guitron and suggested Alex was the shooter. Those friends included Tweetie and other gang members (Valdovinos claimed not to know their names). | Ex. 10 (Preliminary Hearing Tx.) at 21:1-22:6. |
| 214. | Gates acknowledged that there should be a recording of him interviewing Enrique Valdovinos at Paramount Sheriff's Station on January 3, 2001. No such recording exists. | Ex. 3 (Gates Dep.) at 238:2-11; Ex. 24 (Cassette Photographs) |
| 215. | David Castillo acknowledges that if he found out that "Tweetie" was in jail or prison at the time Enrique Valdovinos said Tweedy talked to him, that Castillo would have confronted Valdovinos to find out if he was lying. | Ex. 11 (Castillo Dep.) at 276:15-277:7. |
| 216. | In his notebook, based on information taken from Valdovinos on 1/3/2001 around 3:40 pm, Gates noted that Tweedy/Tweetie was a male hispanic, around 5' 6" tall, with medium short hair, and Gates had OSS [Operation Safe Streets] run a search for information associated with Tweedy. Gates was actively looking for the | Ex. 3 (Gates Dep.) at 348:15-349:10; Dkt. 116-10, Defs.' Ex. 52 (Gates Notebook 2) at COLA 6132. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | person Valdovinos had identified as "Tweedy." | |
| 217. | Gates reviewed the report printed by Daren Diviak regarding Steven Garnica, who was a CVS gang member, and acknowledged that he would have tried to talk to him. | Ex. 3 (Gates Dep.) at 349:14-351:2. |
| 218. | Gates acknowledged that he "probably" would have pulled information about Steven Garnica's criminal history, but insisted that the fact that Tweedy was in prison at the time Valdovinos claimed to talk with him, in his opinion, would not impeach Valdovinos's credibility. | Ex. 3 (Gates Dep.) at 351:10-355:10. |
| 219. | Tweetie was in prison at the time Enrique Valdovinos said Tweedy talked to him. | Ex. 12 (Garnica Dep.) at 8:16-9:7; 9:15-10:19; Ex. 13 (TA056992 Minutes); Ex. 14 (TA056992 docket). |
| 220. | The fact that Tweedy was in prison when Valdovinos claimed to speak with him is not in any of the detectives' reports. | Ex. 3 (Gates Dep.) at 356:3-357:3. |
| 221. | There is no evidence detectives ever discovered another Tweetie or ever confronted Valdovinos about him. | Dkt. 116-2, Defs.' Ex 6 (Murder Book); Ex. 15 (Poor Boy). |
| 222. | Diviak printed Tweetie's profile to give the information to Gates and Castillo. | Ex. 33 (Garnica Jan 3, 2001 printout); Ex. 16 (Diviak June 2023 Dep.) at 191:14-192:7; 194:16-22 |
| 223. | Because Diviak and the detectives hid evidence of Diviak's involvement in the investigation, the prosecutor was able to tell the jury that Diviak had no | Dkt. 116-19, Defs.' Ex. 151 (Trial Tr.) at 387:9-21. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | involvement in the Guitron Homicide investigation. | |
| 224. | Castillo has no reason to believe that any information about Steven Garnica ("Tweetie") ever got to the prosecutor in the Martin Guitron murder. | Ex. 11 (Castillo Dep.) at 277:8-15. |
| **On January 3, 2001, Castillo and Gates Obtain Information to Identify Torres, Whom Valdovinos Has Said Was <u>Not</u> the Shooter** | | |
| 225. | On January 3, Valdovinos told Castillo that "Alex"—i.e, the Alex he knew who was **not** the shooter— "lives on San Juan . . . orange house at dead end." | Dkt. 116-7, Defs.' Ex. 21 (Castillo Notebook 1) at COLA 5960-5961). |
| 226. | As of January 3, 2001, Gates and Castillo had access to information about Alex Torres, and could have identified him as a potential suspect in the case. | Dkt. 116-7, Defs.' Ex. 21 (Castillo Notebook 1) at COLA 5960-61; (describing "Alex" who lived on San Juan); Ex. 17 (Extra-File – 7096 at COLA 7102, 7120-21) (LASD Field Interview Cards of Torres contained within the Poor Boy and notes indicating the search criteria "Alex*" was used to obtain them); Ex. 16 (June 2023 Diviak Dep.) at 143:14-147:16 (describing process of gathering and sharing gang information); Ex. 18 (Sanchez 30(b)(6) Dep.) at 20:14-22:24 (explaining how gang information was gathered and shared during this time); Ex. 3 (Gates Dep.) at 115:19-118:11 (explaining |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | | that he would seek information from Operation Safe Streets about a gang member reported to have threatened a murder victim; i.e, here, Torres, according to information Valdovinos had shared). |
| **Around January 9, Gates and Castillo Fabricate an Identification Against Torres with Valdovinos** | | |
| 227. | On January 9, 2001, Enrique Valdovinos told Gates that when he spotted a person confronting his friend outside his house, Valdovinos did not see a gun in that person's hand because it was dark outside, but Gates did not memorialize in the murder book that Valdovinos said it was dark outside or that Valdovinos did not see the gun. | Ex. 3 (Gates Dep.) at 337:11-17; 338:15-24. |
| 228. | On January 9, 2001, Valdovinos told Gates that he only said Alex had a gun because his friend Lupe told him that the person who confronted him had a gun, but Gates did not memorialize this in the murder book. | Ex. 3 (Gates Dep.) at 338:25-339:13 |
| 229. | On January 9, 2001, Gates had Valdovinos mark the location he saw the Caprice (murder vehicle) before, but that drawing was not preserved and is not in the poor boy, and Gates never wrote in the murder book that such a drawing had been made, and | Ex. 3 (Gates Dep.) at 340:13-342:8; declaration that the drawing isn't in the poor boy. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | Gates did not give the drawing to the prosecutor. | |
| 230. | On January 9, 2001, Castillo showed Valdovinos a picture of a car, but the detectives' reports do not mention that a photo was shown to Castillo and do not indicate what picture was shown to Valdovinos. | Ex. 3 (Gates Dep.) at 342:12-343:15. |
| 231. | The audio recording of Valdovinos's interview, which was not disclosed to Plaintiff or his attorney, reveals several contradictions between what Valdovinos told Gates and Castillo on January 9 and the information that Gates and Castillo put into their report. For example, on January 9, 2001, Valdovinos told Gates and Castillo that he "didn't see" a gun in the hands of the man who approached his friend Lupe and that "[i]t was dark" outside. He added that he only knew that the man had a gun "because my friend saw it." According to Valdovinos, he asked his friend "who was that?" and the friend told him "Alex pull a gun to me," and Valdovinos asked, "Alex?" Valdovinos did not see Alex confronting Lupe - instead, Valdovinos first asked Lupe who had confronted them and then, after Lupe said "Alex," Valdovinos asked "Alex?" In summary, not only did Valdovinos not see a gun in the hands of the man who approached Lupe, he also didn't recognize him as "Alex" | Dkt. 116-25, Def. Ex. 157 (1/9/01 Valdovinos Interview) at 9:10-17; 9:22-10:5; Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 40. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | until Lupe told Valdovinos who he believed the man to be. In the murder book, Gates and Castillo did not record that Valdovinos referred to the shooter as "Alejandro" but described him only as "Alex," and did not record that Valdovinos explained multiple times that the reason he believed the shooter was "Alejandro" or "Alex" was because his friend supposedly told him that was the person. | |
| 232. | The murder book also omits that Valdovinos expressed uncertainty about identifying Alex. Valdovinos said that he was "pretty sure," not completely sure, that Alex was the shooter, and said that when he spoke with detectives on the night of the murder he "was like thinking that he [Alex] might send someone else to did that," meaning that Valdovinos did not recognize the shooter but was still speculating about who it could be. When Castillo asked Valdovinos if he was sure Alex committed the shooting because he "saw the same guy" confront Lupe, Valdovinos did not say "yes" but instead said "What I know is that my – my --- my friend Lupe told me he's scared. He's Alex." | Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 40-41; Dkt. 116-25, Def. Ex. 157 (1/9/01 Valdovinos Interview) at 5:9-24; 33:9-17. |
| 233. | Valdovinos told Castillo and Gates on January 9 that the shooter went by "Alejandro," not "Alex," but the Murder Book never mentions this | Dkt. 116-25, Def. Ex. 157 (1/9/01 Valdovinos Interview) at 4:18-5:2; Dkt. 116-2, Defs.' |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | fact, and nothing in the Murder Book or Poor Boy indicates that Torres ever used the name "Alejandro." | Ex 6 (Murder Book); Ex. 15 (Poor Boy). |
| 234. | At trial, contradicting his earlier undisclosed statements to detectives, Valdovinos claimed he saw Torres shoot Guitron on 12/31/00 and that he saw Torres, with a gun in his hand, confront his friend Lupe on 1/7/01. | Dkt. 116-17, Defs.' Ex. 151 (Trial Tr.) at 320:25-321:23; 324:19-26. |
| **Gates and Castillo Conduct a Corrupt Interrogation of Torres** | | |
| 235. | Gates and Castillo interrogated Torres without recording the conversation, and conducted portions of their interrogation off the record, therefore hiding evidence of what they told Torres. | Ex. 19 (Torres Dep.) at 214:1-23. |
| 236. | Between interrogation sessions, Gates pressured Torres to confess, saying, "Just say you did it. We'll get you a deal." And "If you don't admit to it, you're going to jail for a long time." In response, Torres replied, "I'm not going to admit to something I didn't do." | Ex. 19 (Torres Dep.) at 215:1-216:3. |
| 237. | Castillo coached Torres on what to say during the interrogation and then got angry at him when Torres didn't follow his instructions. | Ex. 19 (Torres Dep.) at 216:4-18. |
| 238. | Castillo threatened to "put" the murder on Torres if Torres would not admit to committing it or identify someone else as committing the murder. | Ex. 19 (Torres Dep.) at 216:4-217:3. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 239. | Castillo and Gates refused Torres's request for an attorney and continued questioning him. | Dkt. 116-28, Defs.' Ex. 162 (Jan. 18 Torres Interrogation at 70:18-72:1 (Torres says "give me my lawyer," but Gates and Castillo keep questioning him and do not provide him with access to an attorney). |
| **Gates and Castillo Used Carlos Arechiga to Manufacture a False Identification of Torres and Suppressed Evidence Impeaching Arechiga's Supposed Identification** | | |
| 240. | On December 31, 2000, Yovana Delgado and her husband Carlos Arechiga[2] were sitting in the yard of a house at 6802 Severn Drive, on the southeast corner of El Camino and Severn Drive, playing poker with family when Martin Guitron was shot and killed. | Ex. 20 (Delgado Dep.) at 10:14-11:7; 15:17-23; 19:3-9. |
| 241. | Deposition Exhibit 47, marked with a black X, shows where Delgado and Arechiga were at the time of the shooting. | Ex. 20 (Delgado Dep.) at 40:1-9; 40:14-42:8; Ex. 21 (Marked Map of Area of Shooting/Dep. Ex. 47) |
| 242. | In his notes dated January 1, 2001, Castillo wrote that "Carlos Arechiga" made an identification of a person wearing a short-sleeved white color shirt. But in their supplemental reports, Gates and Castillo did not write down that Arechiga had seen anyone wearing a short-sleeved white shirt. Castillo admitted that he should | Ex. 11 (Castillo Dep.) at 262:19-263:2; Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 35. |

---

[2] Carlos Arechiga's real name was Alfredo Fajardo. He is referred to as "Arechiga" here.

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | have written down Arechiga's description of the suspect wearing a short-sleeved white shirt in the Murder Book. | |
| 243. | Arechiga's wife, Yovana Delgado, also saw the shooter wearing a short-sleeved white shirt. | Ex. 20 (Delgado Dep.) at 35:3-36:11. |
| 244. | "Carlos Echegaray" is a fake name that Carlos Arechiga crossed the border with. His given name at birth was Alfredo Fajardo. | Ex. 20 (Delgado Dep.) at 12:4-11. |
| 245. | At the time of the shooting, Arechiga was living in Rosarito, Mexico, and Delgado lived in a house at the corner of Camino and Severn - the same place she and Arechiga were when the shooting happened. | Ex. 20 (Delgado Dep.) at 16:11-17:9. |
| 246. | After the car left, Ms. Delgado and her husband Arechiga went over to the scene of the shooting, and they went there at the same time. By the time they arrived, the police were already there. | Ex. 20 (Delgado Dep.) at 36:17-23; 37:21-38:11. |
| 247. | Delgado and Arechiga did not approach the scene of shooting until after the shooter left in the car; Delgado has no memory of moving towards the shooting before the car left, and she would have waited for the shooter to leave the area before getting closer, and she wouldn't have walked towards a shooting before the shooter had left. | Ex. 20 (Delgado Dep.) at 37:2-15. |
| 248. | The "Poor Boy" contains a recorded interview with Arechiga, but it is | Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 33-35; Ex. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | mislabeled as "No Side B" despite containing statements from Arechiga to Gates and Castillo. Although the recording lacks a read-in identifying the interviewers or the interviewee, various details make clear that the interview is of Arechiga. First, the Murder Book only describes three people and two males being interviewed on 1/1/01 through an interpreter: Raul Cordova (there is a separate recording of that interview); Yovana Delgado (there is a separate recording of that interview) and Carlos Arechiga. Second, the details match. The interviewee says on the tape (and the Murder Book attributes to Arechiga) that he saw the shooter had a bald head; that the shooter looked between 20 and 25 years old; that he heard (but didn't see) shots; that he saw the shooter run back into the car and that the car then went north on El Camino and east on Somerset; and that he saw the car before the shooting. | 22 (No Side B recording audio file, produced as "Back side Raul Cordova tape 01-01-01"); Ex. 23 (No Side B Transcript) at 3:23-24; 5:11-20; 7:21-8:2 13:19-14:1. |
| 249. | The interview of Carlos Arechiga recorded on January 1, 2001 is unlabeled - it says "Raul Cordova, No Side B" instead of being labeled with Carlos Arechiga's name. | Ex. 24 (Cassette Photographs) at 11; Ex. 22 (No Side B recording audio file, produced as "Back side Raul Cordova tape 01-01-01"). |
| 250. | After Martin Guitron was shot, detectives found Delgado and Arechiga in Rosarito Beach and met with them there twice. | Ex. 20 (Delgado Dep.) at 43:6-19. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 251. | Those detectives met with Delgado and Arechiga twice, but their report falsely indicates that they only met once. | Ex. 20 (Delgado Dep.) at 43:6-19; Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 69. |
| 252. | Only two detectives were present when Delgado and Arechiga first met with detectives in Rosarito Beach, and there was no interpreter present. The Detectives' report falsely indicates that three detectives, including an interpreter, were present. | Ex. 20 (Delgado Dep.) at 44:1-3, 44:11-14; Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 69. |
| 253. | Alfredo Castro traveled to Mexico with Gates and Castillo to locate and interview Delgado and Arechiga. However, he did not translate for them, he did not give instructions for photo identification procedures, and he did not interpret for them during the conversation. | Ex. 25 (Castro Dep.) at 9:3-18; 16:3-14; 18:6-25; 19:17-25. |
| 254. | Castillo and Gates wrote a false report about the interviews with Arechiga and Delgado in Rosarito Beach: it was false because it indicated that Alfredo Castro interpreted during the conversation (but he didn't) and it was false because it indicated that Castro administered the admonition on the six-pack photo lineup to Arechiga (but he didn't). | Ex. 25 (Castro Dep.) at 22:10-23:8; 23:21-24:15; Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 69. |
| 255. | At trial, Gates told the jury that there Castro, a "fluent Spanish speaker," helped them interview Arechiga on February 15, 2001, and Castro told the jury that the six-pack photo | Dkt. 116-20, Defs.' Ex. 151 (Trial Tx.) at 621:5-23; 629:16-630:6. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | identification with Arechiga was conducted "in Spanish." | |
| 256. | In fact, Delgado interpreted for Arechiga. | Ex. 20 (Delgado Dep.) at 46:13-24 (explaining that her English was good and she could have interpreted for Arechiga at the meetings with detectives). |
| 257. | Gates and Castillo never gave any warning or admonishment about how to make photo identifications with Arechiga or Delgado; they just showed the photos. | Ex. 20 (Delgado Dep.) at 49:21-50:1; 53:8-14. |
| 258. | Gates and Castillo showed a six-pack photo identification lineup to Arechiga. | Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 69. |
| 259. | According to Gates, Arechiga did not make a "good ID," but instead only said that Torres was "[p]ossibly the person" or "it looked like the person" or something similar. | Ex. 3 (Gates Dep.) at 265:14-21; Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 69. |
| 260. | Arechiga later revealed that he had identified two persons in the six-pack photo identification as resembling the suspect (#2 and #6) but he had been told that he had to pick one. | Dkt. 116-19, 116-20, Defs.' Ex. 151 (Trial Tr.) at 604:27-605:2; 611:9-18. |
| 261. | Gates also showed a six-pack photo identification to Arechiga in which Arechiga misidentified the driver of the suspect vehicle, but this identification is nowhere in the investigative file/Poor Boy or the Murder Book. | Ex. 3 (Gates Dep.) at 96:15-97:3; Dkt. 116-2, Defs.' Ex. 6 (Murder Book); Ex. 15 (Poor Boy). |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 262. | Gates and Castillo's investigative file also included a fax dated May 9, 2001 to Jim Gates consisting of a crime report involving an arrest of the second eyewitness against Mr. Torres, Carlos Arechiga. | Ex. 11 (Castillo Dep.) at 298:8-23; Ex. 29 (5.9.01 Arechiga Fax). |
| 263. | The crime report in Gates and Castillo's investigative file indicates that on May 5, 2001, Carlos Arechiga gave a fake ID, lied about his name, and may have stolen multiple vehicles. | Ex. 11 (Castillo Dep.) at 301:24-302:20; Ex. 29 (Arechiga Police Report and False ID from Detectives' Poor Boy). |
| 264. | Castillo agrees he should have included information about Carlos Arechiga's recent arrest in the murder book. He also said that such information was exculpatory for Alexander Torres. (Following an objection from his attorney, he changed his answer and then insisted that he could not tell whether an arrest for giving a false identification to an officer would tend to undermine credibility of an eyewitness.) | Ex. 11 (Castillo Dep.) at 307:9-311:15. |
| 265. | At Torres's criminal trial, the jury heard evidence that Carlos Arechiga had identified Torres as the shooter to Castillo and Gates, and the prosecutor argued as much in closing: thus, Castillo and Gates's fabricated identification was introduced in evidence against Torres. | Dkt. 116-20, 116-23, Defs' Ex. 151 (Trial Tr.) at 620:17-624:22; 629:11-632:18; 911:28-912:13; 931:1-2. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | **On June 10, 2001, Gates and Castillo Fabricate an Additional Police Report with Fabricated Statements from Arechiga** | |
| 266. | Gates knew that Carlos Arechiga lived at 6802 Severn Drive at the time of the murder. | Ex. 3 (Gates Dep.) at 312:2-4. |
| 267. | In a June 10, 2001 police report, Gates wrote that Carlos Arechiga said he was on El Camino Avenue on the east side of the street across the street when the shooting occurred, which conflicts with Arechiga's earlier statement that he was at his house on Severn Ave, 400 feet away from the shooting. | Ex. 3 (Gates Dep.) at 313:17-314:13; 318:25-319:18; 267:6-23 (claiming falsely that Arechiga lived across the street and north two houses from the shooting); Ex. 26 (June 10, 2001 Report) at COLA 304-305. |
| 268. | In that report, Gates and Castillo claimed that Arechiga had said that Torres (the photo he identified) was definitely the shooter, but that too was false, as Arechiga testified at trial. | Ex. 26 (June 10, 2001 Report) at COLA 304-305. |
| 269. | The June 10, 2001 police report is obviously false because it does not indicate anyone interpreted into Spanish for Arechiga, but Arechiga would have needed someone to interpret the conversation into Spanish. | Ex. 26 (June 10, 2001 report); Ex. 3 (Gates Dep.) at 306:5-9 (Gates explaining he and Castillo would need an interpreter for a witness who did not speak good English); Ex. 11 (Castillo Dep.) at 188:20-21 (Castillo acknowledging he does not speak any Spanish); Ex. 20 (Delgado Dep.) at 46:16-19 (Arechiga's wife explaining that she always interpreted for Arechiga); Ex. 22 ("No Side B" audio) (revealing |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | | Arechiga's limited English and the use of an interpreter in the conversation with him). |
| 270. | Arechiga never told Gates that he was just across the street, because in fact he was with his wife Yovana Delgado nearly 400 feet away at the time of Guitron's murder. | Ex. 20 (Delgado Dep.) at 10:14-11:7; 15:17-23; 19:3-9 (they were in the yard at 6802 Severn Dr); Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 2 (location of homicide was 15121 El Camino Ave); Ex. 21 (Google Map showing distance from 6802 Severn Dr to 15121 El Camino Ave. |
| 271. | Gates and Castillo also fabricated statements from Arechiga that he never said: specifically, that Arechiga was in fear of Tortilla Flats and that Tortilla Flats gang members had been slowly driving by his house. In fact, as Arechiga testified at trial and Delgado testified in her deposition in this case, that was not true. | Ex. 26 (June 10, 2021report at COLA 304-305; Dkt. 116-20, Defs.' Ex. 151 (Trial Tr.) at 607:9-22 (Arechiga explaining that he never told Gates anything about being threatened by "Tortilla Flats"); 623:15-624:8 (Gates giving false testimony consistent with his false report about what Arechiga supposedly told him); Ex. 20 (Delgado Dep.) at 53:12-55:1 (Delgado testifying that neither her husband Arechiga nor anyone in her family ever said anything about being scared of or harassed by gang members after Guitron was murdered). |
| 272. | At trial, Arechiga denied making the statements that Gates and Castillo attributed to him. | Dkt. 116-20, Defs.' Ex. 151 (Trial Tr.) at 607:23-26; 608:8-25 |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | **Gates and Castillo Hid Identification Procedures** | |
| 273. | In homicide investigations, David Castillo would document a suspect in a report if a witness made a positive identification, meaning a photo identification, or if there was additional corroborating evidence. | Ex. 11 (Castillo Dep.) at 110:15-111:15. |
| 274. | Castillo's practice was to include information about the photo identification procedures he conducted in homicide investigations in his reports. | Ex. 11 (Castillo Dep.) at 160:15-24. |
| 275. | Castillo would typically make a note in his file indicating that he had eliminated a suspect so that he wouldn't "keep going back to the same guy." The Murder Book, Castillo's notebooks, and the Poor Boy have no indication of any such note. | Ex. 11 (Castillo Dep.) at 127:15-128:4; Dkt. 116-2, Defs.' Ex. 6 (Murder Book); Dkt. 116-7, Defs.' Ex. 21 (Castillo Notebook 1); Dkt. 116-8, Defs.' Ex. 22 (Castillo Notebook 2); Ex. 15 (Poor Boy Documents). |
| 276. | At his deposition, Castillo initially testified that Valdovinos was shown just one photograph of a car - a gray Celebrity that was parked in Alex Torres's driveway. | Ex. 11 (Castillo Dep.) at 230:21-231:5. |
| 277. | On January 3, 2001, Valdovinos was shown a photograph of a dark Impala vehicle, but that non-identification was not included in the Murder Book or the materials disclosed to the prosecutor. | Dkt. 116-10, Defs.' Ex. 52 (Gates Notebook 2) at COLA-6132; Dkt. 116-2, Defs.' Ex. 6 (Murder Book); Ex. 27 (PIMS file). |
| 278. | Castillo testified that he believed the final identification procedure that Enrique Valdovinos participated in was a lineup of Alex Torres on January 31 (2001), and that if he had | Ex. 11 (Castillo Dep.) at 231:22-232:4; e.g., Pl.'s Statement of Add'l Material Facts ("PAMF") ¶¶ 303, 338; |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | done other identification procedures, it would be in the detectives' reports. The identification procedures described elsewhere, including the "Tricks" identification, are not in the detectives' reports. | Dkt. 116-2, Defs.' Ex. 6 (Murder Book). |
|  | **Gates and Castillo Suppressed, Mislabeled, and Destroyed Recorded Interviews** | |
| 279. | Detectives were required to record all witness interviews as of 2000 to 2001. | Ex. 28 (Rodriguez 30b6 Dep.) at 73:5-12. |
| 280. | The homicide detectives were responsible for bringing tapes of audio recordings to court; in this investigation, the responsibility would've been Gates or Castillo's. | Ex. 11 (Castillo Dep.) at 144:7-13. |
| 281. | Gates took a tape recording of an interview with Carlos Arechiga on January 1, 2001. | Ex. 3 (Gates Dep.) at 283:2-12. |
| 282. | In the recorded January 1, 2001 interview, Arechiga told Gates that he didn't see a gun in the shooter's hand, but he heard shots. This detail is not in the Murder Book. | Ex. 3 (Gates Dep.) at 283:13-20; Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 35. |
| 283. | In the recorded January 1, 2001 interview, Arechiga described the shooter as a short, skinny, slim individual wearing a white short-sleeve shirt, about five feet tall because the shooter wasn't much taller than the top of the car; however, none of these details, which are inconsistent with Torres, were included in the Murder Book. | Ex. 3 (Gates Dep.) at 283:21-285:6; Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 34-35 (summary of Arechiga's interview omitting these details); 88 (describing Torres as five feet six inches tall and weighing 165 pounds, which a reasonable juror could conclude is not "skinny" or "slim"). |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 284. | Gates has no explanation for why he failed to label the Carlos Arechiga tape, and he didn't document anywhere what witness was speaking on that tape. | Ex. 3 (Gates Dep.) at 292:18-22; 310:5-311:18. |
| 285. | Castillo has no explanation for why the interview with Enrique Valdovinos on January 3 was not recorded, and Gates "would have" recorded it but has no explanation of how or why it got lost. | Ex. 11 (Castillo Dep.) at 214:14-20; Ex. 3 (Gates Dep.) at 346:14-25. |
| 286. | Gates's practice as a homicide investigator was to tape all witness interviews, but he thinks that there is no recording of his interview with Carlos Arechiga and Yovana Delgado at Rosarito Beach because "the tape may have been lost or something." | Ex. 3 (Gates Dep.) at 157:1-18. |
| 287. | Gates's practice with tapes was to put them in his poor boy and "occasionally" to "ma[k]e copies for discovery." | Ex. 3 (Gates Dep.) at 157:19-23. |
| 288. | Gates tape recorded an interview with the victim's sisters, Delores and Gabriella Guitron, and they provided him with a possible suspect and an address for him. The possible suspect (Thomas Hernandez) and his address are not in the murder book. That tape should be in the poor boy, but it isn't. | Ex. 3 (Gates Dep.) 204:11-205:10; 206:11-206:14; Ex. 24 (Cassette Photographs). |
| 289. | The only recordings that are indicated to have been transcribed and shared with prosecutors are Wendy Roca and Martha Hernandez. | Ex. 3 (Gates Dep.) 232:16-233:16. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| Gates and Castillo Suppressed Evidence of Oscar Valdovinos's Potential Involvement in the Crime Despite Knowing that Torres Suspected Valdovinos as the Real Killer | | |
| 290. | On January 10, 2001, David Castillo learned that Oscar Valenzuela, AKA "Chunts," was one of Torres's friends during high school. | Dkt. 116-7 (Defs.' Ex. 21) at COLA-5975. |
| 291. | Torres told Castillo and Gates that he head heard the shooter was someone named "Sporty" or "Chuntz" who drives a black Marquis. | Ex. 11 (Castillo Dep.) at 219:20-220:12; Ex. 3 (Gates Dep.) at 251:6-14; 252:8-15. |
| 292. | In an audio-recorded interview, Castillo and Gates conducted a photo identification of a vehicle with Enrique Valdvoinos on January 22, 2001. | Ex. 11 (Castillo Dep.) at 234:22-235:10. |
| 293. | During the January 22, 2001 interview with Castillo and Gates, Valdovinos said that the Grand Marquis he was looking at was the same model as the murder vehicle. | Ex. 11 (Castillo Dep.) at 235:14-23. |
| 294. | The January 22, 2001 interview with Castillo and Gates—in which Valdovinos changed his description of the murder vehicle from being a Caprice/Impala to being the "same model" as a Grand Marquis. | Ex. 11 (Castillo Dep.) at 236:12-14; Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 59-60. |
| 295. | Castillo admits he should have written down Valdovinos's identification of the murder vehicle as a Grand Marquis. | Ex. 11 (Castillo Dep.) at 239:25-242:5. |
| 296. | Castillo showed Enrique Valdovinos a photo of Oscar Valenzuela in a six-pack and a photo of Oscar Valenzuela's car, and Valdovinos did | Ex. 11 (Castillo Dep.) at 248:14-249:2; Ex. 3 (Gates Dep.) at 365:2-7; 366:12-23. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | not identify either. Those nonidentifications were not in the Murder Book. | |
| 297. | Castillo has no explanation for why he didn't write down Valdovinos's identification of the murder vehicle as a Grand Marquis. | Ex. 11 (Castillo Dep.) at 242:6-8. |
| 298. | Castillo admits he should have written the negative IDs of Oscar Valenzuela's photo and his car in a supplemental report, and he has no independent recollection of the prosecutors receiving that information. | Ex. 11 (Castillo Dep.) at 249:3-249:9; 250:1-4 |
| 299. | A file labeled "Oscar Valenzuela" in Gates and Castillo's "Poor Boy" included a December 6, 2000 report of a shooting where "Chuntice" (moniker for Oscar Valenzuela) was the driver in a drive-by shooting targeting CVS gang members, just a few weeks before the Guitron homicide on December 31, 2000. | Ex. 11 (Castillo Dep.) at 250:5-252:14. |
| 300. | Gates obtained a report written by Rodney Barton dated December 8, 2000, in which a man named "Chuntz" from the Nuthood Watts gang driving a Mercury Marquis was the driver in a shooting involving an assault with a deadly weapon. This matched what Torres had told Gates, that he heard Guitron was killed by a guy named Chuntz from Nuthood Watts. | Ex. 3 (Gates Dep.) at 369:8-20. |
| 301. | In his deposition in 2023, Gates stated that he was "sure we did a file" | Ex. 3 (Gates Dep.) at 251:17-252:3. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | on Sporty from Nuthood Watts, AKA Oscar Valenzuela. | |
| | **Gates, Castillo, and Barton suppress evidence of Valdovinos's false, gang-motivated identification of "Tricks"** | |
| 302. | On February 27, 2001, Enrique Valdovinos identified "Tricks" as the driver of the murder vehicle the night Martin Guitron was killed. | Ex. 11 (Castillo Dep.) at 279:25-280:21. |
| 303. | On March 22, 2001, Enrique Valdovinos participated in an identification procedure using a six-pack photo array provided by Deputy Barton and identified position #1 as Tricks. | Ex. 11 (Castillo Dep.) at 281:7-10. |
| 304. | Castillo interviewed someone who told him that "Tricks," Alex Torres's cousin from Compton Vario Tortilla Flats, hangs with Compton Vario Segundo and had recently been seen driving Alex. | Ex. 11 (Castillo Dep.) at 278:15-25 |
| 305. | On March 2, 2001, Rodney Barton printed profiles of people with the moniker "Tricks" because the name had come up in Castillo and Gates's investigations. | Ex. 11 (Castillo Dep.) at 286:19-287:1. |
| 306. | Although David Castillo doesn't independently recall whether he and Gates showed Enrique Valdovinos the "Tricks" photo array together, in his practice, they would have done it together. | Ex. 11 (Castillo Dep.) at 287:7-13. |
| 307. | David Castillo and Jimmie Gates had a folder labeled "possible suspects" in their working file, which included printouts of Juan Jose Radillo | Ex. 11 (Castillo Dep.) at 288:3-289:2. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | ("Tricks"), indicating that Castillo and Gates had identified Juan Jose Radillo ("Tricks") during their investigation. | |
| 308. | In Castillo and Gates's "possible suspects" folder, there is a photo identification array that Enrique Valdovinos viewed and signed. It is dated March 22, 2001, and Enrique Valdovinos circled and signed photo number one. This is the photo identification that was conducted with Enrique Valdovinos in Castillo and Gates's investigation. | Ex. 11 (Castillo Dep.) at 289:13-290:60; Dkt. 116-9, Defs.' Ex. 35 at COLA 707230 (Tricks photo array). |
| 309. | The Valdovinos photo identification of Juan Jose Radillo/"Tricks" is a positive photo identification that should have been included in the murder book, per Castillo, but wasn't. | Ex. 11 (Castillo Dep.) at 290:3-18; Ex. 30 (Lincoln Dep.) at 100:9-106:11. |
| 310. | David Castillo has no idea why the positive photo identification of "Tricks" was not included in the murder book and cannot say that the photo identification, or any information about Tricks/Trix, was ever provided to prosecutors. Gates has no recollection of the identification being provided the defense attorney. | Ex. 11 (Castillo Dep.) at 289:3-12; 290:21- 291:1; Ex. 3 (Gates Dep.) at 363:18-25. |
| 311. | Gates documented in his notebook that Valdovinos told him a guy named "Trix" was the driver the night the victim was killed. Gates looked for "Trix" in the course of his investigation. | Ex. 3 (Gates Dep.) at 357:4-16. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 312. | Enrique Valdovinos identified Juan Jose Radillo, "Trix," as the driver during the murder, but it was impossible that Trix committed the murder because he was in prison at that time. According to the criminal history transcript of Juan Radillo, which was contained in Castillo and Gates's "possible suspects" folder and included a criminal history transcript of Juan Radillo that was run five days after Mr. Valdovinos identified Radillo in a six-pack photo identification, Mr. Radillo was convicted of attempt murder on October 12, 2000 and was sentenced to 32 years in state prison, so he couldn't have been the driver in Martin Guitron's shooting because he was in prison. Gates identified that "Trix" was in prison the day Martin Guitron was murdered. | Ex. 3 (Gates Dep.) at 357:20-358:3; 359:14-360:1; Ex. 11 (Castillo Dep.) at 291:16-292:13; 292:18-293:7; Ex. 45 (Radillo criminal history transcript). |
| 313. | Castillo has no reason to believe prosecutors ever learned that Juan Radillo was in prison when the murder occurred and thus could not have been the driver in the murder, as Enrique Valdovinos had claimed to detectives. | Ex. 11 (Castillo Dep.) at 293:12-21. |
| 314. | Castillo admits that this information about Valdovinos's incorrect identification should have been written down because it was exculpatory. | Ex. 11 (Castillo Dep.) at 294:11-18. |
| 315. | Castillo did not deny seeing the information that Radillo was in prison | Ex. 11 (Castillo Dep.) at 295:1-296:4. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | when Guitron was murdered and that Valdovinos's identification was therefore false, and admitted that he would have kept investigating Radillo as the driver in the murder if Radillo had not been ruled out. | |
| **Gates and Castillo Hide Other Evidence of Possible Suspects** | | |
| 316. | Alma Perez, the sister of victim Martin Guitron, told Gates about a man named Manuel who had threatened Guitron before he was murdered, but Gates never figured out who Manuel was and doesn't recall whether he took any steps to visit the address or investigate Manuel. | Ex. 3 (Gates Dep.) at 208:10-209:11. |
| 317. | Alma Perez also told Gates about someone named Ramon or "Chato" who stated he killed Guitron or participated in his murder; Gates then placed "Chato" in a six-pack and recorded the phone number of someone with supposed knowledge of his involvement but never documented any of this in the Murder Book and may or may not have followed up on the lead. | Dkt. 116-12, Defs.' Ex. 54 (Gates notebook 4) at COLA 7836-37; Ex. 3 (Gates Dep.) at 372:8-377:21; Dkt. 116-2, Defs.' Ex. 6 (Murder Book). |
| 318. | Gates never documented any investigation he did on alternative suspects. | Ex. 3 (Gates Dep.) at 220:14-16. |
| 319. | The information on possible suspects that was in Gates's Poor Boy/investigative file was not in the Murder Book. | Ex. 3 (Gates Dep.) at 257:3-5. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | **Gates and Castillo Did Not Disclose Their Notebooks to Prosecutors** | |
| 320. | Castillo routinely carried a notebook during homicide investigations. | Ex. 11 (Castillo Dep.) at 163:25-164:2. |
| 321. | The detectives' notebooks would only go to the prosecutors when they asked for them. | Ex. 11 (Castillo Dep.) at 206:25-207:2. |
| 322. | Castillo has no independent recollection of his detective notebooks being given to the prosecutor in Alex Torres's prosecution. | Ex. 11 (Castillo Dep.) at 249:22-25. |
| 323. | There was not a general practice of turning over homicide detectives' notebooks to the district attorney. | Ex. 30 (Lincoln Dep.) at 145:22-146:1. |
| 324. | The detectives' notebooks are not in the prosecutor's files. | Ex. 27 (PIMS file). |
| | **Lincoln Helped Suppress Exculpatory Evidence** | |
| 325. | Lincoln's practice when reviewing police reports was to make determinations about what he considered exculpatory evidence and to follow up with detectives if the information provided was incomplete. | Ex. 30 (Lincoln Dep.) at 143:21-144:4. |
| 326. | Lincoln knew that homicide notebooks did not need to be turned over absent a "specific request" and was not aware of a general practice of disclosing them. | Ex. 30 (Lincoln Dep.) at 145:10-146:1. |
| 327. | The photographs of cassette tapes held by LASD make clear that several key interviews were not recorded or the recordings were hidden or destroyed, including the January 1, 2001 interview with Carlos Arechiga, | Ex. 24 (Cassette Photographs), Ex. 30 (Lincoln Dep.) at 143:21-144:4 |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
|  | the January 3, 2001 Valdovinos interview and the February 15, 2001 Arechiga/Delgado interview. The January 1, 2001 interview with Arechiga is also mislabeled as "No Side B." Lincoln, in administratively reviewing the file and comparing it to the cassette tapes, would have known that key recordings were missing from the file. |  |
| **Castillo Briefed Diviak on the Case And Asked for His Help, and Diviak Took Several Actions to Move the Investigation Forward, and then Lied at Trial About His Involvement** | | |
| 328. | In January 2001, Diviak was assigned to Operation Safe Streets, where he provided resources to Homicide detectives and other bureaus who wanted information. He worked out of Lakewood Station. | Ex. 16 (Diviak June 2023 Dep.) at 142:15-21; 146:10-17; 179:12-19. |
| 329. | During the Guitron homicide investigation, Castillo contacted Daren Diviak, provided him with names and gang names that came up in the investigation, asked Diviak to research those names, briefed Diviak on the case, let him know the circumstances of the case, and shared information on the suspect vehicle. | Ex. 11 (Castillo Dep.) at 77:22-79:15. |
| 330. | Diviak obtained and shared with Gates and Castillo numerous profiles of potential suspects and witnesses. | Defs.' Exs. 5, 7, 8, 9, 10 (Dkt. Nos. 116-1—116-5); DUMF ¶ 43. |
| 331. | Castillo understood that during a gang case, "there's always the potential that somebody is trying to | Ex. 11 (Castillo Dep.) at 139:5-140:5. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | put something on somebody else," so it was necessary to work with gang investigators to identify the motive of witnesses, and Castillo relied on Operation Safe Streets [OSS] to get that information. | |
| 332. | As of January 14, 2001, Castillo learned that Alex Torres was the victim of an assault with a firearm on January 13, 2001. In his practice as a detective, Castillo would have contacted the investigators of that assault and documented any information he learned in the murder book. Daren Diviak was the investigator assigned to that assault. | Ex. 11 (Castillo Dep.) at 320:1-322:22; DUMF ¶ 45; Ex. 31 (Castillo Dep Ex. 13.) |
| 333. | Castillo and Gates documented two conversations with Daren Diviak on January 16, 2001. In the morning of January 16, 2001, Diviak shared information with Gates about the crime he was investigating where the victim is Alexander Tores. In the afternoon of January 16, 2001, Diviak surveilled Torres's home and provided information on the residents of the house where Torres lived, the two cars in Torres's driveway, and the closed-circuit camera in the driveway. Diviak also provided a disc with pictures he had taken of the area. | Dkt. 116-7 (Defs.' Ex. 21, Castillo Notebook 1) at COLA 5981; Dkt. 116-10 (Defs.' Ex. 52, Gates Notebook 2) at COLA 6153; 6155. |
| 334. | Diviak interviewed Torres on January 16, 2001—two days before Torres was arrested. | Dkt. 116-18, Defs.' Ex. 151 (Trial Tx.) at 380:25-381:3. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 335. | At trial, the prosecutor indicated that Diviak was not involved in the Guitron murder investigation. | Dkt. 116-19, Defs.' Ex. 151 (Trial Tx.) at 387:9-21. |
| 336. | In a search warrant application, Jimmie Gates described himself learning that Alexander Torres was the victim of an assault with a deadly weapon on January 16, 2001—the same day that Diviak allegedly interviewed Torres about that shooting. | Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 86. |
| 337. | At trial, Diviak testified as an apparently neutral gang expert. He falsely claimed that he did not know whether there was "bad blood" between Mr. Torres and "Casper" (Martin Guitron), but as discussed above, Diviak had been briefed on the Guitron homicide at that time and knew that Torres was a suspect. | Dkt. 116-19, 116-20, Defs.' Ex. 151 (Trial Tr.) at 376:16-377:26; 390:2-5. |
| 338. | While investigating Oscar Valenzuela for a drive-by shooting in January 2001, Diviak learned that Oscar Valenzuela drove a Grand Marquis. Diviak served a warrant on January 18, 2001 on Oscar Valenzuela, at which time the Lakewood Operation Safe Streets Team (including Diviak) learned that Oscar Valenzuela had received a traffic citation for driving a 1992 Mercury Marquis on December 3, 2000, just 28 days before Guitron was murdered. As described below, Gates and Castillo later showed photos of the Marquis to Valdovinos, | Diviak Ex. 16 (Diviak June 2023 Dep.) at 222:8-25; 224:3-14; Ex. 32 (Oscar Valenzuela File) at COLA 6460 (referencing December 3 citation); COLA 6471-6476 (photos of Valenzuela's 1992 Mercury Marquis). |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | but withheld the results of that identification procedure. | |
| 339. | Diviak acknowledged he would provide information he had to detectives if he believed it was relevant. | Ex. 16 (Diviak June 2023 Dep.) at 234:9-24. |
| **Gates and Castillo Knew They Needed to Document Exculpatory Information in Their Reports or the Murder Book But Failed to Do So, and Instead Placed Exculpatory Information in an Undisclosed Working Folder / "Poor Boy" that Was Not Shared with Prosecutors** | | |
| 340. | Castillo understood he should document any exculpatory evidence in his reports. | Ex. 11 (Castillo Dep.) at 150:8-22. |
| 341. | Castillo knew that the information he needed to disclose during his investigations had to be put into his supplementary reports. | Ex. 11 (Castillo Dep.) at 163:2-20 |
| 342. | Castillo knew that any exculpatory information from his notebooks needed to be written in a supplementary report and forwarded to the district attorney. | Ex. 11 (Castillo Dep.) at 166:1-12 |
| 343. | Castillo is "sure" that he "probably removed some documents" from the working file. | Ex. 11 (Castillo Dep.) at 172:4-11. |
| 344. | Only Castillo and Gates had access to their working file during their investigation. | Ex. 11 (Castillo Dep.) at 172:16-19. |
| 345. | Deposition Exhibit 23 is the "poor boy" where Castillo and Gates "kept a lot of our files" and consisting of the "working file" Castillo kept as a homicide detective. | Ex. 11 (Castillo Dep.) at 203:2-206:3. |
| 346. | The contents of the working folder would not go to the prosecutor. | Ex. 11 (Castillo Dep.) at 206:19-21. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 347. | The "poor boy" contains thousands of pages of documents not disclosed to the prosecutor, Torres, or Torres's defense counsel. Ex. 19 (Torres Dep.) at 217:13-218:24 (discussing information not given to Torres). | Ex. 27 (prosecutor's PIMs file) (the prosecutors' file, which did not include detectives' notebooks or other documents from the Poor Boy); Ex. 15 (Poor Boy file) (containing documents withheld from prosecutors and Torres). |
| 348. | The Poor Boy in the Guitron investigation also contained physical evidence like an address book recovered from the scene which was never logged into evidence. | Ex. 5 (Address Book from Poor Boy); Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 26-27 (not logging address book into evidence or mentioning it). |
| 349. | When presenting a case to the prosecutor to decide whether to initiate charges, Castillo presented the murder book, knowing that the relevant information about the case needs to then be in the murder book. | Ex. 11 (Castillo Dep.) at 165:3-25. |
| 350. | Trial prosecutor Stephen Gallon would have turned over any information impeaching witnesses to the defense—including evidence of a key eyewitness picking someone else out of a six pack or identifying somebody as being involved who was in jail at the time—but recalls no such evidence from Torres's criminal prosecution. | Ex. 34 (Gallon Dep.) at 18:14-20:7. |
| 351. | If Gallon had received the detectives' notebooks, he would have given them to the defense; however, the defense never received them. | Ex. 34 (Gallon Dep.) at 45:11-23; Ex. 19 (Torres Dep.) at 217:10-21 (never saw any notebooks produced at trial); Ex. 27 (Prosecution PIMS |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | | file) (no evidence of notebooks). |
| 352. | If Gallon had received the detectives' notebooks, they would be in the prosecutor's file; however, they were not in the prosecutor's file. | Ex. 34 (Gallon Dep.) at 35:22-36:6; Ex. 27 (Prosecution PIMS file) (no evidence of notebooks). |
| 353. | In 2001, the practice for homicide detectives was to xerox their notebooks and include them in the Murder Book; indeed, Escalante, in her 35 years as a prosecutor at the Los Angeles District Attorney's office, has never seen an actual detectives' notebook, just photocopied pages. The Murder Book of the Guitron Homicide Investigation has no pages from the homicide detectives' notebooks in it. | Ex. 35 (Escalante Dep.) at 44:19-46:11; 104:12-21; Dkt. 116-2, Defs.' Ex. 6 (Murder Book). |
| 354. | Escalante, in 35 years as a Los Angeles prosecutor, has never seen detectives present her with a "poor boy" or "homicide box." All of the evidence that the detectives brought to Court was in the murder book and "[t]here was no box of other stuff that would come to court." | Ex. 35 (Escalante Dep.) at 11:16-18; 54:16-55:8; 106:24-107:6. |
| 355. | Gallon had an open book policy and turned over everything he received from detectives to the defense. Escalante also turned over all the discovery she received to defendants, and doesn't recall any time when she obtained documents in a criminal case and failed to share them with the defense. | Ex. 34 (Gallon Dep.) at 37:8-19; Ex. 35 (Escalante Dep.) at 125:11-127:19; 134:15-135:10. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 356. | Any documents that Escalante had in her possession from the preliminary stages of prosecuting Torres for murder would have been given to Gallon in the file as something he reviewed, and Gallon would have disclosed it to Torres. | Ex. 34 (Gallon Dep.) at 48:2-14. |
| 357. | If Gallon had been given a copy of the "Poor Boy," he would have looked through it, made sure he had everything in there, and turned it over to the defense, and the district attorney's office would still have a copy. No such copy is in the possession of the district attorney's office and Gallon does not have an explanation for why it is not present there. | Ex. 34 (Gallon Dep.) at 48:23-50:1; Ex. 27 (Prosecution File). |
| 358. | Regarding recordings of witness interviews in homicide cases, Gallon explained, "they should be turned over without asking. That's how it works." | Ex. 34 (Gallon Dep.) at 80:13-23. |
| 359. | The documents from the Los Angeles District Attorney's Office file are uploaded into a system called "PIMs." The Office produced a complete set of its case file from the time of the trial labeled as "PIMs," which is labeled LADA 417-1191. | Ex. 35 (Escalante Dep.) at 10:18-11:6); Ex. 27 (Prosecutor's PIMs file) |
| 360. | Gates admits he has "no idea" that the poor boy was given to the prosecutor in Torres's criminal case. | Ex. 3 (Gates Dep.) at 355:24-356:2. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| There Was No Probable Cause for Torres's Arrest or Prosecution ||| 
| 361. | Gates completed a sworn affidavit in support of the arrest of Alex Torres and the search of his home. | Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 80-88. |
| 362. | Gates's probable cause affidavit omitted that Valdovinos said he merely suspected Alex of committing the murder and had not seen Alex on either December 31 or January 7; that Valdovinos said he was more than twenty feet away and pedaling harder at the moment he first heard shots on December 31; that Valdovinos associated the shooter with "Alejandro" even though that is not Torres's name and no evidence associates that name with him; and other facts relevant to probable cause. | Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at 80-88. |
| The LASD Failed to Create or Enforce Standards for Identification Procedures, and as a Result Castillo and Gates Conducted Unreliable and Inappropriately Suggestive Identifications ||| 
| 363. | Detectives Gates and Castillo conducted a suggestive identification procedure of Mr. Torres's house: they showed Mr. Valdovinos multiple photographs of Mr. Torres's house and he signed a photograph of a single resident that represented Mr. Torres's house. | Ex. 36 Franklin Report) ¶¶ 95-96; Ex. 46 (COLA 6156), Ex. 47, (COLA 6663), Ex. 48 (COLA 7468), Ex. 49 (COLA 7471-7474), Ex. 50 (COLA 7485). |
| 364. | One of the photographs of Mr. Torres's house shown to Mr. Valdovinos showed a large graffiti tag of the victim's gang name, "CVS," which, given Mr. | Ex. 36 (Franklin Report) ¶ 97; Ex. 50 (COLA 7485). |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | Valdovinos's belief that the murder was motivated by gang rivalry, was a powerful and highly suggestive prompt to identify the location and its resident as the shooter. | |
| 365. | To conduct a fair and proper eyewitness identification, it was necessary that the photo array of Mr. Torres shown to Enrique Valdovinos involve a suitable set of fillers and to otherwise be properly conducted. | Ex. 36 (Franklin Report) ¶¶ 98-99. |
| 366. | In the fairness assessment conducted by Dr. Franklin—giving 30 naïve participants the description memorialized by Mr. Valdovinos and showing them the same photo array that Mr. Valdovinos was shown—23 out of 30 respondents identified Mr. Torres, which showed that the photo array was extremely biased toward creating an identification of Mr. Torres with essentially no viable alternative candidate. There is less than a 2 in a quadrillion chance that such a skewed result occurred by chance. | Ex. 36 (Franklin Report) ¶ 100. |
| 367. | Because the photo identification conducted by Gates and Castillo was so biased, it had negligible diagnostic value and irreparably contaminated Mr. Valdovinos's memory going forward. | Ex. 36 (Franklin Report) ¶ 101. |
| 368. | Because of the biased photo identification procedure that was conducted, the live lineup of Mr. Torres conducted January 31, 2001 | Ex. 36 (Franklin Report) ¶ 102. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | with Enrique Valdovinos did not indicate a true identification and the presence of multiple non-blind officers at the lineup increased further risk of a false identification. | |
| 369. | Gates and Castillo's interactions with Valdovinos violated the 1998 California Commission on Peace Officer Standards and Training Manual and generally accepted standards from the American Psychology-Law Society's 1998 White Paper on identification procedures. Among other things, the detectives failed to ensure that officers administering the identifications were blind to the identity of the suspect and failed to ensure that the suspect did not stand out unduly. | Ex. 36 (Franklin Report) ¶ 104. |
| 370. | The identification procedures conducted with Carlos Arechiga on February 15, 2001 resulted in a non-identification. | Ex. 36 (Franklin Report) ¶ 112. |
| 371. | The fact that the day after the shooting Mr. Arechiga described the shooter to Detective Castillo as 5'0" and skinny, which substantially mismatches Mr. Torres regarding height and build, makes his subsequent identification unreliable. | Ex. 36 (Franklin Report) ¶114; Ex. 51, (COLA 5948). |
| 372. | The detectives' violations of generally accepted standards for eyewitness identification included showing photos of the same person multiple times or failing to take | Ex. 36 (Franklin Report) ¶¶ 106-109, 115-116. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | measure to prevent repeat identification procedures; conducting showup (single photo) identification procedures with Mr. Torres's residence and Mr. Torres's car; failing to cover up the plaid shirt worn by Mr. Torres in the six-pack after Valdovinos had identified the perpetrator as wearing a plaid shirt; not separating Mr. Arechiga and Ms. Delgado during the photo identification procedures; and making the suggestive instruction to Mr. Arechiga that he "had to pick one." | |
| 373. | The identifications of Mr. Torres made by Mr. Valdovinos (and by Mr. Arechiga, if he made any) were highly unreliable and were likely the result of exposure to highly suggestive influences introduced by police. | Franklin Report ¶ 122. |
| 374. | No written document guided detectives about how to conduct six-pack photo identifications; any guidance would come from other detectives. | Ex. 28 (Rodriguez 30b6 Dep.) at 107:5-22. |
| 375. | The LASD also did not enforce the policies that it set regarding identification. For example, the policy required all lineups to be videotaped, but lineups have never been videotaped by the LASD. | Ex. 28 (Rodriguez 30b6 Dep.) at 105:6-107:4. |
| 376. | The LASD had no policy or practice addressing the potential prejudice when a witness is shown both a photo identification procedure and a live | Ex. 28 (Rodriguez 30b6 Dep.) at 120:7-121:4. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | lineup (as happened with Valdovinos in this case). | |
|  | **The LASD Used Undisclosed "Poor Boy" Investigative Files, in This Case and Others, to Hide Evidence** | |
| 377. | From December 2000 to June 2001, the "mindset of the Poor Boy" among homicide detectives was "The poor boy is our bible. I'm not giving that to anybody" and that unless there was a "court order" or "some kind of legal obligation" to provide it, the poor boy was "the holy grail . . . of your case." | Ex. 28 (Rodriguez 30b6 Dep.) at 103:4-21. |
| 378. | The LASD's 30(b)(6) representative gave the following testimony regarding the disclosure of Poor Boy files:<br>Q: Detective Gates testified, "I have never given a poor boy to anybody, other than myself or my partner, maybe -- maybe Lincoln or Lieutenant maybe, but I doubt that. The poor boy is our bible. I'm not giving that to anybody. Is that consistent with the practices at the time [December 2000 to June 2001], that all things equal, there is no reason an investigator needs to give their poor boy to anybody else?<br>A.      Not knowing the context of when he said not giving it to anybody else, but during that time, that would be the mindset of the poor boy. Obviously, you are under -- unless you were under some kind of legal obligation or court order to provide | Ex. 28 (Rodriguez 30b6 Dep.) at 103:4-21 (emphasis added). |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
|  | that to a trier of fact, or district attorney, or -- or -- or – or defense, I think it was just being more that that's kind of the holy grail of -- of -- of your case." |  |
| 379. | Gates would never give his poor boy (investigative file) to a prosecutor or defense attorney. | Ex. 3 (Gates Dep.) at 150:14-19. |
| 380. | Because defense attorneys would sometimes request Gates's entire poor boy when he brought it to a discovery hearing, Gates's practice was only to bring certain documents from his investigation to discovery hearings, and not the entire investigative file. | Ex. 3 (Gates Dep.) at 150:20:-151:3 |
| 381. | Gates did not want defense lawyers to go through his entire poor boy because he did not want them to have information about potential suspects. | Ex. 3 (Gates Dep.) at 151:4-13. |
| 382. | Gates never gave a copy of the poor boy (investigative file) to the prosecutor or defense or made any copies of it for any purpose. | Ex. 3 (Gates Dep.) at 141:11-142:6 |
| 383. | According to Gates, his investigation notebooks are "not for the defense. They're not for my lieutenant. They're not for anybody except me." | Ex. 3 (Gates Dep.) at 145:18-20. |
| 384. | Gates has never given a poor boy to anybody except himself or his partner, and "maybe Lincoln, our lieutenant, maybe, but I doubt that." | Ex. 3 (Gates Dep.) at 158:23-159:2 |
| 385. | Larry Lincoln, who supervised Gates and Castillo in 2001, acknowledged that the "poor boy" files were kept | Ex. 30 (Lincoln Dep.) at 55:11-21. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | exclusively by the homicide detectives and not shared with others. | |
| 386. | Lincoln would not expect homicide detectives to turn over files with information about possible suspects, such as was kept by Gates and Castillo in a "possible suspects" folder in the Guitron homicide investigation, to the district attorney. | Ex. 30 (Lincoln Dep.) at 148:16-22. |
| 387. | From December 2000 to June 2001, there was no practice at LASD of anyone other than the homicide investigators assigned to a case reviewing the Poor Boy. | Ex. 28 (Rodriguez 30b6 Dep.) at 82:24-83:5. |
| **The LASD Failed to Ensure that Exculpatory Evidence Was Disclosed in Homicide Investigations** | | |
| 388. | The LASD failed to create or enforce standards regarding providing robust, detailed, and accurate investigatory reports and guiding investigator's "discretion" to determine what was made available to the prosecutors for review. The LASD should have, but didn't routinely make poor boy files available to prosecutors for review. Their failures were inconsistent with well-established police practices & procedures and generally accepted standards. | Ex. 37 (Scott Expert Report) at ¶ 2.38. |
| 389. | No policy, training manual, or other written source defined what investigative steps should be documented in reports as opposed to their notebooks. | Ex. 28 (Rodriguez 30b6 Dep.) at 77:15-25. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 390. | No written policy or training materials defined exculpatory evidence for detectives. | Ex. 28 (Rodriguez 30b6 Dep.) at 90:10-13. |
| 391. | From December 2000 to June 2001 at LASD, there was nothing written or documented through training about what should be included in investigators' reports. Even today, there are no written standards; the most the LASD's 30b6 representative could say was that the "accepted practices, through some trial and error . . . hopefully ha[ve] gotten [better]." | Ex. 28 (Rodriguez 30b6 Dep.) at 80:3-81:2. |
| 392. | At the time of the Guitron homicide investigation, it was acceptable within the LASD to maintain physical evidence from a homicide victim, such as a physical address and telephone book or a photo ID, in the poor boy and to not log that evidence into the Department's inventory/evidence storage system. This practice directly violated the written policies of the Department but the Department treated the issue to be at the investigator's discretion. | Ex. 28 (Rodriguez 30b6 Dep.) at 100:9-103:3. |
| 393. | In 2001, Castillo was not aware of any policy about how to maintain a working file in homicide investigations. | Ex. 11 (Castillo Dep.) at 171:17-21. |
| 394. | Castillo and Gates did not know of any policy about how to create a Murder Book. | Ex. 11 (Castillo Dep.) at 171:11-16; Ex. 3 (Gates Dep.) at 136:16-19. |
| 395. | Castillo was not aware of any policies about how to maintain his notebooks | Ex. 11 (Castillo Dep.) at 172:20-24. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | when investigating homicides in 2001. | |
| 396. | Gates never received any training on what impeachment evidence is. | Ex. 3 (Gates Dep.) at 98:19-21. |
| 397. | The LASD had no policies that instructed detectives on what they were supposed to put in a report. | Ex. 3 (Gates Dep.) at 122:7-12; |
| 398. | Gates did not feel obligated to record differences in descriptions of a car involved in the crime in the murder book, e.g., if a witness said a car was blue one day and black the next day, or if a witness changed their description of the suspect's height by five or six inches. | Ex. 3 (Gates Dep.) at 162:5-165:23. |
| 399. | Gates did not feel obligated to record that an eyewitness against a murder suspect had previously given a fake name to the police, and he in fact failed to record evidence known to him on this point in the Murder Book. | Ex. 3 (Gates Dep.) at 269:7-276:6; Ex 29 (Arechiga arrest report from Poor Boy); Dkt. 116-2, Defs.' Ex. 6 (Murder Book) (lacking evidence of Arechiga's arrest and giving a fake name to the police). |
| **The LASD Failed to Supervise Homicide Investigations in General and the Guitron Investigation in Particular** | | |
| 400. | At LASD homicide, homicide detectives did not get guidance from their supervisors; the detectives were given autonomy to operate without supervision. | Ex. 28 (Rodriguez 30b6 Dep.) at 61:23-63:4. |
| 401. | No document specified how homicide bureau lieutenants were supposed to supervise homicide investigators. | Ex. 28 (Rodriguez 30b6 Dep.) at 63:5-9. |
| 402. | Homicide investigators' lieutenants did not instruct homicide investigators on acceptable and | Ex. 28 (Rodriguez 30b6 Dep.) at 63:24-64:21; 66:10-14. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | recommended practices for homicide investigation, and most often, the homicide lieutenants had never worked as homicide investigators. No other supervisors participated in enforcing recommended and acceptable investigation standards, either. | |
| 403. | Instead, the Department relied on the homicide detectives to "kind of police[] themselves." | Ex. 28 (Rodriguez 30b6 Dep.) at 65:19-24. |
| 404. | Lieutenants were responsible for reviewing the murder book, but there was no policy and no standards to guide their review. They learned how to review them from other homicide lieutenants, who told them "just scan through it, look through it, and initial it." | Ex. 28 (Rodriguez 30b6 Dep.) at 87:15-88:3. |
| 405. | It was evident that LASD homicide investigators had limited to no supervision as they conducted their respective investigations. This hands-off style of supervision was prevalent throughout LASD Homicide. | Ex. 37 (Scott Expert Report) at ¶¶ 3.6, 3.18. |
| 406. | Providing little direction and control over subordinate investigators in a homicide unit is inconsistent with well-established police practices and procedures. | Ex. 37 (Scott Expert Report) at ¶ 3.23. |
| 407. | The LASD condoned Lieutenant Lincoln's decision not to be actively involved with the homicide investigations of the detectives he supervised. | Ex. 37 (Scott Expert Report) at ¶ 3.26. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 408. | LASD's refusal to document practice via written policies is short of well-established police practices and procedures and represents a failure of leadership. | Ex. 37 (Scott Expert Report) at ¶ 3.27. |
| 409. | The failure to supervise would be expected to cause wrongful convictions because (1) it leads to withholding of exculpatory information and (2) it leads to insufficient and unthorough investigations. | Ex. 37 (Scott Expert Report) at ¶ 3.28. |
| 410. | Castillo and Gates reported directly to Lincoln, with no one in between in the chain of command. | Ex. 30 (Lincoln Dep.) at 42:1-13; Ex. 28 (Rodriguez 30b6 Dep.) at 15:6-13. |
| 411. | Lieutenant Lincoln checked Gates and Castillo's reports just for spelling and grammar, but not for content. | Ex. 3 (Gates Dep.) at 128:1-17; Ex. 30 (Lincoln Dep.) at 58:20-59:8; 140:9-13. |
| 412. | Lincoln was never in the homicide bureau before he became a homicide lieutenant and received no additional training to become homicide a lieutenant. He never served as the lead detective in any homicide investigation. | Ex. 30 (Lincoln Dep.) at 23:8-10; 24:7-11. |
| 413. | Lincoln does not believe he was personally involved in deciding the strategy for any homicide investigation while he was a homicide lieutenant in 2001. | Ex. 30 (Lincoln Dep.) at 29:2-8. |
| 414. | Lincoln did not provide any training to the homicide investigators under his supervision. | Ex. 30 (Lincoln Dep.) at 29:9-30:1. |
| 415. | Lincoln did not review the notebooks of the detectives he supervised. | Ex. 30 (Lincoln Dep.) at 40:7-18. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 416. | Lincoln did not review any of his investigators' poor boy files and not required to do so by LASD. | Ex. 30 (Lincoln Dep.) at 56:25-57:8 |
| 417. | There was no requirement for homicide detectives to turn over working files to anyone unless requested in discovery, and homicide detectives were not required to make copies of the file for any purpose. | Ex. 30 (Lincoln Dep.) at 56:10-24. |
| 418. | Although training materials were "available" to homicide investigators, they were essentially irrelevant, because 99 percent of the "training" that new investigators received was "mentoring" from new homicide detectives, not formal or standardized training. | Ex. 28 (Rodriguez 30b6 Dep.) at 46:14-22. |
| 419. | Gates never received any training as to how to investigate cases when he became a detective. | Ex. 3 (Gates Dep.) at 97:25-98:4. |
| A Culture of Deputy Gangs Infused the Department and Corrupted the Guitron Homicide Investigation | | |
| 420. | Daren Diviak was a member of the "Vikings" Deputy Gang. | Ex. 38 (Diviak Responses to Plaintiff's Second Interrogatories) at 5-6; Ex. 39 (Clark Expert Report) at 34. |
| 421. | Diviak lied under oath at his first deposition, when he said he didn't know of any group of deputies who associated as "Vikings" and testified that it was just a mascot, as far as he ever heard. | Ex. 16 (Diviak June 2023 Dep.) at 67:20-68:12. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| 422. | Diviak lied under oath a second time when he submitted a sworn response to interrogatories in January 2024. In response to a question that specifically sought details of his tattoo including "numbers, plumes of smoke, or other details," He swore that the Vikings tattoo he had gotten while he was a deputy was "left outer ankle with a Viking head with a helmet. No smoke, no guns, no other descriptions." | Ex. 38 (Diviak Responses to Plaintiff's Second Interrogatories) at 5-6. |
| 423. | At his deposition in March 2024, Diviak revealed that his Vikings tattoo actually had the number "81," on it which meant that the tattoo was "designated at" the number 81 because, he believed, "it's the 81st version of that tattoo," although Diviak had previously denied any numbering associated with his tattoo in his earlier interrogatory response. | Ex. 40 (Diviak March 2024 Dep.) at 4:22-5:9. |
| 424. | In 1993, while Diviak was working at Lynwood station, he got a call from "one of the older heads at the station"—a deputy, not a supervisor—who told him to come down to a place on Long Beach. He was handed a drink and told "It's going to hurt." He then went into a tattoo shop's back room and got a Vikings tattoo with the number 81 on his ankle. | Ex. 40 (Diviak March 2024 Dep.) at 5:10-22; 7:15-22. |
| 425. | Diviak believed he was invited to get the tattoo because he "did a good job on training" and was "a good deputy, | Ex. 40 (Diviak March 2024 Dep.) at 10:18-11:16. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | a hard worker, answering calls, being a team player." He noted that "not everyone got" the tattoo but he "looked at it as an honor because [he] was born at that station." | |
| 426. | Diviak had seen another man with the same Vikings tattoo Diviak has on his ankle. | Ex. 40 (Diviak March 2024 Dep.) at 13:2-15. |
| 427. | When Diviak got his Vikings tattoo in 1993, he understood other deputies had also been honored by getting the tattoo and he would assume that other "hardworking deputies that could be counted on" from Lynwood station also had the tattoo. | Ex. 40 (Diviak March 2024 Dep.) at 14:23-16:14. |
| 428. | Diviak knew that there was a station tattoo at Lynwood station because deputies talked about it and asked each other after they got off training whether they got the tattoo. Although the tattoo was discussed, it wasn't generally shown. | Ex. 40 (Diviak March 2024 Dep.) at 17:3-18:11. |
| 429. | Diviak understood that the Viking tattoo was just for people who completed training at Lynwood Station. | Ex. 40 (Diviak March 2024 Dep.) at 27:10-28:7. |
| 430. | Diviak never told anyone in the Department about his Viking tattoo. | Ex. 40 (Diviak March 2024 Dep.) at 30:4-8. |
| 431. | Diviak explained that when he went to the parking lot to get his Vikings tattoo, there were multiple older deputies waiting there. These deputies were "respected people that you could count on . . . because the supervisors there were all about | Ex. 40 (Diviak March 2024 Dep.) at 31:21-32:7; 33:23-36:7. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | trying to put a case on you. They're from internal affairs . . . [t]hey were not there to be your friends." | |
| 432. | Diviak testified that there were "plenty of people I worked with at the station that I believe were a part of the Lynwood Vikings" but refused to name any of them. | Ex. 40 (Diviak March 2024 Dep.) at 39:12-41:13. |
| 433. | In 2024, while under oath, Matthew Landreth, the homicide detective who reinvestigated Guitron's murder, also refused to name deputy gang members known or suspected by him. | Ex. 7 (Landreth 2024 Dep.) at 140:19-146-15. |
| 434. | LASD, in particular, has had a propensity for "deputy clan[s]" or "Peer-Clans" - groups that develop and corrupt professional standards. | Ex. 39 (Clark Expert Report) at 30. |
| 435. | Clark first became aware of the Vikings deputy clan at Lynwood station in 1983-1984. | Ex. 39 (Clark Expert Report) at 30-31. |
| 436. | "Vikings" tattoos reflect systemic racial prejudice and hatred. | Ex. 39 (Clark Expert Report) at 31. |
| 437. | In the 1980s and 1990's, LASD's Lynwood Station was out of control. The Vikings became an admired peer group and literally took over the station. The Aryan Vikings symbol appeared on a flag and clothing. Supervisory and command staff did nothing to control the Vikings. Roger Clark informed his superior, Commander Bill Hanke, about the activities of the Vikings group and informed department heads on | Ex. 39 (Clark Expert Report) at 31. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | multiple occasions about the group and its ganglike behaviors. | |
| 438. | In August 1991, Clark wrote a memorandum to a department Division Chief that stated: "In my opinion, we are hosting a cancer that could eventually kill us. These groups are so dangerous to our ethical health that the department should officially view and react to membership in them as acts of disloyalty. The narrow clique values of peer groups must not be tolerated. Our tacit acceptance of them must end." | Ex. 39 (Clark Expert Report) at 32. |
| 439. | The Department took no action in response to Clark's memorandum, but numerous executive officers retaliated against Clark in response to his raising of the issue. | Ex. 39 (Clark Expert Report) at 32. |
| 440. | The LASD has continued to exhibit a "code of silence" where police do not report misconduct by one another. That code of silence is exacerbated by poor command and supervision among executives. | Ex. 39 (Clark Expert Report) at 32. |
| 441. | Because of weak administration by Sheriff Baca, line deputies in the LASD were allowed to develop sub rosa codes of behaviors and commit misconduct with the expectation that supervisors would look the other way. | Ex. 39 (Clark Expert Report) at 33. |
| 442. | Daren Diviak's "Viking" tattoo indicates he was a member of the Vikings deputy gang. Diviak provided gang information to the homicide investigators that Mr. | Ex. 39 (Clark Expert Report) at 34. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | Torres has alleged was suppressed from him. The suppression of that evidence is consistent with the nature of deputy gangs in the LASD, which prioritize making arrests and convictions over constitutional rights and obligations. LASD's failure to address deputy gangs communicated to Diviak that it would tolerate unconstitutional police conduct. | |
| 443. | Larry Lincoln's actions in abiding and overlooking the suppression of evidence was consistent with patterns of behavior by LASD deputy gangs. Lincoln was a member of a deputy gang and was subject to the code of silence pervasive throughout the LASD. His failure to monitor the investigators' behavior is consistent with the LASD's code of silence and the prevalence of deputy gangs/subgroups. | Ex. 39 (Clark Expert Report) at 34-35. |
| 444. | Having "ink" – a tattoo associated with a deputy gang/subgroup – helped deputies to get good assignments and promotions. | Ex. 41 (Moffett Dep.) at 25:24-27:5. |
| 445. | Deputies "earned" their "ink" through "street credibility," which included "shooting at suspects." | Ex. 41 (Moffett Dep.) at 27:21-28:11; 29:16-31:22. |
| 446. | It would be dangerous for deputies to have ink they didn't earn – i.e., get a deputy subgroup/gang tattoo if they hadn't been admitted to the group. | Ex. 41 (Moffett Dep.) at 32:12-34:8. |
| 447. | Paul Tanaka, "the most famous Viking" in the history of the LASD, was a "king maker" within the | Ex. 41 (Moffett Dep.) at 35:2-13. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
|  | LASD, and his Vikings "ink" helped him to advance. |  |
| 448. | It was not hard to identify deputy gang members. For example, Mark Moffett, who worked at Century Station for several years shortly after the time of the Guitron homicide investigation, testified that "for the most part," it was easy to identify the members of the Regulators deputy gang. | Ex. 41 (Moffett Dep.) at 59:24-60:4. |
| 449. | The deputy gangs made it impossible for deputies to go to internal affairs because of retaliation; it was preferable to transfer out of a deputy gang station to avoid problems with deputy gang members than to make an official complaint within the Department, because supervisors and internal affairs staff were also "inked" and belonged to deputy gangs. | Ex. 41 (Moffett Dep.) at 61:13-63:13. |
| 450. | The Vikings tattoo allowed sergeants to have more "juice" than lieutenants, meaning influence within the Department, which upended the traditional chain of command hierarchy within the Department. | Ex. 41 (Moffett Dep.) at 63:14-64:2. |
| 451. | Members of the Vikings deputy gang within the chain of command, including Undersheriff Paul Tanka, covered up Mark Moffett's complaint that a Viking deputy gang member carried "throw-away guns" – guns to plant on suspects after committing a | Ex. 41 (Moffett Dep.) at 71:18-73:13. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | shooting to falsely justify self-defense. | |
| 452. | The nature of deputy gangs within the Los Angeles Sheriff's Department as of 2001 was so pervasive and systemic that it created a general corruption of the professional standards and the oath required within the LASD. | Ex. 39 (Clark Expert Report) at 35. |
| 453. | There was sufficient evidence to put the Los Angeles Sheriff's Department on notice that it needed to address the issue of deputy gangs when Mr. Torres was investigated and convicted for a homicide he did not commit. | Ex. 39 (Clark Expert Report) at 35. |
| 454. | When Mr. Torres was falsely convicted in 2001 it was reasonably expected that tolerance of deputy gangs would cause violations of civil rights and wrongful convictions. | Ex. 39 (Clark Expert Report) at 35. |
| 455. | From 1995 to 2002, the LASD was aware that the Vikings subgroup "had been a Lynwood Station group that adopted a symbol and thought they were exclusive enough that they should number the -- the tattoos" and that the group "had once been singled out by a federal judge as a . . . neo-Nazi racist gang." | Ex. 42 (Tyler 30(b)(6) Dep.) at 58:13-59:3. |
| 456. | Deputy subgroups existed from 1995 to 2002 and the LASD's leadership knew about them, but the LASD did not investigate or monitor those groups during that time period. Thus, the Vikings never investigated the | Ex. 42 (Tyler 30(b)(6) Dep.) at 55:2-62:6; 58:13-59:3. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | nature or extent of the Vikings' operations even though they had been identified as a "neo-Nazi racist gang." | |
| 457. | Even though specific deputies had been identified as Vikings and would have had knowledge of the nature and extent of the Vikings' activities, the Department never interviewed them or engaged them in investigating the nature and extent of the subgroup. | Ex. 42 (Tyler 30(b)(6) Dep.) at 96:7-19. |
| 458. | The LASD was also aware of deputy "subgroups" called the "Grim Reapers" and the "Regulators." | Ex. 42 (Tyler 30(b)(6) Dep.) at 85:4-23. |
| 459. | From 1995 to 2002, the LASD made no reform efforts whatsoever that explicitly discussed the idea of deputy subgroups with deputies, or prohibited deputies from joining or belonging to deputy subgroups, or warned deputies about the risks of such groups, or defined "deputy subgroup," "deputy gang," or "deputy clique" in any way, nor did the LASD have any such policies. | Ex. 42 (Tyler 30(b)(6) Dep.) at 78:11-79:15; 83:8-84:9. |
| 460. | In 2001, the LASD did nothing to gather and use information about Deputy membership in subgroups. | Ex. 42 (Tyler 30(b)(6) Dep.) at 42:6-43:7. |
| 461. | Even though the Kolts Report, an official report that catalyzed a decades-long monitoring of the Sheriff's Department, recommended that the LASD "conduct an immediate, throughout internal affairs investigation to identify, root out, and punish severely any lingering gang-like behavior by its deputies," the | 186.   Ex. 42 (Tyler 30(b)(6) Dep.) at 87:14-21; 100:5-17; Ex. 43 (Kolts Report) at TORRES 5131. |

| NO. | PLAINTIFF'S ADDITIONAL MATERIAL FACTS ESTABLISHING GENIUNE DISPUTES | PLAINTIFFS' SUPPORTING EVIDENCE |
|---|---|---|
| | LASD never did so, either from 1995-2001 or otherwise. | |
| 462. | In 2000 and 2001, the LASD was determining, discovering, and getting the sense that there was a problem with a group called the "Regulators," but nevertheless took no actions to investigate that subgroup or otherwise address the risks associated with such groups. | Ex. 42 (Tyler 30(b)(6) Dep.) at 108:15-21. |
| 463. | Although by 1994 the LASD had received a recommendation to implement a rotation policy to rotate deputies and thereby prevent subgroup formations, the LASD had not done so as of 2002. | Ex. 42 (Tyler 30(b)(6) Dep.) at 115:3-116:10. |
| 464. | Although the LASD had received a recommendation to discourage participation and adoption of subgroup symbols and eradicate offensive symbols as of 1995, it never did so from 1995-2002. | Ex. 42 (Tyler 30(b)(6) Dep.) at 116:11-22. |
| 465. | Although in 1992, the LASD had received a recommendation to break up problematic subgroups, it never did so between 1995 and 2002. | Ex. 42 (Tyler 30(b)(6) Dep.) at 117:25-118:13. |
| 466. | The LASD was on notice that deputy gangs needed to be addressed as of 2001. | Ex. 39 (Clark Expert Report) at 35. |
| 467. | Deputy gangs were persistent and widespread during in 2001. | Ex. 39 (Clark Expert Report) at 30; 34-35. |

**II.**

## II.    PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENTS OF UNCONTROVERTED FACTS

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | **DEFENDANT DEPUTY BAHMAN ATABAKI** | |
| 1. | On December 31, 2000, Deputy Bahman Atabaki responded to 15121 El Camino Avenue in the city of Paramount regarding an assault with a deadly weapon call (tag 327). The call was assigned to Deputy Atabaki as a "handling unit." <br><br> *Evidence:* <br> Ex. 6 Martin Guitron Murder Investigation Homicide Book ("Homicide Book") (COLA 006270, 006274); <br> Ex.173 Deposition of Bahman Atabaki ("Atabaki Depo.") 38:24 – 39:22, 49:23-50:3. | Undisputed. |
| 2. | As part of his duties as a patrol deputy at Lakewood Station, Deputy Atabaki responded to the scene of the shooting, secured the scene, contacted witnesses and memorialized all gathered facts and relevant information in his "Sheriff's Department Incident Report." <br><br> *Evidence:* <br> Ex. 6 Homicide Book (COLA 006276, 006269); <br> Ex. 173 Atabaki Depo. 17:14-23:25, 26:3-26:21, 40:10-40:24. | Undisputed that these were his general responsibilities, but his testimony does not indicate whether he memorialized all gathered facts and relevant information in the Guitron homicide investigation. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 3. | Deputy Atabaki contacted eyewitness Enrique Valdovinos. Valdovinos stated to Deputy Atabaki that he was walking with victim Martin Guitron Northbound El Camino Avenue, on the West sidewalk. The victim was riding a bicycle and was very nervous, because the gangsters from Compton Varrio Tortilla Flats "CVTF" were going to kill him. *Evidence:* Ex. 6 Homicide Book (COLA 006276); Ex. 173 Atabaki Depo. 61:20-62:24. | Undisputed that Atabaki memorialized as much; object to truth of its contents as hearsay. |
| 4. | Valdovinos stated to Deputy Atabaki that he and Guitron saw Chevy Caprice car, light blue, 4 door, with tinted windows driving Northbound El Camino Avenue. Valdovinos and the victim were in front of 15121 El Camino Avenue when the Chevy stopped in the middle of the street. *Evidence:* Ex. 6 Homicide Book (COLA 006276); Ex. 173 Atabaki Depo. 63:8-63:22. | Undisputed. |
| 5. | Valdovinos stated to Deputy Atabaki that he observed [the shooter], Suspect 1, who exited the passenger side of the car and ran towards Guitron, confronted him and asked several times if he was "Casper." The victim got of the bicycle, then the Suspect 1 produced a handgun and started to shoot him 3-4 times. Guitron dropped the bicycle and run. The | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Suspect chased him and fired several more times at him. Fearing for his life Valdovinos did not try to stop Suspect 1 and ran Southbound on El Camino. *Evidence:* Ex. 6 Homicide Book (COLA 006277); Ex. 173 Atabaki Depo. 65:8-65:22, 66:12-67:19; 70:8-70:25. | |
| 6. | Valdovinos stated that the victim was a Compton Varrio Segundo "CVS" gangster and went by name of "Casper." *Evidence:* Ex. 6 Homicide Book (COLA 006278); Ex. 173 Atabaki Depo. 70:21-70:25. | Undisputed. |
| 7. | Valdovinos stated that the driver of the car was sitting inside the car having engine running at all times during the incident. Valdovinos stated that suspect 2, was male Hispanic, bald. *Evidence:* Ex. 6 Homicide Book (COLA 006278); Ex. 173 Atabaki Depo. 71:6-71:14. | Undisputed. |
| 8. | Deputy Atabaki contacted witness Carlos Echegaray Arechiga ("Arechiga"), who stated that he was at the corner of the Severn Street and El Camino Avenue when saw the suspect's car driving Northbound El Camino Avenue. | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Ex. 6 Homicide Book (COLA 006278); Ex. 173 Atabaki Depo. 88:24-89:12. | |
| 9. | Arechiga stated that the Chevy stopped in the middle of the street, the Suspect exited the passenger side vehicle run into the yard of the incident location. Arechiga heard 7-8 shots coming from inside the yard, then he saw [the shooter] Suspect 1, run out the yard and enter the Chevy. The Chevy then drove Northbound on El Camino. *Evidence:* Ex. 6 Homicide Book (COLA 006279); Ex. 173 Atabaki Depo. 89:8-90:5. | Undisputed. |
| 10. | Deputy Atabaki spoke to witness Daniel Silva and noted in his supplemental report that Mr. Silva stated the same details as Valdovinos and Arechiga. Atabaki noted in the report that during the incident witness Silva was standing across the street from the location. *Evidence:* Ex. 6 Homicide Book (COLA 006279-006280); Ex. 173 Atabaki Depo. 91:9-91:20. | Undisputed. |
| 11. | Deputy Atabaki prepared the Incident report and Supplementary Report. *Evidence:* | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 6 Homicide Book (COLA 006269 – 0066273, COLA 006274 – 006280); Ex. 173 Atabaki Depo. 40:10-40:24, 55:17 – 55:22. | |
| 12. | Deputy Atabaki did not have further participation in the investigation nor any involvement with individual defendants at any time regarding Guitron murder and never spoke to any of the co-defendants.<br><br>Evidence:<br>Ex. 173 Atabaki Depo. 10:25-11:22. | Disputed. The cited excerpt states only that Deputy Atabaki does not know who Jimmie Gates, David Castillo, or Michael O'Shea are, that he hasn't spoken to the other Defendants **about this lawsuit,** and that he hasn't spoken to Rodney Barton for years. |
| | **DEFENDANT DEPUTY RYAN DEYOUNG** | |
| 13. | On December 31, 2000, Deputy Ryan DeYoung was assigned as a patrol deputy to Lakewood Station. Deputy DeYoung responded to the scene of the shooting to assist the "handling unit" Deputy Atabaki.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006282); Ex. 176 Deposition of Ryan DeYoung ("DeYoung Depo.") 25:8-26:2. | Undisputed. |
| 14. | Deputy DeYoung memorialized information gathered and his involvement in his Supplemental report.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006282); | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 176 DeYoung Depo. 26:3-27:1, 28:19-30:15. | |
| 15. | Deputy DeYoung spoke to neighbors who stated that they heard 3-4 gunshots coming from outside, but they saw nothing and could not give information regarding the Incident.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006282); Ex. 176 DeYoung Depo. 30:22-31:7. | Undisputed. |
| 16. | Deputy DeYoung contacted Raul Cordova who stated that he heard several gunshots come from the front driveway of the location. He saw two males run from the driveway area. They ran toward a dark, possibly black vehicle (92 Chevy Impala, 4 door) which was parked in the middle of the street facing Northbound. He saw the two males jump into a car and speed off Northbound El Camino Street to Eastbound Somerset Blvd.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006282); Ex. 176 DeYoung Depo. 32:8-32:21. | Undisputed. |

**DEFENDANT DEPUTY RODNEY BARTON**

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 17. | On December 31, 2000, Deputy Rodney Barton was working as a special assignment Deputy for the city of Paramount when he responded to the location of the Guitron shooting.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006281); Ex. 174 Deposition of Rodney Barton ("Barton Depo.") 14:11-14:16. | Undisputed. |
| 18. | Deputy Barton's responsibilities were to be involved with educating the community on gang activities or crimes in Paramount and how to prevent crimes, monitor and enter gang related information in CalGang database, conduct field interview reports on gang members.<br><br>*Evidence:*<br>Ex. 174 Barton Depo. 14:17-16:12. | Undisputed. |
| 19. | Deputy Barton prepared a supplemental report memorializing his involvement in Guitron's case.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (Supplemental Report COLA 006281, Incident Log COLA 006286); Ex. 174 Barton Depo. 41:22-42:18. | Undisputed. |
| 20. | Deputy Barton contacted Valdovinos, who stated that he was present when the | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | shooting occurred and identified himself as a friend of the victim. Deputy Barton asked Valdovinos if he agreed to speak to him at station. Valdovinos agreed and was transported to Paramount substation.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006281). | |
| 21. | Valdovinos told Deputy Barton that while walking alongside with Guitron, Blue Chevy Caprice approached from the behind, the passenger (male Hispanic) exited and rapidly walked up to the victim asking if he was "Casper". The victim said "No", then suspect said "You're Casper." Then suspect pointed gun at the victim and fired approximately 5 times. The victim stuck by gunfire ran into the yard located at 15121 El Camino and collapsed.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006281). | Undisputed. |
| 22. | Valdovinos told Deputy Barton that he thought that suspect was from Compton Varrio Tortilla Flats (CVTF) gang member, explaining that approximately 1 week ago Casper, who was a Compton Varrio Segundo gang member had "shot up" a CVTF residence. Witness added | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | that numerous CVTF gang members were after the victim of past altercations. *Evidence:* Ex. 6 Homicide Book (COLA 006281). | |
| 23. | Valdovinos stated to Deputy Barton that suspect was male Hispanic 16-20, with clean shaven face and head. *Evidence:* Ex. 6 Homicide Book (COLA 006281). | Undisputed. |
| 24. | Deputy Barton showed several pictures of gang members, who were "field interviewed" by Lakewood deputies and entered into gangs' books in order to identify the potential shooter to prevent gang rivalry chain shooting, but Valdovinos did not identify the suspect from the photographs. *Evidence:* Ex. 6 Homicide Book (COLA 006281). | Undisputed. |
| 25. | On March 3, 2001, per Homicide Detectives' request, Deputy Barton printed out several gang members subject file report from CalGang database and provided to homicide detectives. *Evidence:* | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 33 (Gang Member Subject File Report Magana Israel COLA 007531); Ex. 34 (Gang Member Subject File Report Magana Ernesto COLA 007538); Ex. 174 Barton Depo. 51:5-52:1, 53:13-53:22. | |
| 26. | On March 22, 2001, Deputy Barton prepared six-pack for photo identification and provided to Detectives Gates and Castillo. Deputy Barton did not have further involvement in the admonishment, showing the six pack, or interview of Valdovinos with Detectives Gates and Castillo on March 22, 2001. *Evidence:* Ex. 35 Trix File Six-Pack Photos (COLA 007072); Ex. 54 Gates Notebook 4 (COLA 007832); Ex. 174 Barton Depo 23:16-28:7, 44:12-46:15, 46:19-50:22. | Undisputed. |
| **DEFENDANT DEPUTY STEVE TILLMAN** | | |
| 27. | On December 31, 2000, Deputy Steve Tillman was assigned to LASD Scientific Services Bureau when he arrived at the location the Guitron murder and contacted LASD Detectives Castillo and Gates. As part of his duties, he conducted technical investigation of the scene. *Evidence:* | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 6 Homicide Book (COLA 006413); Ex. 178 Deposition of Steve Tillman ("Tillman Depo.") 30:18-31:3. | |
| 28. | Deputy Tillman took color photographs of the scene, the street and front yard of 15121 El Camino house and color photographs of number of evidence items.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006413); Ex. 178 Tillman Depo. 30:18-31:3. | Undisputed. |
| 29. | On December 31, 2000, Deputy Tillman responded to Paramount substation, where he took a photograph of a witness.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006413); Ex. 74 Photo of Valdovinos (COLA 007620, 007525); Ex. 178 Tillman Depo. 30:25-31:3. | Undisputed. |
| 30. | Deputy Tillman responded to St. Francis medical center where he took close-up and color photographs of the victim and of his injuries.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006413); Ex. 74 Photos of clothing and victim's injuries (COLA 007775); Ex. 178 Tillman Depo. 31:13 – 31:17. | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 31. | Deputy Tillman transported exposed film to LASD crime lab for further processing.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006413). | Undisputed. |
| 32. | Deputy Tillman prepared a supplemental report documenting his involvement in Guitron's murder investigation.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006413); Ex. 178 Tillman Depo. 9:8-11:5, 28:20-29:11, 48:14-50:2, 52:5-53:1. | Undisputed. |
| | **DEFENDANT DEPUTY RALPH SALAZAR** | |
| 33. | On January 18, 2001, Deputy Ralph Salazar was working as a Crime Scene Investigator within LASD Scientific Services Bureau when he participated in a search warrant serving.  He photographed and videotaped residence of Torres before and after the search warrant was served.<br><br>*Evidence:*<br> Ex. 6 Homicide Book (COLA 006414, 006309);<br>Ex. 179 Deposition of Ralph Salazar ("Salazar Depo.") 43:15-44:1. | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | | |
| 34. | Deputy Salazar was not involved in the briefings related to serving the warrant.<br><br>*Evidence:*<br>Ex. 179 Salazar Depo. 49:11-49:23. | Undisputed. |
| 35. | On January 18, 2001, Deputy Salazar was utilized as an interpreter during Jesus Lopez's interview.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006310); Ex. 179 Salazar Depo. 48:12-48:24. | Undisputed. |
| 36. | Deputy Salazar processed (5) expended bullet casings (45 caliber) for latent print.<br><br>*Evidence:*<br> Ex. 6 Homicide Book (COLA 006414); Ex. 179 Salazar Depo. 50:10-50:25. | Undisputed. |
| 37. | Deputy Salazar prepared a supplemental report.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006414); Ex. 179 Salazar Depo. 50:10-50:25, 80:13-82:16. | Undisputed. |
| | **DEFENDANT SERGEANT MICHAEL O'SHEA** | |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 38. | On December 31, 2000, Michael O'Shea was assigned as a Sergeant at Lakewood station where he supervised the special assignment unit and patrol deputies.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (Major Incident Log COLA 006286);<br>Ex. 175 Deposition of Sergeant Michael O'Shea ("O'Shea Depo.") 11:22-13:10, 24:10-27:3. | Undisputed. |
| 39. | On December 31, 2000, he visited the Guitron murder crime scene.<br>*Evidence:*<br>Ex. 6 Homicide Book (Major Incident Log COLA 006286);<br> Ex. 175 O'Shea Depo. 72:24-73:2. | Undisputed. |
| 40. | Sergeant O'Shea approved Deputy Atabaki's Incident Report and Supplemental reports by Deputies Atabaki,  Barton, and DeYoung.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006269, 006282, 006274);<br>Ex. 175 O'Shea Depo. 52:4-52:19. | Undisputed. |
| 41. | Sergeant O'Shea approved Supplemental reports prepared by Deputies Romash, Nowell and Cadman. | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Ex. 6 Homicide Book (COLA 006284, 006285, 006291); Ex. 175 O'Shea Depo. 78:24-80:1, 116:13-22; 116:23-118:19. | |
| | **DEFENDANT DEPUTY DARREN DIVIAK** | |
| 42. | On December 31, 2000, Deputy Darren Diviak was assigned as a gang investigator in the LASD Operation Safe Street Bureau at Lakewood Station. *Evidence:* Ex. 1 Torres Trial Transcript Excerpt – Daren Diviak Testimony (LADA 001482-001495); Request for Judicial Notice Ex. "1", Certified Docket in Case No. TA 058744. Ex. 171 Deposition of Daren Diviak, Vol. 1, Part 1, ("Diviak Depo.") 76:1-8. | Undisputed. |
| 43. | On January 3, 2001, Deputy Diviak printed out from the CalGang database the gang membership cards of the following people: CVS gang member Steven Garnica, CVS gang member Tomas Arrows, CVTF gang member Eric Orosco, CVTF gang member Carlos Moncada, and CVTF gang member "Lalo." | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:*<br>Ex. 5 Steven Garnica Gang Card printout (COLA 6970);  Ex. 7 Eric Orosco Gang Card printout (COLA 6758); Ex. 8 Tomas Arrows Gang Card printout (COLA 6967); Ex. 9 Carlos Moncado Gang Card printout (COLA 6772); Ex. 10 "Lalo" Gang Card printout (COLA 6782);<br><br>Ex. 171 Diviak Depo. Vol. 1, Part 1, 191:15-194:25, 205:19-206:12, 210:12-211:2, 212:13-213:10; 213:20-214:3. | |
| 44. | On January 13, 2001, Torres was contacted by deputies from Paramount stations, regarding an incident where Torres and his sister were victims of an assault with a deadly weapon, but Torres and his sister were uncooperative.<br><br>*Evidence:*<br>Ex. 13 Alexander Torres Victim of a Crime Incident Report (COLA 006497-6502);<br>Ex. 171 Diviak Depo. Vol. 1, Part 1, 89:1-91:16. | Disputed that Torres and his sister were "uncooperative"; there is no indication in the document that Torres and his sister withheld information in their possession from the responding officers, and the responding officers have not been deposed and their reports are inadmissible hearsay. Undisputed that Torres was contacted by deputies on that date. |
| 45. | Detective Diviak investigated a case in which Torres was a victim of an assault with deadly weapon. | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Ex. 171 Diviak Depo. Vol. 1, Part 1, 31:2-32:21; 89:1-92:3. | |
| 46. | On January 16, 2001, Deputy Diviak interviewed Torres during which Torres stated to Deputy Diviak that he was Compton Varrio Tortilla Flats gang member. *Evidence:* Ex. 1 Torres Trial Transcript Excerpt (LADA 001492 line 20 – 001495 line11); Ex. 13 Torres Victim of a Crime Incident Report (COLA 006502); | Disputed. The records of Diviak's contact with Torres's contact with Torres appear to have been suppressed. Exhibit 13 is not Diviak's report and does not say anything about an interaction between Diviak and Torres. |
| 47. | Deputy Diviak filled out a gang membership card regarding Torres. *Evidence:* Ex. 1 Torres Trial Transcript Excerpt (LADA 001495); Ex. 171 Diviak Depo. 107:17-108:15. | Disputed; Diviak doesn't specifically recall completing a gang membership card with Torres, and no such card is in the poor boy. |
| 48. | Deputy Diviak did not have any further participation in the investigation of the Guitron with any other defendants. *Evidence:* Ex. 171 Diviak Depo. Vol. 1, Part 1, 93:15-97:23. | Disputed; see PAMF ¶¶ 210-24; 328-39. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 49. | Deputy Diviak was called by Detective Gates to testify at the Guitron murder trial.<br><br>*Evidence:*<br>Ex. 171 Diviak Depo. Vol. 1, Part 1, 83:20-87:10. | Undisputed. |
| 50. | Deputy Diviak testified about CVS gang, CVTF gang, Torres's gang membership and speaking to Torres.<br><br>*Evidence:*<br>Ex. 1 Torres Trial Transcript Excerpt (LADA 001483 line 25 – 001488 line19);<br>Ex. 171 Diviak Depo. Vol. 1, Part 1, 87:15-88:3. | Undisputed. |
| 51. | Deputy Diviak testified that Torres admitted to him that he was in CVTF gang.<br><br>*Evidence:*<br>Ex. 1 Torres Trial Transcript Excerpt (LADA 001486 line 2 – 001487 line 13);<br>Ex. 171 Diviak Depo. Vol. 1, Part 1, 88:4-88:22. | Undisputed. |
| | **HOMICIDE BUREAU LEUTENANT LARRY LINCOLN** | |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 52. | From December 31, 2000 to August 2001, Larry Lincoln was a Homicide Bureau Lieutenant at LASD where he supervised the homicide investigators. His duties as a Homicide Bureau supervisor were to respond any homicide his team was assigned to investigate, to read, correct and approve reports, to make available departmental resources for detectives, handle media inquiries with regards to the cases. He was not involved in deciding the strategy of how to conduct investigation.<br><br>*Evidence:*<br>Ex. 177 Deposition of Lieutenant Larry Lincoln ("Lincoln Depo.") 22:16-22:21, 25:7-25:24, 27:14-28:13, 28:19-29:5. | Disputed in part. Lincoln testified that he did not substantively review reports, i.e., for the truth of their content. Ex. 30 (Lincoln Dep.) at 27:19-25, 140:8-13. Undisputed that Lincoln had the other described responsibilities, which did not include active supervision of homicide investigators. |
| 53. | On December 31, 2000, he visited the Guitron murder crime scene to coordinate resources and provide needed support. He was not involved in the murder investigation itself.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (Major Incident Log COLA 006286);<br>Ex. 177 Lt. Lincoln Depo. 26:16-27:18, 60:15-61:20. | Disputed in part. Lincoln reviewed sufficient materials to notice that the Guitron homicide investigation was missing critical documents and was complicit in covering up the corrupt investigation. PAMF ¶¶ 325-27. Undisputed that Lincoln was not charged with actively supervising homicide investigators and that he chose not to do so in the Guitron investigation. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 54. | Lt. Lincoln reviewed and approved Supplemental Reports prepared by Detectives Gates and Castillo and signed the Homicide Book.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006305, 006326, 006337);<br>Ex. 177 Lt. Lincoln Depo. 57:22-59:1, 61:21-62:16, 95:4-95:11, 95:20-95:25. | Undisputed. |
| | **HOMICIDE INVESTIGATION** | |
| 55. | On December 31, 2000, the investigation into the murder of Martin Guitron was assigned to LASD Homicide Bureau Detectives Jimmie Gates ("Gates") and David Castillo ("Castillo"), (collectively "Detectives").<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006296). | Undisputed. |
| 56. | At the crime scene, Deputy Atabaki informed Detectives regarding information he received from witnesses on the circumstances of the murder, description of suspects and suspect car.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006297). | Undisputed. |
| 57. | On December 31, 2000, at 23:50 hours Detectives interviewed Valdovinos at Paramount Station. | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Ex. 6 Homicide Book (COLA 006300 – 006301); Ex. 153 December 31, 2000, Valdovinos audio recorded interview transcript ("December 31, 2000, Valdovinos interview transcript") 2:1-2:15; Ex. 152 December 31, 2000, Valdovinos audio recorded interview. | |
| 58. | On December 31, 2000, Valdovinos told Detectives that Guitron was riding his bicycle on the east side of El Camino Avenue, and he was riding on the West side. When he and the victim were in front of location Guitron saw the suspect car and thought "Cops" were in back of them. When he realized that it wasn't police car he rode bicycle to the West side of the street and joined Valdovinos.<br><br>*Evidence:* Ex. 6 Homicide Book (COLA 006300); Ex. 153 December 31, 2000, Valdovinos interview transcript 2:16-7:24. | Undisputed. |
| 59. | Valdovinos described the suspect's car as a 1990's Chevy Caprice, four door, blue, tinted windows, shiny chrome rims and low-profile tires, possibly 17 inch, two male Hispanics with bald heads driving it.<br><br>*Evidence:* | Disputed in part; Valdovinos initially described the car as a light blue Chevrolet Impala. Then, after Gates suggested that the car might have been a Caprice by asking Valdovinos if it was a "Caprice or an Impala," Valdovinos said it |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 6 Homicide Book (COLA 006300); Ex. 153 December 31, 2000, Valdovinos interview transcript 8:2-25. | was a Caprice. Dkt. 116-24, Defs.' Ex. 153 at 6:19-22; 9:2-6. |
| 60. | Valdovinos stated that suspect car stopped, and the passenger (Suspect 1) exited the car and approached the victim and started yelling "Your Casper, Your Casper." The victim asked, "What do you want." Suspect 1, then walked about three feet from the victim and begun to shoot him.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006300)<br>Ex. 153 December 31, 2000, Valdovinos interview transcript 8:14-10:16. | Disputed in part. Valdovinos did not know how close the shooter was to the victim when the shooting started because Valdovinos only heard the shots and was already twenty feet away and pedaling faster when the shooting started. Dkt. 116-24, Defs.' Ex. 153 at 12:23-13:8. |
| 61. | Valdovinos stated that as soon suspect started to shoot the victim, he rode his bicycle southbound on El Camino Avenue, away from shooting.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006300)<br>Ex. 153 December 31, 2000, Valdovinos interview transcript 10:20-11:5. | Disputed. Valdovinos said that he was already twenty feet away and pedaling faster when the shooting started. Dkt. 116-24, Defs.' Ex. 153 at 12:23-13:8. |
| 62. | Valdovinos told Detectives that he heard 6-7 rapid shots when he was 20 feet away. He stated that he did not see the Suspect 1 shoot the victim, because he knew what was about to happen and rode his bicycle away from the shooting. | Disputed in part. The Murder Book does not describe this fact and misleadingly omits that Valdovinos was 20 feet away when the shooting started. Undisputed that |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:*<br>Ex. 6 Homicide Book (COLA 006300);<br>Ex. 153 December 31, 2000, Valdovinos interview transcript 11:6-13:8. | Valdovinos told as much when the shooting started. |
| 63. | Valdovinos looked back and saw the suspect gang member walking to the car, and the car traveled northbound on El Camino Avenue to eastbound Somerset Boulevard.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006300 – 006301);<br>Ex. 153 December 31, 2000, Valdovinos interview transcript 13:11-14:16. | Undisputed. |
| 64. | Valdovinos stated that the driver (Suspect 2), never exited the car, he described suspect 2 as a male Hispanic, bald approximately 24 years old.<br><br>*Evidence:*<br> Ex. 6 Homicide Book (COLA 006301);<br>Ex. 153 December 31, 2000, Valdovinos interview transcript 16:2-17:12. | Undisputed. |
| 65. | Valdovinos described Suspect 1, as a male Hispanic, 16-17 years old, bald skinny, wearing a red and yellow long sleeved plaid shirt, a white or gray T-shirt and baggy grey pants.<br><br>*Evidence:* | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 6 Homicide Book (COLA 006301); Ex. 153 December 31, 2000, Valdovinos interview transcript 17:10-20:4. | |
| 66. | Valdovinos told Detectives that three days before the shooting, Casper told him that "Alex" from "Compton Varrio T Flats" wanted to kill him. Casper told Valdovinos that CVTF and CVS were involved in gang battle. He told Detectives that suspect 1 was not Alex he knew from T-Flats. *Evidence:* Ex. 6 Homicide Book (COLA 006301); Ex. 153 December 31, 2000, Valdovinos interview transcript 20:19-23:12. | Undisputed. |
| 67. | On January 3, 2001, Detectives interviewed Valdovinos second time at the at Paramount station, where Valdovinos stated that the day after the murder (01-01-2001) he was approached at his house by CVS gang member, named "Tweedy" or "Tweetie," who told him not to speak to detectives. Tweedy added that his fellow gang members from Compton Varrio Segundo knew "The Tuna Fish" gangster, who was responsible for the murder. *Evidence:* Ex. 6 Homicide Book (COLA 006308); | Undisputed, but note that this was at least Valdovinos's fourth interview: he was previously interviewed by Atabaki and Barton in addition to the 12/31/00 interview by Gates and Castillo. Dkt. 116-2, Ex. 6 at COLA 6276-6278, 6281, 6300-01. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 157 January 9, 2001, Valdovinos interview transcript 13:19-14:2; Ex. 156 January 9, 2001, Valdovinos audio recorded interview; Ex. 52 Gates Notebook 2 (COLA 006132); Ex. 21 Castillo Notebook 1(COLA 005060). | |
| 68. | On January 7, 2001, Valdovinos reached out to Detectives on their pagers and requested a meeting.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006308); Ex. 52 Gates Notebook (COLA 006143); Ex. 151 Torres Trial Transcript – Detective Gates Testimony (LADA 001504 line 15 - 001515 line 10, LADA 001527 line 20- 001529 line 22); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Disputed. The Homicide Book is hearsay on this point; Gates claims to have no recollection of his interactions with Valdovinos; and Castillo testified differently during his deposition about what precipitated this meeting. Ex. 11 (Castillo Dep.) at 46:20-24 (Castillo believes Valdovinos called on January 9 to meet with Detectives); Ex. 3 (Gates Dep.) at 64:9-12 (Gates has no recollection of interacting with Valdovinos). |
| 69. | On January 9, 2001, Detectives interviewed Valdovinos third time at the Lennox station, where Valdovinos stated that he knew who shot Casper, that it was Casper's enemy Alex or Alejandro, and that he had seen Alejandro on previous occasions.<br><br>*Evidence:* | As in Plaintiff's response to Defs.' Statement of Fact # 67, note that this was at least Valdovinos's fifth interview; undisputed that Valdovinos so stated, but disputed that Valdovinos was not pressured or coerced to make the |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 6 Homicide Book (COLA 006308); Ex. 157 January 9, 2001, Valdovinos audio recorded interview transcript ("January 9, 2001, Valdovinos interview transcript 2:1-4:15; Ex. 156 January 9, 2001, Valdovinos audio recorded interview. | identification. PAMF ¶¶ 207-209; 227-234. |
| 70. | Valdovinos stated that he was pretty sure it was "Alex" or "Alejandro" because he saw Alex shoot Casper and he saw Alex pulling his car into his friend "Lupe's" home a couple days ago looking for him. *Evidence:* Ex. 6 Homicide Book (COLA 006308); Ex. 157 January 9, 2001, Valdovinos interview transcript 5:1-6:25; Ex. 156 January 9, 2001, Valdovinos audio recorded interview. | Disputed. After being prompted that the shooter was perhaps named "Alejandro" by Gates, Defendant Valdovinos says it was someone named "Alejandro," not someone named "Alex," who shot and killed Casper. Dkt. 116-25, Def. Ex. 157 (1/9/01 Valdovinos Interview) at 4:18-6:19. |
| 71. | Valdovinos stated that the shooter was looking for him and he believes that "Alex" is trying to find and kill him, because he was a witness. *Evidence:* Ex. 6 Homicide Book (COLA 006308); Ex. 157 January 9, 2001, Valdovinos interview transcript 6:3-13:15; Ex. 156 January 9, 2001, Valdovinos audio recorded interview. | Disputed. Valdovinos lacks foundation as to whether the shooter was looking for him and never interacted with the man who confronted his friend Lupe, according to the cited materials. Further, as in Plaintiff's response to Defs.' Statement of Fact #70, Valdovinos identified the |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | | shooter as "Alejandro," not Alex. |
| 72. | Valdovinos stated that he was too scared to identify "Alex" as the person who killed Guitron. Now, he is certain that Alex shot Casper. He told Detectives that he knew Alex and had seen him on previous occasions, prior to the murder.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006308)<br>Ex. 157 January 9, 2001, Valdovinos interview transcript 33:6-33:8;<br>Ex. 156 January 9, 2001, Valdovinos audio recorded interview. | Disputed. Valdovinos never stated he was too scared; he was asked "[w]ere you scared at that time when you told us you weren't sure?" and he answered "Yeah, I wasn't sure. I was like thinking that he might send someone else to did that, but I'm pretty sure it was him . . ." Dkt. 116-25, Def.'s Ex. 157 (1/9/01 Valdovinos Recorded Interview) at 5:18-24. Further, as in Plaintiff's response to Defs.' Statement of Fact #70, Valdovinos identified the shooter as "Alejandro," not Alex. Undisputed that Valdovinos stated that he had seen "Alex" "a couple of times." Dkt. 116-25, Def.'s Ex. 157 (1/9/01 Valdovinos Recorded Interview) at 28:25-29:3. |
| 73. | Valdovinos told Detectives that two weeks before Guitron was murdered he was with him at the market in Paramount when Alex was at the same store, where Guitron said to Alex "Compton Varrio Segundo Santos" and Alex said, "Compton Varrio T Flats."<br><br>*Evidence:* | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
|  | Ex. 6 Homicide Book (COLA 006308 – 006309); Ex. 157 January 9, 2001, Valdovinos interview transcript 15:23- 16:14; Ex. 156 January 9, 2001, Valdovinos audio recorded interview. |  |
| 74. | Valdovinos described where Alex lives and drew the residence address on the piece of paper. *Evidence:* Ex. 157 January 9, 2001, Valdovinos interview transcript 17:2-22:15; Ex. 156 January 9, 2001, Valdovinos audio recorded interview. | Disputed. The interview transcript describes only that Valdovinos drew some kind of map and does not indicate that he drew the residence address or described Alex's house correctly.  Dkt. 116-25, Def.'s Ex. 157 (1/9/01 Valdovinos Recorded Interview) at 17:2-21:18. Valdovinos said that Torres's house had a white gate, but it doesn't. *Id.*; Photos.pdf (COLA 7473). He never mentioned that Alex's family lived in a building in the **back** of the plot, not in the front building. Photos.pdf (COLA 7468). Gates and Castillo hid, destroyed, or lost that map – it is not in the Poor Boy or the Murder Book. Ex. 15 (Poor Boy); Dkt. 116-2, Defs.' Ex. 6 (Murder Book). |
| 75. | Valdovinos stated that four days before Casper was murdered, Casper was "all scratched and beat up" and he told Valdovinos "Alex got him in the store." | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Ex. 6 Homicide Book (COLA 006309); Ex. 157 January 9, 2001, Valdovinos interview transcript 26:1-26:25; Ex. 156 January 9, 2001, Valdovinos audio recorded interview. | |
| 76. | Valdovinos stated that Alex threatened Guitron on two separate occasions that he was going to "smoke him." <br><br>*Evidence:* Ex. 6 Homicide Book (COLA 006309) Ex. 157 January 9, 2001, Valdovinos interview transcript 24:2-25:25; Ex. 156 January 9, 2001, Valdovinos audio recorded interview. | Disputed. Valdovinos claims he heard Alex say "I'ma smoke you" in an alley on one occasion, and that according to his "friend," Alex had told Guitron "I'ma get you later on" in a fight at a store. Defs.' Dkt. 116-25, Ex. 157 January 9, 2001, Valdovinos interview transcript 25:12-16; 25:24-26:22. |
| 77. | On January 10, 2001, Detectives conducted the fourth interview with Valdovinos where Detectives showed him residences located in 6500 block of San Juan Street. Valdovinos pointed to the residence located at 6528 San Juan Street and stated that were Alex lived. <br><br>*Evidence:* Ex. 6 Homicide Book (COLA 006309); Ex. 52 Gates Notebook (COLA 006149); Ex. 21 Castillo Notebook (COLA 005971). | Disputed. Gates and Castillo both lack independent recollection of this interview with Valdovinos. Ex. 3 (Gates Dep.) at 64:9-12; Ex. 11 (Castillo Dep.) at 46:20-24, 49:10-20 (memory of Valdovinos on 1/9/01); 53:10-17 (next memory of Valdovinos is lineup, which occurred on January 31, 2001 – not meeting on 1/10/01); is from documents, not independent); 55:14-20 (no further memories of Valdovinos). Gates would have recorded all interviews, |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | | and any recording of the interview has been lost, hidden, or destroyed.  Ex. 3 (Gates Dep.) at 238:12-239:9; Ex. 24 (Cassette Photographs). The Murder Book claims that Valdovinos was shown "a photograph of residences in the 6500 block of San Juan Street" but all the photos are of the same house. Ex. 15, (Investigator's Poor Boy File) at COLA-006663; Ex. 36 (Franklin Report) at ¶¶ 95-96. The photograph circled and signed by Valdovinos, which was not in the murder book and Plaintiff never received during his criminal case, is not of Mr. Torres's house but of the building in front of his house. Ex. 44 (Torres Alexander File) Ex. 47 (COLA 6663). |
| 78. | Detectives admonished Valdovinos on the viewing of Mug Show Up and showed him the Mug Show Up folder "A". Valdovinos immediately pointed to position #2 and stated, "it is the Alex, he was the one who killed Casper." <br><br> *Evidence:* Ex. 6 Homicide Book (COLA 006309, COLA 006343); | Disputed. Defendants both lack independent recollection of this interaction with Valdovinos. Ex. 3 (Gates Dep.) at 64:9-12; Ex. 11 (Castillo Dep.) at 46:20-24-50:10; 52:1-53:17 (Castillo says he remembers that Valdovinos picked Torres, but no further details). Defendants fabricated the identification of |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 52 Gates Notebook (COLA 006149); Ex. 21 Castillo Notebook (COLA005973). | Plaintiff. PAMF ¶¶ 227-34. The Murder Book and the notebooks are hearsay as to what Valdovinos did when presented with the lineup. |
| 79. | On January 16, 2001, Los Angeles Superior Court Judge signed the search and arrest warrants with night service endorsement for Alexander Torres. *Evidence:* Ex. 6 Homicide Book -Affidavit and Search Warrant (COLA 006309). | Undisputed. |
| 80. | On January 18, search and arrest warrants were served at 6528 San Juan Street, city of Paramount where Torres resided. *Evidence:* Ex. 6 Homicide Book (COLA 006309). | Undisputed. |
| 81. | On January 18, 2001 Detectives searched the residence and recovered a document that says "Alexander, T.F., Grumpy, and Boxer," and the red sprint C.D. case. *Evidence:* | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
|  | Ex. 151 Torres Trial Transcript – Detective Gates Testimony (LADA 001520 line 21 - 001521 line 16); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744; Ex. 52 Gates Notebook (COLA ); Ex. 1 Castillo Notebook (COLA ). |  |
| 82. | On January 22, 2001, Alexander Torres was arrested and taken to the Paramount Station. *Evidence:* Ex. 6 Homicide Book (COLA); | Disputed. He was arrested on January 18, 2001, Dkt. 116-2, Defs.' Ex. 6 (Murder Book) at COLA 6309. |
| | **SUSPECT ALEXANDER TORRES'S ALIBI AND FAMILY MEMBERS' STATEMENTS** | |
| 83. | On January 18, 2001, Detectives interviewed Torres's sister **Martha Ofelia Roca**. She told Detectives that Alexander Torres was active member of "Compton Varrio T-Flats" gang. She told that two months ago her mother's car was "tagged" by Casper. She said that CVS and CVTF are rival gangs and currently involved in gang battle. *Evidence*: Ex. 6 Homicide Book (COLA 006310); Ex. 151 Torres Trial Transcript - Martha Roca Testimony (LADA 001474 line 21 -001477 line 6), Gates Testimony (LADA 001526 lines 6-26); Request for | Disputed. Gates would have recorded all interviews, and any recording of the interview has been lost, hidden, or destroyed. Ex. 3 (Gates Dep.) at 238:12-239:9; Ex. 24 (Cassette Photographs). An adverse inference should be drawn against Defendants regarding this conversation due to their failure to preserve the tape. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | |
| 84. | Martha Roca stated that three weeks ago she and her brother Alex were in local store, where victim Guitron admitted to them that he tagged their mother's car. While they were driving away, Guitron tried to hit them, so she hit him to stop his attack. Martha stated that her brother and Guitron had problems in the past few months.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006310); Ex. 151 Torres Trial Transcript Excerpt- Martha Roca Testimony (LADA 001477 line 10 - 001480 line 21); Gates testimony (LADA 001526 line 26 – 001527 line 7; LADA 001527 line; Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Disputed. Gates would have recorded all interviews, and any recording of the interview has been lost, hidden, or destroyed.   Ex. 3 (Gates Dep.) at 238:12-239:9; Ex. 24 (Cassette photographs). An adverse inference should be drawn against Defendants regarding this conversation due to their failure to preserve the tape. |
| 85. | Martha Roca told Detectives that on the day of the murder (12/31/2001) Torres was at home with family celebrating the holiday. He left that night approximately 19:30 with his friend Rudy and returned 30 minutes later.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006310); | Disputed. Gates would have recorded all interviews, and any recording of the interview has been lost, hidden, or destroyed.   Ex. 3 (Gates Dep.) at 238:12-239:9; Ex. 24 (Cassette Photographs). An adverse inference should be drawn against Defendants regarding this conversation |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 21 Castillo Notebook (COLA 005985); Ex. 52 Gates Notebook (COLA 006158-006161). | due to their failure to preserve the tape. |
| 86. | Martha Roca testified at the trial and stated that when asked by the detectives if Alex was a Tortilla Flats member, she told them "No." She admitted Torres having Tortilla Flats friends that used to come over to their house. *Evidence:* Ex. 151 Torres Trial Transcript Excerpt- Martha Roca Testimony (LADA 001477 lines 3-6, 001480 lines 4-10, 001601 lines 4-20, LADA 001616 lines 12-26) Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Undisputed. |
| 87. | Martha Roca testified about Torres injuring his hand in the fight with Casper and having a cast on his hand on the day of the murder. *Evidence:* Ex. 151 Torres Trial Transcript Excerpt- Martha Roca Testimony (LADA 001601 line 21 – 001607 line 2, 001611 line 15 – 001616 line 9); Request for Judicial | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Notice Ex. "151", Certified Docket in Case No. TA 058744. | |
| 88. | Martha Roca testified that Torres was home in the backyard on December 31, 2000, and never left, but then changed her testimony multiple times.<br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript Excerpt-Martha Roca Testimony (LADA 001607 line 8 – 001610 line 21, 001614 line 3 – 001602 line 9); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Disputed. Martha Roca was asked when the family party on 12/31/00 started, and answered "like at 5:00." She was then asked "did Alex leave at all **at that time**" and answered "No." Martha Roca then explained that she took the Taurus to drop off clothes at "like 7:30," but she saw Alex at home earlier at 7:00 and 7:15, and then she came home at 9:00 pm. Dkt. 116-21, Defs.' Ex. 151 (Trial Tx) at 671:8-674:21. She later answered that her brother Alex had left at about 5:30 pm in the evening with a person named Rudy but that was "the day before"; the prosecutor then asked "didn't you just testify a moment ago that he never left at all," but he misrepresented her testimony, because Roca had not answered that Torres "never left at all." Dkt. 116-21, Defs.' Ex. 151 (Trial Tx. at 677:28-680:9. Thus, Defendants' statement that Roca "then changed her testimony multiple times" is inaccurate. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 89. | On January 18, Detectives interviewed Torres's mother **Martha Hernandez** during which she stated that on the day of the incident in the evening hours Torres left the house several times and was only away for short periods of time.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006312); Ex. 164 January 18, 2001, Martha Hernandez audio recorded interview transcript ("January 18, 2001, Martha Hernandez interview transcript") 3:17-4:4;<br>Ex. 163 January 18, 2001, Martha Hernandez audio recorded interview. | Disputed. The transcript indicates that Ms. Hernandez said Alex would leave and come back shortly but doesn't say he left multiple times. Dkt. 116-29, Defs.' Ex. 164 (Martha Hernandez recorded interview transcript) at 3:20-25. The transcript contains only the interpreter (Deputy Salazar's) rendition of what Ms. Hernandez said and he summarized her statement instead of interpreting word by word. Salazar had no training in interpretation and the LASD had no policies on interpretation. Ex. 4 (Salazar Dep.) at 33:23-34:3. Ms. Hernandez testified that she told Detective Castillo that her son used to go in and out but not on the day Guitron was murdered. Dkt. 116-20, Defs.' Ex. 151 (Trial Tx.) at 650:6-15. |
| 90. | Martha Hernandez stated that she had seen the items that Detectives recovered from the house that had writings of "T Flats" on the and "Alex" underneath T Flats, but she did not pay attention to those and that she advised Alex and her | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | daughters that she did not want to see those writings at home.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006312);<br>Ex. 164 January 18, 2001, Martha Hernandez interview transcript 5:18-6:5. | |
| 91. | Martha Hernandez stated that after her car was tagged by Casper, a fight occurred between Alex and Casper three weeks ago, and Alex broke his hand and had to place a cast on it. She stated that after Casper confronted Torres, he admitted writing on the car and stated that he won't stop until he kills Alex.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006315-006316);<br>Ex. 164 January 18, 2001, Martha Hernandez interview transcript 10:17-12:24. | Undisputed. |
| 92. | Martha Hernandez told Detectives that Torres was having problems with gang members of Segundos and that he was shot when driving the 5.0 Mustang car, which had a bullet hole in it.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006315); | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 164 January 18, 2001, Martha Hernandez interview transcript 11:14-12:16. | |
| 93. | Martha Hernandez testified at the trial and changed the statements she made to detectives during her interview as to Torres leaving the house during the evening hours on December 31, 2000.<br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript Excerpt-Martha Hernandez Testimony (LADA 001580 line 15 – 001586 line 15); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Disputed. Ms. Hernandez testified at trial that Torres had not left the house between 6:30 pm and 7:30 pm that night. Ms. Hernandez testified that she told Detective Castillo that her son used to go in and out but not on the day Guitron was murdered. Dkt. 116-20, Defs.' Ex. 151 (Trial Tx.) at 650:6-15. Those statements are consistent. |
| 94. | **Guitron's sister, Alma Perez**, testified at the trial that after her brother's murder, she had a contact with Matha Hernandez, who stated to her that her son Alex could not be the shooter because her son was at friend's house during the time when Guitron was shot.<br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript Excerpt-Alma Perez Testimony (LADA 001638 line 15 –001639 line 5); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Undisputed that she so testified. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | **SUSPECT ALEXANDER TORRES'S ARREST AND STATEMENTS** | |
| 95. | During his January 18, 2001, interview Torres admitted that he was a gang member of Tortilla Flats street gang for past three years and had the moniker "Droopy." Torres stated that Casper didn't want him to live in his neighborhood, because it's claimed by CVS. This issue led to problems between him and Casper. Torres added that Casper and his friend would knock the door and tell him to move out.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006318); Ex. 162 January 18, 2001, Alexander Torres audio recorded interview transcript ("January 18, 2001, Alexander Torres interview transcript") 4:4-4:11, 4:14-4:24, 5:10-5:15; Ex. 163 January 18, 2001, Alexander Torres audio recorded interview. | Undisputed. |
| 96. | Torres stated that Casper was responsible for his mother's car damage, which occurred on December 10, 2000. After the incident, Torres went looking for Casper and found him in local liquor store where fought.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006318); Ex. 162 January 18, 2001, Alexander Torres interview transcript 7:16-9:22; | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
|  | Ex. 161 January 18, 2001, Alexander Torres audio recorded interview. |  |
| 97. | Torres stated that Casper shot at him a couple of times, but he never shot at Casper. He stated that he was driving to his girlfriend house when he heard loud shot, he ducked and looked to the direction of the shot and saw Casper pointing a gun in his direction.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006318 – 006319);<br>Ex. 162 January 18, 2001, Alexander Torres interview transcript 11:16-12:18;<br>Ex. 161 January 18, 2001, Alexander Torres audio recorded interview. | Undisputed. |
| 98. | Torres stated that on the day of the shooting he remained home all day and never left the house.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006319);<br>Ex. 162 January 18, 2001, Alexander Torres interview transcript 13:22-16:11;<br>Ex.161 January 18, 2001, Alexander Torres audio recorded interview. | Disputed in part. Torres acknowledged that he "left in the nighttime." Dkt. 116-27, Defs.' Ex. 162 (Torres 1/18/01 transcript) at 14:6-11). |
| 99. | Detectives asked Torres if he was in a possession of a Colt 45 caliber handgun. He admitted having a .45 caliber, blue steel handgun, but stated that he threw the handgun off of the bridge into the riverbed. Torres hesitated and stated that he sold the gun to a guy for three | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | hundred dollars, but he did not know the male.<br><br>*Evidence:*<br> Ex. 6 Homicide Book (COLA 006320); Ex. 162 January 18, 2001, Alexander Torres interview transcript 18:16-21:20; Ex. 161 January 18, 2001, Alexander Torres audio recorded interview. | |
| 100. | Torres stated that he found the gun in the Banana Park inside a white sock. Torres again changed his story and stated that he bought the gun from a person named "George" who was a Tortilla Flats gang member.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006320; 006325);<br>Ex. 162 January 18, 2001, Alexander Torres interview transcript 21:24-22:13, 95:17-96:16;<br>Ex. 161 January 18, 2001, Alexander Torres audio recorded interview. | Undisputed. |
| 101. | Torres told Detectives that on the day of the shooting his friends "Moe" and "Biggie" came over at approximately 20:00-21:00 and they smoked "tweak" in his car.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006321); | Disputed in part; Torres said that they smoked "some twig." Dkt. 116-27, Defs.' Ex. 162 (Torres 1/18/01 transcript) at 36:14-17). Otherwise, undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 162 January 18, 2001, Alexander Torres interview transcript 35:21-36:20; Ex. 161 January 18, 2001, Alexander Torres audio recorded interview. | |
| 102. | Torres told Detectives that he left the house at 02:00 the night of the shooting to go to Food for Less. Then he changed his story stating that he went to a friend who lived near Food for Less. *Evidence:* Ex. 6 Homicide Book (COLA 006321); Ex. 162 January 18, 2001, Alexander Torres interview transcript 39:19-41:19; Ex. 161 January 18, 2001, Alexander Torres audio recorded interview. | Disputed, mischaracterizes Torres's statement. Torres said that he went "over there by, um, Food – Food4Less," and then acknowledged that he didn't go to the Food4Less, which was consistent with his statement that he went "**by the** Food4Less." Torres never said he went to the Food4Less. Dkt. 116-27, Defs.' Ex. 162 (Torres 1/18/01 transcript) at 39:19-41:7. |
| 103. | Torres stated that he gave the gun to "Joe" who sold it for 300 dollars. But he didn't know where Joe lived. Torres changed the story again stating that it was not Joe, but someone else. Torres stated that he did not find the gun in the park but bought the gun from a black male. Torres stated that he sold the gun to the person named "Lalo" for three hundred dollars. *Evidence:* Ex. 6 Homicide Book (COLA 006322 – 006323); | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 162 January 18, 2001, Alexander Torres interview transcript 56:22-58:13, 59:12-60:23, 64:5-65:21; Ex. 161 January 18, 2001, Alexander Torres audio recorded interview. | |
| 104. | During the interview Torres stated that Oscar Valenzuela a.k.a. "Sporty," also called "Chunts" shot and killed by Casper. Torres later testified that Jose Nunez told him that "Sporty" is from Nuthood Watts, stating that he heard that "Sporty" killed Casper from "Grumpy," a gang member from Nutwood Watts. Torres did not provide Jose Nunez name to Detectives.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006324); Ex. 162 January 18, 2001, Alexander Torres interview transcript 73:11-74:21; Ex. 161 January 18, 2001, Alexander Torres audio recorded interview; Ex. 180 Deposition of Alexander Torres ("Alexander Torres Depo.") 90:17-91:25, 93:1-14, 99:16-24. | Undisputed that Torres stated on January 18 that he had heard Oscar Valenzuela, AKA "Sporty" or "Chuntz," shot and killed Casper. Disputed that Torres never provided Jose Nunez's name to detectives; Torres testified that the detectives turned the tape recorder off multiple times during his interrogation, and so Defendants are relying on an incomplete record of the interrogation of Torres by Gates and Castillo. Ex. 19 (Torres Dep.) at 214:1-217:9. |
| 105. | Torres told Detectives and his defense counsel Levinson about Oscar Valenzuela or "Sporty" being the shooter. Torres told his attorney about his interview with Detectives when he told them about Oscar Valenzuela.<br><br>*Evidence:* | Disputed in part. As instructed, Torres maintained attorney-client privilege and did not answer questions about what he told his attorneys. and Defendants' counsel represented that she was "not going into his conversation |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 180 Alexander Torres Depo. 100:2-101:3, 101:18-106:25, 113:4-117:5; 117:21-120:9, 143:9-145:12. | with his lawyers," and Mr. Torres maintained that privilege during his deposition. Ex. 19 (Torres Dep.) at 79:25-80:23; 145:7-147:2. Undisputed that Torres told Gates and Castillo that he believed Oscar Valenzuela was the killer. |
| 106. | Torres did not request a private investigator from the Court regarding third-party culprits.<br><br>*Evidence:*<br> Ex. 180 Alexander Torres Depo. 149:24-150:11. | Undisputed. |
| 107. | Torres was afraid of being a "snitch" because gangs will retaliate against him and his family. Torres wanted to give information to Detectives, but he did not want the information about the shooter to be in the "paperwork." Torres did not want to identify Oscar Valenzuela on the recorded call.<br><br>*Evidence:*<br>Ex. 180 Alexander Torres Depo. 113:4-117:5; 117:21-120:9, 134:24-135:23. | Undisputed that Torres was afraid of the consequences of identifying the shooter, but clarify that he did identify Oscar Valenzuela as the shooter to Gates and Castillo. DUMF ¶ 105. |
| 108. | On January 19, 2001, Torres voluntarily took a polygraph examination, which resulted in "the subject being deceptive."<br><br>*Evidence:*<br> Ex. 6 Homicide Book COLA (006325); | Disputed that the examination was voluntary, as (among other things) Castillo and Gates refused Torres's request for an attorney and continued questioning him. Dkt. 116-28, |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 71 Consent-Waiver for Alexander Torres Polygraph Examination (LADA 001282); Ex. 184 Alexander Torres Polygraph Examination Video. | Defs.' Ex. 162 (Jan. 18 Torres Interrogation at 70:18-72:1 (Torres says "give me my lawyer," but Gates and Castillo keep questioning him and do not provide him with access to an attorney). Undisputed that the polygraph examiner checked the "deceptive" box on the polygraph report, but dispute that there was a foundation for her opinion. |
| 109. | Torres again changed his story regarding the gun, stating that "Eric Tripper" from Tortilla Flats gave him the gun and that Eric probably was the person who shot and killed Guitron.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006326); Ex. 53 Gates Notebook 3 (COLA 006057); Ex. 184 Alexander Torres Polygraph Examination Video. | Disputed; the homicide book and notebook are hearsay, and Defendants have not cited to a transcript of the polygraph examination video and have not identified any point in the video where that statement was made. |
| 110. | Torres stated to Deputy Smith that he never left the house on the day of the incident, then changed his story stating that he left for a "few seconds" to buy beer. Torres again stated that he could not remember if he left house that day because he smoked marijuana. | Disputed; the homicide book and notebook are hearsay, and Defendants have not cited to a transcript of the polygraph examination video and have not identified any point in the video where that statement was made. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Ex. 6 Homicide Book (COLA 006326); Ex. 71 Consent-Waiver for Alexander Torres Polygraph Examination (LADA 001281-001284; Ex. 184 Alexander Torres Polygraph Examination Video. | |
| 111. | After polygraph examination Torres stated that rumor has that "Little Sporty" from "Nut Hood Wats" shot the victim. Torres stated that Sporty drives a Marquis, black with gold rims. <br><br> *Evidence:* Ex. 6 Homicide Book (COLA 006326); Ex. 71 Consent-Waiver for Torres Polygraph Examination (LADA 001283); Ex. 184 Alexander Torres Polygraph Examination Video. Ex. 180 Alexander Torres Depo. 108:24-109:7; 121:10-122:14. | Undisputed. |
| 112. | Torres testified that until 2006 he thought the shooter was "Sporty" because Sporty himself told him about that when Torres saw him in the jail transportation bus. Torres stated that his attorney Levinson brought up Valenzuela in the trial. <br><br> *Evidence:* Ex. 180 Alexander Torres Depo. 194:11-197:2. | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | **POST ARREST INVESTIGATIONS AND VALDOVINOS'S STATEMENTS** | |
| 113. | On January 22, 2001, interviewed Valdovinos regarding the suspect's car description where Valdovinos did not identify the Mercury Grand Marquis as the shooter's car.<br><br>*Evidence:*<br>Ex. 22 Castillo Notebook (COLA 006001);<br>Ex. 28 January 22, 2001, Valdovinos audio recorded interview.<br>Ex. 158 January 22, 2001, Valdovinos audio recorded interview transcript;<br>Ex. 53 Gates Notebook 3 (COLA 006059). | Disputed in part. Valdovinos told Gates and Castillo that the Grand Marquis he was shown was the same model as the murder vehicle; but Detectives failed to record this in the Murder Book. Ex. 11 (Castillo Dep.) at 235:14-23; Dkt. 116-26, Defs.' Ex. 158 (Jan 22 Valdovinos Recorded Interview) at 3:7-4:1 (Valdovinos telling Gates and Castillo that the Grand Marquis he was shown was "close" to the murder vehicle, that it was "the same model, the same everything" except the windows and rims, and that if the windows were tinted, it would be the car). Undisputed that Valdovinos also said that the photo of the Grand Marquis he was shown was not the murder vehicle. |
| 114. | Valdovinos was admonished and shown a six-pack photo identification that included photo of Oscar Valenzuela a.k.a. "Sporty" but he did not pick Oscar Valenzuela as the shooter.<br><br>*Evidence:* | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 28 January 22, 2001, Valdovinos audio recorded interview. Ex. 158 January 22, 2001, Valdovinos audio recorded interview transcript; Ex. 53 Gates Notebook 3 (COLA 006060). | |
| 115. | On January 22, 2001, Deputy District Attorney Mary Ann Escalante filed the Felony Complaint against Torres alleging violation of Penal Code section 187 (a) and special allegation Penal Code section 12022.53(d).<br><br>*Evidence:*<br>Ex. 53 Gates Notebook 3 (COLA 006058);<br>Exhibit 72, PIMS, (LADA 000420 – 000422);<br>Request for Judicial Notice Ex. "72", Certified Docket in Case No. TA 058744. | Undisputed. |
| | **TORRES'S FRIENDS' INTERVIEWS AND TESTIMONIES** | |
| 116. | **On January 23, 2001, Detectives interviewed Alvaro Castro** "Moe." He stated that on the day of the incident Torres picked him up at approximately 10:30-11:00 and they arrived Torres's house and smoked marijuana in the backyard. Then "Biggie" came over and | Disputed in part. Castro said he left around 12:30 pm and then returned later, and was at the house from around 2:30 or 3:00 pm until 8:00, 8:30, or 9:00 pm. Dkt. 116-31, Defs.' Ex. 168 (Jan. 23 2001 Castro |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | they smoked marijuana. Then at 15:00-16:00 hours "Biggie" drove him home. He returned to Torres's house arriving at approximately 17:30-18:00 and with Torres they "kicked it" in the backyard until witness he went home approx. 20:30.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006329 – 006331);<br>Ex. 168 January 23, 2001, Alvaro Castro audio recorded interview transcript 6:11-22:19;<br>Ex. 167 January 23, 2001, Alvaro Castro audio recorded interview. | Interview) 10:8-9, 22:14-23. Otherwise, undisputed. |
| 117. | Alvaro Castro told Detectives that after Casper tagged his name on Torres's mother's car, they Torres got in a fight with Casper and Torres broke his hand.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006331).<br>Ex. 168 January 23, 2001, Alvaro Castro audio recorded interview transcript 41:15-42:11;<br>Ex.167 January 23, 2001, Alvaro Castro audio recorded interview. | Undisputed. |
| 118. | On January 23, 2001, **Detectives interviewed Hilario Sausedo** who stated that two days before Torres was arrested he came to Saucedo's house and offered | Disputed. The cited testimony is by Gates, and his account of what Sausedo told him is hearsay. The homicide book is |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | to sell him 45 caliber semi-automatic handgun.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006329); Ex. 151 Torres Trial Transcript Excerpt (LADA 001525 line 19 – 001526 line 5); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | also hearsay. Undisputed that Gates and Castillo wrote as much in the murder book. |
| 119. | On January 24, 2001, Detectives interviewed **Jose Cruz "Biggie."** He stated that on the day of incident Torres called him at approximately 10:00 hours and told him to come over and "kick it".<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006333); Ex. 166, January 24, 2001, Jose Cruz interview transcript 4:18-6:2; Ex. 165, January 24, 2001, Jose Cruz audio recorded interview. | Undisputed. |
| 120. | Cruz told Detectives that he remembered Torres working on his mother's car. Cruz stayed at Torres's residence until approximately 21:00 and he was certain that Torres did not leave the house until Cruz walked home at 21:00.<br><br>*Evidence:* | Disputed. Cruz acknowledged that he left around noon, consistent with Castro's testimony that he left around 12:30. Cruz then stayed at the house until around 9:00 or 10:00 pm. Dkt. 116-30, Defs.' Ex. 166 (Cruz recorded |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 6 Homicide Book (COLA 006333-006334). Ex. 166 January 24, 2001, Jose Cruz interview transcript 17:4-17:14; Ex. 165 January 24, 2001, Jose Cruz audio recorded interview. | interview) at 6:23-7:3; 17:2-14. |
| 121. | Cruz stated that he, Torres, and Alvaro Castro stayed at Torres's residence from 12:00-19:00 and never left the house. But Cruz recalled that Torres' mother and sister Martha Roca left around 7:00 o'clock for about 15 minutes to a half-hour to get food.

*Evidence:*
Ex. 6 Homicide Book (COLA 006333); Ex. 166 January 24, 2001, Jose Cruz interview transcript 14:1-15:19; Ex. 165 January 24, 2001, Jose Cruz audio recorded interview. | Disputed. Cruz stated that between 12:15 pm and seven o'clock, he, Moe, and Alex didn't leave that as far as he recalled. Undisputed that he stated that Torres's mother and one of his sisters left to get food but he was "pretty sure the stepfather stayed there." Dkt. 116-30, Defs.' Ex. 166 (Cruz recorded interview) at 14:1-15:19. |
| 122. | Cruz stated that Casper wrote his name and CVS on Torres's mother's car and because of that Casper and Torres got into the fight after which Torres injured his arm and had a cast on it.

*Evidence:*
Ex. 6 Homicide Book (COLA 006334); Ex. 166 January 24, 2001, Jose Cruz interview transcript 25:15-26:22; Ex. 165 January 22, 2001 Jose Cruz audio recorded interview. | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 123. | Cruz testified at the jury trial and provided the same statements in response to examinations but testified that Torres left house with him just once to go drop off a friend and it was at 8:15 at night, taking about 5-10 minutes.<br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript Excerpt – Jose "Biggie" Cruz Testimony (LADA 001621 line 21 – 001624 line 21); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Disputed that Cruz "provided the same statements," in that the assertion is vague and doesn't describe which of the "same statements" were provided. Otherwise, undisputed. |
| | **GUADALUPE CARNALES'S AND ENRIQUE VALDOVINOS'S STATEMENTS** | |
| 124. | On January 22, 2001, Detectives interviewed Guadalupe Carnales regarding the incident with the gun. Carnales stated that when he was getting to his house from his parked car, a small Oldsmobile, bluish gray, pulled up and the passenger got out, approached him and pointed a square gun at him.<br><br>*Evidence:*<br>Ex. 170 January 22, 2001, Guadalupe Carnales audio recorded interview transcript ("January 22, 2001, Carnales interview transcript") 10:8-11:7; | Disputed. The transcript and recording are ambiguous because Castillo appears to confirm that the man with the gun was the driver, not the passenger, of the car. Dkt. 116-32, Defs.' Ex. 170 (Carnales Jan. 22 Recording) at 10:23-11:3. Otherwise, undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 169 January 22, 2001, Guadalupe Canales audio recorded interview. | |
| 125. | Carnales stated that he did not know the person with the gun, but it was a skinny Hispanic guy, 17,18 years old. *Evidence:* Ex. 170 January 22, 2001, Carnales interview transcript 11:14-25, 12:14-13:3; Ex. 169 January 22, 2001, Guadalupe Carnales audio recorded interview. | Undisputed. |
| 126. | Carnales was shown a Mug Show Up Folder "B", photo lineup which had the booking photo of Torres as, but he did not identify the person who had approached and pointed the gun at him. *Evidence:* Ex. 6 Homicide Book (COLA 006327-6328, COLA 006344); Ex. 170 January 22, 2001, Carnales interview transcript 12:8-13:3; Ex. 169 January 22, 2001, Guadalupe Carnales audio recorded interview. | Undisputed. |
| 127. | Carnales stated that he spoke to Valdovinos about the incident and that Valdovinos told him that the guy with the gun was probably the one who killed Casper. *Evidence:* | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 170 January 22, 2001, Carnales interview transcript 13:13-14:5; Ex. 169 January 22, 2001, Guadalupe Carnales audio recorded interview. | |
| 128. | Carnales refused to attend a life lineup to identify the guy with the gun and stated that he did not want to have any involvement with the case.<br><br>*Evidence:*<br>Ex. 170 January 22, 2001, Carnales interview transcript 13:13-14:5;<br>Ex. 169 January 22, 2001, Guadalupe Carnales audio recorded interview. | Disputed. Carnales told Castillo and Gates that he could attend the lineup "tomorrow," but Castillo responded that it wasn't scheduled until the following week. Undisputed that Carnales also said that he did not want to be involved with the case. Dkt. 116-32, Defs.' Ex. 170 (Carnales Jan. 22 Recording) at 15:18-23. |
| 129. | On January 31, 2001, Valdovinos attended a court ordered lineup where he identified Torres in #5 position in the presence of the Public Defender Marie Johnson, who was representing Torres at the time.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006335);<br>Ex. 22 Castillo Notebook 2 (COLA 006023). | Undisputed. |
| 130. | On January 31, 2001, Detectives interviewed Valdovinos where they showed him a photo of Gray Celebrity car that were taken at Torres residence in | Disputed. Castillo first showed pictures of that vehicle to Valdovinos in an unrecorded identification procedure while |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
|  | driveway. Valdovinos identified the car as the same car he observed Torres get out and approach "Lupe" Carnales and point the gun at Lupe.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006335); Ex. 22 Castillo Notebook 2 (COLA (COLA 006023); Ex. 160 January 31, 2001, Valdovinos interview transcript 3:14-4:20; Ex. 159 January 31, 2001, Valdovinos audio recorded interview. | waiting for the Torres lineup. Dkt. 116-26, Defs.' Ex. 160 (Jan. 31, 2001 Valdovinos recording) at 2:2-22. Castillo and Gates then coached Valdovinos by telling him that he had previously told them that he saw a "silver, gray-colored Celebrity" pull up alongside Lupe; but in fact, Valdovinos had never said what color the Celebrity was. *Id.* at 3:14-23; Dkt. 116-25, Ex. 157 (Valdovinos Jan. 9, 2001 recording) (not mentioning color of the Celebrity). Undisputed that Valdovinos picked the car after such coaching, but dispute that his actions constituted an "identification." |
| 131. | Valdovinos told Detectives that he spoke with Carnales about Carnales being interviewed by Detectives. Carnales told Valdovinos that he told the investigators that he did not know the person who pointed a gun with him and that Carnales did not pick Torres from the Mug Show Up that detectives showed him.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006335); Ex. 160 January 31, 2001, Valdovinos interview transcript 9:8-21; Ex. 159 January 31, 2001, Valdovinos audio recorded interview. | Undisputed that Valdovinos said that Carnales said the following things, but dispute that such evidence is admissible; it is hearsay and there is nobody who can testify to the foundation of what Carnales said to Valdovinos. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 132. | Valdovinos told the Detectives that he was insulted by Carnales on January 26, 2001, who was still upset at Valdovinos for telling the detectives about the incident with the gun pointing at him. Valdovinos went and spoke to Carnales. Carnales told him that he was "chavala" ("a pussy" in gang slang). Carnales told Valdovinos that Alex was involved in the incident, that Alex was looking for him and that Valdovinos should not be talking to investigators.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006336-37);<br>Ex. 160 January 31, 2001, Valdovinos interview transcript 6:12 – 8:5;<br>Ex. 159 January 31, 2001, Valdovinos audio recorded interview. | Undisputed that Valdovinos said that Carnales said the following things, but dispute that such evidence is directly admissible; it is hearsay. |
| 133. | Carnales told Valdovinos that he did not want to be involved in the case because he did not want to have any problems at the house he resided.<br><br>*Evidence:*<br>Ex. 160 January 31, 2001, Valdovinos interview transcript 6:12 – 8:5;<br>Ex. 159 January 31, 2001, Valdovinos audio recorded interview. | Undisputed that Valdovinos said that Carnales said the following things, but dispute that such evidence is directly admissible; it is hearsay. |
| | **CARLOS ARECHIGA AND YOVANA DELGADO'S INTERVIEWS** | |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 134. | On January 1, Detectives interviewed Yovana Delgado. She stated that she was in front of her house with her husband Carlos Arechiga ("Fajardo"). She observed two males Hispanics on the bicycles. Behind them she saw 4 door, dark blue Chevrolet Caprice with tinted windows rolled down and Chrome wheels.<br><br>*Evidence:*<br>Ex. 6 Homicide Book (COLA 006303).<br>Ex. 155 January 1, 2001, Yovana Delgado audio recorded interview transcript ("January 1, 2001, Delgado interview transcript") 2:2-3:25, 4:17-24, 12:6-23;<br>Ex. 154 Yovana Delgado audio recorded interview;<br>Ex. Deposition of Yovana Delgado ("Ex. 181 Delgado Depo.) 25:16-26:11, 28:18-25, 30:6-15, 31:18-24, 32:16-19. | Undisputed. |
| 135. | Both male Hispanics in the vehicle had bald heads and were in their late 19's or early 20's.<br><br>*Evidence:*<br>Ex. 6 Homicide book (COLA 006303);<br>Ex. 155 January 1, 2001, Delgado interview transcript 4:1-8, 8:7-8:10;<br>Ex. 154 Yovana Delgado audio recorded interview. | Undisputed that Ms. Delgado said this to Castillo and Gates. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 136. | When vehicle drove past her she saw it stopped in the street, she heard sound of gunshots, then she saw male Hispanic ran back and enter the vehicle.<br><br>*Evidence:*<br>Ex. 6 Homicide book (COLA 006303);<br>Ex. 155 January 1, 2001, Delgado interview transcript 5:24-6:6, 6:25-7:15;<br>Ex. 154 Yovana Delgado audio recorded interview;<br>Ex. 181 Delgado Depo. 33:15-20. | Undisputed. |
| 137. | Delgado described the running male Hispanic as approximately 19 years old, "chubby", wearing a white shirt and black or blue jeans.<br><br>*Evidence:*<br>Ex. 6 Homicide book (COLA 006303);<br>Ex. 155 January 1, 2001, Delgado interview transcript 6:11-6:15, 8:12-8:20, 9:1-5, 11:17-11:20;<br>Ex. 154 Yovana Delgado audio recorded interview;<br>Ex. 181 Delgado Depo. 33:21-24. | Undisputed, but clarify that Delgado described the male Hispanic as wearing a "short-sleeved white shirt." Dkt. 116-25, Ex. 155 (Delgado Interview Recording) at 7:21-8:13. |
| 138. | On January 1, Detectives also interviewed Carlos Arechiga who stated that on the day of the murder he was sitting outside of his house, and he saw two males riding bicycles. Arechiga then saw 1990-1992 full size blue Chevrolet Caprice or Impala with tinted windows and chrome wheels driving slowly behind the two males on bicycles. | Disputed in part; Gates and Castillo either hid, destroyed, or lost the full recording of this interview, so there is only a partial record of what Arechiga told them. In the available recording, Arechiga does not say that it was a 1990-1992 model car or that it |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Ex. 6 Homicide Book (COLA 006302-6203); Ex. 51 Gates Notebook 1 (COLA 006114-6115). | was blue. Ex. 22 (No Side B recording); PAMF ¶¶ 248-49. |
| 139. | Arechiga stated that the car stopped, and the passenger exited. Then Arechiga heard gunshots and observed passenger running back to the vehicle.  *Evidence:* Ex. 6 Homicide Book (COLA 006303). | Undisputed. |
| 140. | Arechiga described the passenger as a male Hispanic, 20-25 years old, with a bald head.  *Evidence:* Ex. 6 Homicide Book (COLA 006303). | Undisputed, but note that the Murder Book omits other details describing the passenger, including that he was five feet tall, was "skinny, slim," and was wearing a white short-sleeved shirt. Ex. 23 (No Side B Tx.) at 12:7-25; 13:5-14. |
| 141. | On February 15, 2001, Detective Gates and Deputy Alfredo Castro met Arechiga and his wife Delgado in Rosarito Beach, Mexico.  *Evidence:* Ex. 6 Homicide Book (COLA 006337) Ex. 54 Gates Notebook 4 (COLA 007828); Ex. 181 Delgado Depo. 43:13-25, 45:3-10. | Disputed to the extent that this suggests that Castillo was not there; Castillo testified that he also drove to Mexico to speak with Arechiga and Delgado. Ex. 11 (Castillo Dep.) at 70:13-16. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | | |
| 142. | Detectives advised Delgado Mug Show Up procedures and showed Mug Show Up folder "B." Delgado did not identify any suspects. She testified that they were afraid of gangs because they knew it was a gang involved shooting.<br><br>*Evidence:*<br>Ex. 6 Homicide book (COLA 006337); Ex. 181 Delgado Depo. 47:4-11, 72:5-13; 77:18-78; 82:14-84:21, 87:15-88:12. | Undisputed that Ms. Delgado did not identify any suspects. Disputed that she was then afraid of gangs because it was a gang involved shooting. Ms. Delgado's testimony was that she "never thought maybe consequences after like – we were young. We were just talking what we saw, you know." In other words, fear of gangs **did not** influence her statements to Castillo or Gates. Ex. 20 (Delgado Dep.) at 88:9-12. |
| 143. | On February 15, 2001, Deputy Castro advised Arechiga on the Mug Show Up procedures in Spanish. Detective Gates showed Mug Show Up Folder "B" to Arechiga.<br><br>*Evidence:*<br>Ex. 6 Homicide book (COLA 006337); Ex. 151 Torres Trial Transcript –Alfredo Castro Testimony (LADA 001565 line 26 – 001566 line 6); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744 | Disputed. Delgado testified that when the detectives showed her photos, they did not tell her how to make an identification or give her any warning, they just showed her the photos. Ex. 20 (Delgado Dep.) at 48:5-18. Arechiga was not given any warning, either. Ex. 20 (Delgado Dep.) at 49:21-50:1. Castro testified that he never interpreted or helped detectives with their photo identifications. 186. Ex. 25 (Castro Dep.) at 9:3-18; 16:3-14; 18:6-25; 19:17-25. |
| 144. | Arechiga pointed to No. 2 in six pack and stated that "this look like him," then Arechiga circled the photo of Torres and | Disputed. According to his trial testimony, Arechiga was shown the photos, and "[t]wo |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | write his name and statement "he looks like No. 2". *Evidence:* Ex. 6 Homicide book (COLA 006337); Ex. 151 Torres Trial Transcript –Alfredo Castro Testimony (LADA 001567 line 12-22); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. Ex. 181 Delgado Depo. 50:11-18; 73:5-23, 74:2-24. | of them look[ed] familiar, but I had to pick one" and the detectives didn't ask him if the shooter was in the photographs, but only asked him to pick the person who "refreshed [his] memory." Dkt. 116-19, 116-20, Def. Ex. 161 (Trial Tx.) at 604:27-605:2; 606:3-7. |
| | **DEPUTY ALFREDO CASTRO** | |
| 145. | Deputy Alfredo Castro working as a was homicide investigator with the LASD Homicide Bureau. On February 15, 2001, Deputy Castro traveled with Detectives Gates to Rosarito Beach, Mexico to interview witnesses Carlos Arechiga and Yovanna Delgado. Deputy Castro served as a driver and interpreter. *Evidence:* Ex. 6 Homicide Book (COLA 006337). Ex. 151 Torres Trial Transcript –Alfredo Castro Testimony (LADA 001565 line 11-28); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Disputed to the extent that this suggests that Castillo was not there; Castillo testified that he also drove to Mexico to speak with Arechiga and Delgado. Ex. 11 (Castillo Dep.) at 70:13-16. |
| 146. | Deputy Castro testified at the trial that Carlos Arechiga was asked to view a six- | Undisputed, but note that Castro's testimony in this |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | pack photograph, prior to which he had read admonishment in Spanish.<br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript –Alfredo Castro Testimony (LADA 001565 line 26 – 001566 line 19); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | litigation indicates that his trial testimony was false. Ex. 25 (Castro Dep.) at 16:15-25; 23:21-24:15 (Castro never gave instructions for photo identifications when traveling to Mexico and never had any involvement with other detectives' photo identifications). |
| 147. | Deputy Castro testified that Arechiga pointed No. 2 in six pack and stated that "this look like him," then Arechiga circled the photo of Torres and write his name and statement "he looks like No. 2".<br><br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript –Alfredo Castro Testimony (LADA 001567 line 12-22); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Undisputed that he so testified at trial. |
| | **PRELIMINARY HEARING** | |
| 148. | Preliminary Hearing was held on February 27, 2001, in the Los Angeles Superior Court.<br><br>*Evidence:* | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 72 Preliminary Hearing Transcript (LADA 000706-000708, LADA 000817-000830); Request for Judicial Notice Ex. "72", Certified Docket in Case No. TA 058744. | |
| 149. | Before the Preliminary Hearing on February 27, 2001, at the Compton Courthouse, around 10:00 hours, Valdovinos stated that "Trix" or "Trips" was the driver of the Caprice the night "Casper" was killed.<br><br>*Evidence:*<br>Ex. 54 Gates Notebook 4 (COLA 007830);<br>Ex. 22 Castillo Notebook 2. | Undisputed. |
| 150. | Preliminary hearing began at 10:55 hours. DDA Escalante called Valdovinos as a witness. Defense attorney Donald E. Levinson cross-examined Valdovinos.<br><br>*Evidence:*<br>Ex. 72 Preliminary Hearing Transcript (LADA 000706-000708). | Undisputed. |
| 151. | Valdovinos identified Defendant Alexander Torres as the shooter of Martin Guitron in court.<br><br>*Evidence:*<br>Ex. 72 Preliminary Hearing Transcript (LADA 000711-000827). | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | | |
| 152. | Valdovinos testified about his observation from the time of the shooting of Guitron. He stated that Torres asked the victim three times, "You're Casper? You're Casper?." The fourth time Torres told the victim "You're Casper" and shoot at his friend five or six times. "You're Casper." *Evidence:* Ex. 72 Preliminary Hearing Transcript (LADA 000711-000715). | Undisputed that he so testified. |
| 153. | Valdovinos was cross-examined by defense attorney Levinson about the lies he told to police during his initial interviews. He accepted that he told police that he did not know who the shooter was until January 9, 2001, and that he intentionally did not tell the truth to police because he was scared to identify Torres. *Evidence:* Ex. 72 Preliminary Hearing Transcript (LADA 000711-000716, 000818-000822). | Undisputed. |
| 154. | Valdovinos testified that he knew who Torres was because he saw him a couple of times arguing with his friend Casper. Valdovinos testified that during the | Undisputed that he so testified. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | incident it was dark outside, but they were under streetlight, and he didn't have any trouble seeing Torres's face.<br><br>*Evidence:*<br>Ex. 72 Preliminary Hearing Transcript (LADA 000716, 000825). | |
| 155. | Valdovinos testified that he decided to tell the truth to police when he saw Torres in front of his house going towards hi friend "Lupe" (Carnales) with the gun. After seeing Torres approaching Lupe, Valdovinos moved out of the area and called Detectives.<br><br>*Evidence:*<br>Ex. 72 Preliminary Hearing Transcript (LADA 000822-000825). | Undisputed that he so testified. |
| 156. | Valdovinos testified that the Casper was a member of CVS gang and that the gang members tried to talk to him, but only person he spoke to was "Lupe." He admitted that a gang member with the moniker "Tweedy" suggested him to say that Torres as the shooter.<br><br>*Evidence:*<br>Ex. 72 Preliminary Hearing Transcript (LADA 000826-000827). | Undisputed. |
| | **FURTHER INVESTIGATIONS ON THE DRIVER OF THE CAR** | |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 157. | March 22, 2001, 1800 hours, Detectives interviewed Valdovinos and showed him picture of "Trix/Trips". Valdovinos identified position #1 in the six pack.<br><br>*Evidence:*<br>Ex. 22 Castillo Notebook 2 (COLA<br>Ex. 54 Gates Notebook 4 (COLA 007833-33). | Undisputed. |
| **ENRIQUE VALDOVINOS TRIAL TESTIMONY** | | |
| 158. | Enrique Valdovinos was called as an eyewitness to the Guitron murder and identified Torres as the shooter of Guitron. Valdovinos testified as to his observations on the night of the shooting. He testified about Caper's and Torres's gang membership and rivalry.<br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript – Enrique Valdovinos Testimony (LADA 001422 – 001433); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Undisputed that he so testified, but dispute that his testimony as to his observations was true. E.g., PAMF 197-206; 227-34 (explaining how Gates and Castillo manufactured Valdovinos's identification testimony). |
| 159. | Valdovinos testified that that Torres came out the passenger side of the car and towards victim asking, "are you Casper, are you Casper" and then he told victim "You are Casper" and started shoot him. | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Ex. 151 Torres Trial Transcript – Enrique Valdovinos Testimony (LADA 001427); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | |
| 160. | Valdovinos was impeached for not telling the truth. *Evidence:* Ex. 151 Torres Trial Transcript – Enrique Valdovinos Testimony (LADA 001427-001431); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Undisputed. |
| 161. | Valdovinos testified that he had seen Torres before he was with his friend Casper and Mr. Torres and one of his sisters drove out of the driveway, and Mr. Torres said, "Compton Varrio T Flats" and victim said, "Compton Varrio Segundo". *Evidence:* Ex. 151 Torres Trial Transcript – Enrique Valdovinos Testimony (LADA 001433-001434); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Undisputed. |
| 162. | During the cross-examination, defense attorney asked if Valdovinos knows "Oscar Gonzalez" to be the killer of Casper, but Valdovinos responded that | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | he did not know who "Oscar Gonzalez" is.<br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript – Enrique Valdovinos Testimony (LADA 001433-001434); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | |
| 163. | Valdovinos testified that the prosecutor and detectives did not refresh his memory before the trial. He admitted he was a CVS gang member before but did not attend their parties.<br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript – Enrique Valdovinos Testimony (LADA 001433-001440); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Undisputed, but clarify that Valdovinos acknowledged that he had gone over his testimony with the district attorney and also "with the Sheriff's deputy." Dkt. 116-17, Defs.' Ex. 151 (Trial Tx.) at 329:2-5. |
| 164. | In response to defense attorney's cross-examination, Valdovinos admitted that "Tweedy" told him to tell police that Torres killed Casper, but he denied that he knows that the killer was Oscar Gonzalez.<br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript – Enrique Valdovinos Testimony (LADA 001441-001442); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 165. | Valdovinos testified that he saw Torres days after the incident in front of his house with a gun threatening his friend, but he didn't see if there was a cast on Torres's right arm. Valdovinos admitted he did not remember the date Torres threatened his friend. He remembered calling police and then moved out of the house that night at 3:00 am in the morning because his family was pressuring him to leave the house for his safety. *Evidence:* Ex. 151 Torres Trial Transcript – Enrique Valdovinos Testimony (LADA 001447-001453, 001462-001466); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Undisputed that he so testified. |
| | **CARLOS ARECHIGA TRIAL TESTIMONY** | |
| 166. | On June 10, 2001, Detective Castro called Carlos Arechiga about the court appearance, but Arechiga was hesitant and stated that he did not want to go to court because the mother of the suspect went to his mother-in-law house and males were driving by house slowly. He was afraid. *Evidence:* | Disputed. Arechiga denied this during his trial testimony, and Delgado did not testify that Arechiga was afraid. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 22 Castillo Notebook 2 (COLA 006034); Ex. 181 Delgado Depo. 72:5-13; 77:18-78. | |
| 167. | On May 5, 2001, Carlos Echegaray Arechiga was arrested by Fullerton Police for burglary and false identity. On May 10, 2001, Detective Gates sent the police report via fax to trial prosecuting Deputy District Attorney Steve Gallon.<br><br>*Evidence:*<br>Ex. 61 Carlos Echegaray Arechiga Fullerton Police Arrest Report (LADA 000955-958). | Disputed in part; Gates sent some of the police report, but not a copy of Arechiga's false identification, to Gallon. Compare Ex. 29 (Arechiga Police Report and False ID from Detectives' Poor Boy) to Dkt. 116-12, Defs.' Ex. 61 (arrest report as faxed to Gallon). |
| 168. | Arechiga testified at the trial but did not identify Torres as the shooter.<br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript – Carlos Arechiga Testimony (LADA 001538 lines 4 – 001554 line 24); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744; Ex. 181 Delgado Depo. 81:11-15, 82:3-13, 89:16-91:2. | Undisputed. |
| 169. | Arechiga testified that on February 15, 2001, he met the detectives, and they asked him to look at some photographs, but he did not recognize nobody.<br><br>*Evidence:* | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | Ex. 151 Torres Trial Transcript – Carlos Arechiga Testimony (LADA 001538 line 4 – 001539 line 27); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | |
| 170. | Arechiga testified that he picked out one of the individuals in those photographs because two of them look familiar, but he had to pick one.<br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript – Carlos Arechiga Testimony (LADA 001543 lines 11- 25, 001547 line 5 – 001549 line 20); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Disputed in part; a reasonable jury could interpret Arechiga's testimony to mean that he told Gates and Castillo that two of the photographs looked familiar, but they instructed him to just pick one. |
| 171. | Arechiga further testified that he did not remember exactly if Torres killed the victim adding that he would say "No" he just picked Torres up because he looked like shooter.<br><br>*Evidence:*<br>Ex. 151 Torres Trial Transcript – Carlos Arechiga Testimony (LADA 001544 lines 14-25); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Disputed. According to the testimony, Arechiga testified that he didn't remember exactly what he "told the detective yesterday," but that he didn't recognize Torres as the shooter. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 172. | Arechiga testified that he told the detectives that he was afraid of testifying against "cholos." *Evidence:* Ex. 151 Torres Trial Transcript – Carlos Arechiga Testimony (LADA 001544 line 26 – 001545 line 13); Request for Judicial Notice Ex. "151", Certified Docket in Case No. TA 058744. | Disputed. According to Defendants' citation, Arechiga testified that he told detective he was afraid to testify because he "saw . . . several cholos there," not because he was afraid to testify **against** cholos. |
| | **FACTS AS TO *MONELL* CLAIM** | |
| 173. | From 2000 to 2001, the LASD had comprehensive policies and practices in place that addressed the issues of fabrication of evidence, disclosure of exculpatory evidence, interrogations, witness interviews, eyewitness identifications, report writing, investigations, polygraph examination, and investigations including homicide. *Evidence*: Ex. 186 Deposition of Person Most Qualified, Michael Rodrigues ("Rodriguez Depo.") 21:1-22:5, 35:20-37:16, 74:4-81:15, 82:18-85:10, 88:18-90:9, 98:10-99:17, 104:13-106:21, Ex. 96 Homicide Bureau Manual from Late 1990s and 2000s; Ex. 97 Homicide and Death Investigator's Course Excerpt from (COLA 008597); | Disputed. The LASD's policies fell short of generally accepted standards. To give just a few examples, there were **no** written standards for investigators to follow regarding what information should be included in police reports; the policies and practices of the LASD involved the widespread hiding of investigatory materials in undisclosed "Poor Boy" files without any written standards to govern their use; and failed to supervise homicide detectives whatsoever. Ex. 37 (Scott Report) at ¶¶ 2.13, 2.38, 3.28; *see* PAMF ¶¶ 377-419. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | The Manual of Policy and Procedure ("MPP) document is about 1,360 pages long, revised on 4/1/1996 was in place during relevant times (COLA-005897-COLA 5919). | |
| 174. | The LASD's policy and practice for detectives was to err on the caution and disclose of their entire file (with limited exception to confidential information that would compromise the safe of third parties and witnesses).<br><br>*Evidence:*<br>Ex. 186 Rodriguez Depo. 82:18-85:10, 88:18-90:9. | Disputed. Marina Escalante, who tried dozens of homicide cases and was a Los Angeles prosecutor for 35 years, **_never_** saw materials from detectives outside of the Murder Book, which omitted many documents from the Poor Boy / investigative file. *See* PAMF ¶¶ 353-54. |
| 175. | It is has been the practice of the LASD to require its detectives "fully and accurately" document their investigations and for detectives to disclose their entire files (with limited exceptions), this eliminated the possibility of detectives inadvertently making wrong choices about what materials needed to be disclosed pursuant to *Brady*.<br><br>*Evidence:*<br>Ex. 186 Rodriguez Depo. 74:4-81:15, 82:18-85:10, 88:18-90:9 | Disputed. The LASD's policies fell short of generally accepted standards. To give just a few examples, there were **_no_** written standards for investigators to follow regarding what information should be included in police reports; the policies and practices of the LASD involved the widespread hiding of investigatory materials in undisclosed "Poor Boy" files without any written standards to govern their use; and failed to supervise homicide detectives whatsoever. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | | Ex. 37 (Scott Report) at ¶¶ 2.13, 2.38, 3.28; *see* PAMF ¶¶ 388-419. |
| 176. | The LASD's practice was for its detectives to take detailed notes of all of their observations (regardless as to whether such observations may support or potentially weaken their case).<br><br>*Evidence:*<br>Ex. 186 Rodriguez Depo. 75:11-73:13. | Disputed. The LASD's policies fell short of generally accepted standards. To give just a few examples, there were **no** written standards for investigators to follow regarding what information should be included in police reports; the policies and practices of the LASD involved the widespread hiding of investigatory materials in undisclosed "Poor Boy" files without any written standards to govern their use; and failed to supervise homicide detectives whatsoever. Ex. 37 (Scott Report) at ¶¶ 2.13, 2.38, 3.28; *see* PAMF ¶¶ 388-419. |
| 177. | All deputies and investigators had to go through academy, multiple level of continuing training, on job training in regard to report writing, witness interviews, interrogations, conducting photo and live lineups, investigating different crimes, gang related offenses and scientific collection and examination of physical evidence, and disclosure of evidence that benefits the criminal defendant (exculpatory) 40-hour investigator's course. | Undisputed that Rodriguez testified that such topics were covered generally, but dispute in that he did not testify that the main topic of the 40-hour "basic investigator" course took exculpatory evidence as a main focus. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Ex. 186 Rodriguez Depo. 22:15-24:22, 26:29- 21:28, 35:-36:9, 90:14-93:18, 104:13-106:21, 116:11-19, 127:11-134:21, 136:19-138:13. | |
| 178. | In 2000 to 2001, the Homicide Investigators had to go to homicide school to be trained. The LASD's Advance Training Bureau would provide training to homicide detectives obtain advanced POST Certification.<br><br>*Evidence:* Ex. 186 Rodriguez Depo: 22:15-24:22, 26:29- 21:28, Ex. 97 Homicide and Death Investigator's Course (COLA 008597, COLA 8389-8402); Ex. 96 Homicide Bureau Manual from Late 1990s and 2000s (COLA 104243-144365; COLA-105018-105041); | Undisputed that Rodriguez testified that new homicide investigators received these training materials from 2000 to 2001, but disputed in that Rodriguez's testimony does not mention the "Advanced Training Bureau," nor does it describe obtaining "advanced POST Certification." |
| 179. | Any sworn member of the LASD seeking to become a homicide detective must have covered a course for exculpatory evidence disclosure (40 hours investigative course) , have prior experience and complete additional training on various topics such as witness identifications, accurate report writing, production of exculpatory evidence. | Disputed. Rodriguez testified that there was a "40-hour basic investigator course" but did not say that the 40-hour basic investigator course focused on exculpatory evidence, only that it "goes over" the topic. Rodriguez also testified that his testimony was about "deputy generalists," not "homicide detectives." His |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:* Ex. 186 Rodriguez Depo. 90:14-93:6, 94:2-18, | testimony did not address the requirements for becoming a homicide detective. |
| 180. | Homicide Investigators were in charge of operation and were given a great independence from managerial and supervisorial control. The most senior homicide investigator will supervise and mentor the newest member of the team.<br><br>*Evidence:* Ex. 186 Rodriguez Depo. 15:6-13, 61:8-63:4, Ex. 96. Homicide Bureau Manual from Late 1990s and 2000s (COLA 104243-144365); Ex. 97 Homicide and Death Investigator's Course (COLA 008597). | Undisputed that homicide detectives had "great independence from managerial and supervisorial control." Disputed that "[t]he most senior homicide investigator will supervise and mentor the newest member of the team"; Defendants' 124-page citation to the homicide bureau manual is not sufficiently specific to support that point, to that point and Rodriguez's cited testimony says nothing about that. |
| 181. | Homicide Detectives were supervised by Lieutenants, who would oversee the team and provide resources. The investigator's autonomy would not be intervened by the lieutenant.<br><br>*Evidence:* Ex. 186 Rodriguez Depo. 15:6-13, 61:8-63:4, 63:10-65:11, 66:15-67:15, 87:15-88:17, | Undisputed that Lieutenants did not "intervene" in investigators' "autonomy and were, at least according to the chain of command, "supervised" by Lieutenants. |
| 182. | Diviak has a "Viking" tattoo that he got during his employment with the LASD.<br><br>*Evidence:* Ex. 182 Diviak Depo. Vol. 2, 4:17-5:22. | Undisputed. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| 183. | Diviak's tattoo nor association with the subgroup was not a misconduct nor it caused him to violate other people's civil right. He has not been investigated for nor engaged any misconduct that was caused by his "Viking" tattoo or association with a deputy subgroup<br><br>*Evidence:*<br>Ex. 182 Diviak Depo. Vol. 2, 10:13-12:15. | Disputed. Diviak's membership in a racist, neo-Nazi law enforcement gang contributed to the violation of Torres's rights. PAMF ¶¶ 420-67. |
| 184. | Larry Lincoln has a faded "caveman" tattoo that he received during his employment with the LASD. Lincoln has not been investigated for nor engaged any misconduct that was caused by his "caveman" tattoo or association with a deputy subgroup.<br><br>*Evidence:*<br>Ex. 185 Lincoln Depo. Vol. 2, 4:23-5:16, 8:20-9:4, 10:5-22, | Undisputed that he has the tattoo and that the LASD never investigated it (or any other deputy gang/subgroup activity) |
| 185. | The LASD had policies and procedures in place to investigate and discipline personnel misconduct, violations of the rights of others and violations of law regardless of the personnel's membership in a deputy subgroup or having a tattoo. If the LASD deputies were engaged in a criminal gang-like behavior violating rights of others they would be subject to a discipline ranging from termination to prosecution. | Undisputed that LASD never investigated deputy gangs/subgroups during this time period. Disputed that LASD deputies would be disciplined for engaging in criminal gang-like behavior; most deputies involved in that behavior never were, because LASD never investigated such behavior. PAMF ¶¶ 420-67. |

| NO. | DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|---|
| | *Evidence:*<br>Ex. 183 Deposition of Person Most Qualified, Neal Tyler ("Tyler Depo.") 62:10-64:16; 76:1-78:2. | |

Dated: June 17, 2024

Respectfully submitted,

**ALEXANDER TORRES**

By: /s/ Wallace Hilke_____

*One of Plaintiff's attorneys*

**David Owens** (SBN 275030)
**Elizabeth Wang\***, IL Bar: 6287634, CO Bar 45976
**Steven Art\***, IL Bar: 6302319
**Wallace Hilke\***, IL Bar: 6329814
hilke@loevy.com
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902
*Admitted pro hac vice

**Jan Stiglitz** (SBN 103815)
js@cwsl.edu

**Michael D. Seplow** (SBN 150183)
**Paul Hoffman** (SBN 71244)
mseplow@sshhzlaw.com
hoffpaul@aol.com
Schonbrun Seplow Harris
Hoffman & Zeldes LLP
9415 Culver Boulevard, #115
Culver City, CA 90232
Phone: (310) 396-0731

*Counsel for Plaintiff*

Law Office of Jan Stiglitz
14462 Garden Tr.
San Diego, CA 92127
Phone: (619) 807-5890